# EXHIBIT A

# Exhibit 1

RECEIVED

JAN **1 4** 2026

Legal  Department

"FLStatue69.081Complaint…pdf"

115 pages of opening arguments, medical records
and, patents/patent-related communications

### IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT

### IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case #: __CA25-1784__

Judge: __Judge Kenneth J. Janesk, II__

**Mr. Brandon Ward**

Plaintiff

**Complaint:**

**Product Liability**

**V.s**

**Johnson and Johnson**
Defendant

### 1. Claim

In 2022, Johnson and Johnson obstructed justice on an underlying Product Liability claim for Invega® which caused my emergency surgery that occurred in April 2019 – I am mentally incapacitated as a disabled veteran for purposes of **2024 Florida Statute 95.051(d)**. Indicating a 7 year statue of limitations tolling for disabled people leaving my Product Liability claim available for trial until April 2026. Johnson and Johnson herein referred to as J&J, committed an unprofessional legal coercion and concealment of a known hazardous product directly prohibited in **The Sunshine in Litigation Act or 2024 Florida Statue 69.081, SEC Rule 21F-17(a) and, American Bar Associations Model Rules of Professional Conduct 3.4(f), 5.6(b) and, 8.4(c-e)** via a Confidentiality Agreement solicited by Company Lawyer: Mr. John D. Winter esq. Mr. Winter is a partner in Patterson Belknap's Products Liability group who represents California jurisdiction for this claim while sending settlement documents to Tennessee before scope of liability was known and while I was under duress albeit the fact the Product Liability Surgery occurred in Ohio. It is for that reason I beg The State of Florida take jurisdiction and open this multi-million dollar Invega Sustena® Product Liability claim.

**This Complaint is Requesting Trial for Product Liability in the sum of $37 million dollars.**

**Defendant Lawyer for Confidentiality Agreement:** Mr. John D. Winter *

**1133 Avenue of the Americas. jwinter@pbwt.com * New York, New York**

**10036. (212) 336-2000**

Date Served: __1|14|2ιρ__

Company Served: _____

_____  JJ

(1)

Addl Rsp - JSL2022000144

Personal Service        MC

## 2. <u>Claim details</u>

I, Mr. Brandon Ward, am a 100% Permanent & Total Service-Connected U.S Army Gulf War Era, Marksmanship Badge Award-Winning Disabled American Veteran and Sexual Trauma Survivor who suffered a Laparoscopic Cholecystectomy in April 2019 when J&J product Invega® caused excruciating brown gallstones or not stereotypical gallstones but, ones containing conjugate elevations of bilirubin[2]. In comparative contrast to previous J&J legal claims against Mr Andrew Yount or Mr. Austin Pledger with Risperdal®, Gynecomastia and, Prolactin. I after serious research/investigation into Invega® raising monocyte, blood bilirubin and, other levels found it being directly tied to gallstones. The Government and Company explicitly acknowledged Invega being directly linked to Gallstones in the 2003 Risperdal FDA patent for MTabs and injection active metabolite 'Paliperdone' during which Russell Katz M.D and J&J Dr. Edward Brann state twice the risk of gallstones on patent page 20 and 21. I tried to warn CEO(s): Mr. Alex Gorsky, Mr. Joaquin Duato and, J&J Board of

Directors through various Social Media namely Venmo, LinkedIn & Gmail that Invega® was dangerous and that they had excluded gallstones on more recent, more potent patents. The company has a grim past that demonstrated being worth existence in the public domain many times. I beg you, Honorable Judge stand with me against Invega® and force J&J to bear notice in there annual reports once again to profound litigation. J&J has caused numerous deaths of sensitive populations, paying millions of dollars to product liability victims some suffering from diabetes, gynecomastia/the resulting surgery or, those like me who need emergency surgery for non-cosmetic reasons. J&J even after D.O.J sanctions worth billions devise more potent, longer-lasting versions of Invega® thusly raising the overall number of adverse events for Invega®

J&J lawyer Mr. John Winter in preparing, advising for and, paying for my 2022 Confidentiality Settlement Agreement obstructed justice and broke. **'American Bar Associations Model Rule of Professional Conduct Rule 8.4( e)** by implying an ability to influence improperly a government agency

*" 5.2 RELEASOR understands that upon execution of this Agreement, RELEASOR is forever barred from filing or causing to be filed any claim or litigation or proceeding in and before any agency, tribunal or court relating to any claim RELEASOR may have ever had or could have in the future against RELEASEES in any way arising out of or related to Claimant's Claims "*

'Confidentiality Settlement Agreement section 5.2' by J&J Lawyer Mr. Winter **also violates SEC Rule 21F-17(a)** which provides that "[n]o person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing or threatening to enforce a confidentiality agreement...with respect to such communications."

(2)

### 3. Claim Details Continued

J&J Defense Lawyer Mr.John Winter **broke the American Bar Associations Model Rules of Professional Conduct Rule 8.4( d)** by engaging in conduct that is prejudicial to the administration of justice. Not being able to converse with other attorneys or there Claimants as laid out in Section 4.1 of the Confidentiality Agreement also restricts a lawyers right to practice which **violates the American Bar Associations Model Rules of Professional Conduct Rule 5.6(b)** A lawyer shall not participate in offering or making an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.

*"4.1....RELEASOR agrees that he will not make any statement, either directly or indirectly, by implication or innuendo, to anyone, including but not limited to the press or media or to other attorneys or Claimants or potential Claimants concerning the Agreement Terms or describing or characterizing the Agreement Terms in any way other than to say that the matter has been resolved"*

Furthermore J&J Lawyer John Winter **breaks 'American Bar Associations Model Rules of Professional Conduct Rule 8.4( c)** by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;' when he advises further Confidentiality Agreement Terms such as:

*"6.4....The RELEASOR further expressly agrees and covenants to release, discharge, forever indemnify, defend, and hold harmless RELEASEES and their attorneys from any liens and/or claims which may arise or may have heretofore arisen in favor of Medicare, Medicaid, any other government program or any other governmental entity, federal, state or local, by operation of law or equity, for medical expenses, disability benefits, or any other charge or expense, directly or indirectly relating to the alleged injuries caused by RELEASOR'S use of Risperdal® and/or Invega®. The indemnification set forth in this section specifically includes, but is not limited to, the payment of all reasonable costs and expenses of investigation, defense, settlement, attorney fees, judgments, court costs, and all other costs and expenses of defending such claims."*

All 3 sections of Mr. John D. Winters 2022 Confidentiality Agreement: 4.1, 5.2 and, 6.4 **break American Bar Associations Model Rules of Professional Conduct Rule 3.4(f)** which states a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party

### 3. Personal Evidence of Injury and Obstruction

1. 2022 Confidentiality Settlement Agreement
2. 2022 Emails with John D. Winter ESQ.
3. 2019 Toledo Flower Hospital-State Hospital Inpatient Document
4. 2019 Harbor Behavioral Health in Toledo Ohio Invega Injection Records
5. 2019 Laparoscopic Cholecystectomy & Pathophysiological Findings
6. Early 2000's-2019 Company Prior Record Court Documents
   6a. 2003 risperdal FDA Patent states risperdal causes cholesestatis

(3)

### 4. Scientific Evidence For Claim

1) National Library of Medicine, PubMed study titled **New Pathophysiological Concepts Underlying Pathogenesis of Pigment Gallstones** [1], "Pigment gallstones, which are much less frequent than cholesterol stones, are classified descriptively as 'black' or 'brown'. They are composed mostly of calcium hydrogen bilirubinate, Ca(HUCB)2."

2) National Library of Medicine, PubMed Study, **Pathogenesis of Gallstones** [2]. "Gallstones are composed principally of cholesterol monohydrate crystals (cholesterol stones) or the acid salt of calcium bilirubinate (pigment stones). Cholesterol stones and the black variety of pigment gallstones form in sterile gallbladder bile whereas brown pigment gallstones form in infected bile. **Biliary supersaturation is the principal pathophysiological defect and is hepatic in origin. Supersaturation results from excessive secretion of cholesterol or bilirubin conjugates**, the precursors of unconjugated bilirubin, and/or, deficient secretion of bile salt and lecithin, the solubilizers of these otherwise insoluble lipids" This Study further states, "Chemical compositions of brown and black pigment stones are different: In black stones, calcium bilirubinate is polymerized and oxidatively degraded **but in brown stones, calcium bilirubinate is present as the unpolymerised salt."**

3) The National Library of Medicine further states in a study Titled **LiverTox: Clinical and Research Information on Drug-Induced Liver Injury,** [3] "Risperidone is an atypical antipsychotic that is used widely in the treatment of mania and schizophrenia. Risperidone therapy is associated with serum aminotransferase elevations and in rare instances has been linked to clinically apparent acute liver injury." The Study further states, **"Liver test abnormalities may occur in up to 30% of patients on long term therapy with risperidone..The pattern of serum enzyme elevations is typically cholestatic,** but cases with hepatocellular and mixed patterns have also been described"

4) According to sciencedirect.com, Medical Faculty and Medical Scholars associated with European Psychiatry Volume 26, Supplement 1 conducted a study Titled **P01279 – Liver function tests and one year Risperidone treatment in children and adolescents** "Asymptomatic liver function test abnormalities mostly ALP elevation was found **in subjects treated with risperidone. The mean levels of liver enzymes and billuribin of the patients were significantly higher after one year of treatment than the baseline.** Also the mean levels of liver enzymes and billuribin of the patients were significantly higher after one year of treatment than the six months. **There was significant association between changes in weight, risperidone dose and liver enzymes and billuribin levels.**

(4)

5) According to Conversion guidance written on National Library of Medicine Government website in study, "**Maintenance dose conversion between oral risperidone and paliperidone palmitate 1 month: Practical guidance based on pharmacokinetic simulations**" from J&J Dr. Russu," **Patients taking risperidone are therefore exposed as well to paliperidone** following in vivo conversion and **the clinical effects of oral risperidone result from the combined concentrations of risperidone and paliperidone (ie activemoiety).**5 [According to 21 CFR § 314.3 an Active moiety is the molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt.]

6) In a study published on the government website The National Library of Medicine in a study by Kentaro Kawabe, MD. Department of Neuropsychiatry, Graduate School of Medicine, Ehime University titled "**A Case of Acute Pancreatitis Associated with Risperidone Treatment**" the team stated, "**Gallstones were present, which were due to an adverse effect of risperidone** because the two separate risperidone administrations elevated serum amylase and lipase independently."

7) C.. Michael Gibson M.S., M.D., Professor of Medicine, Harvard Medical School Founder and Chairman of the Board, WikiDoc Foundation (a 509 (a)(1) Charitable Organization); Chief Executive Officer, Baim Institute for Clinical Research says in his website wikidoc.org, "During its premarketing assessment, multiple doses of Risperdal® were administered to 2607 adult patients with schizophrenia and 1923 pediatric patients in Phase 2 and 3 studies...In the listings that follow, spontaneously reported adverse events were classified using World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 adult or 1923 pediatric patients exposed to multiple doses of Risperdal® who experienced an event of the type cited on at least one occasion while receiving Risperdal®.. (which then lists under) a.
   **Gastrointestinal** (symptoms) b.
   **Cholelithiasis** (gallstones)

8) Dr.Aseel Al-Ibrahim stated in Psychiatry Research Case Reports Volume 3, Issue 1, June 2024 **A case of recurrent acute pancreatitis due to paliperidone palmitate long-acting injectables (LAI),** "Our patient experienced recurrent **acute pancreatitis five days after her paliperidone injection dates, pointing to a consistent latency**. All other possible causes were eliminated, rendering paliperidone a class IA drug based on the level of evidence (Badalov et al., 2007).)

(5)

9) M-X Yan, Y-Q Li, Department of Gastroenterology, Shandong University Qilu Hospital, Shandong Province, China study on The Labeled, "**Gall stones and chronic pancreatitis: the black box in between**": "77% of gallstone patients, while 47% of non-gallstone patients were found to have chronic pancreatitis according to the Cambridge classification" "Secondly, a connection between gall stones and chronic inflammation of the pancreas might exist. **Numerous studies or investigations have shown that changes associated with chronic pancreatitis are common in gallstone patients.**"

10) Matthew Silva, Pharm.D., R.Ph., B.C.P.S., a professor of pharmacy practice at MCPHS University in Worcester, Mass., and colleagues published: '**Antipsychotics May Contribute to Cases of Acute Pancreatitis**' stating, "they reviewed case reports of antipsychotic pancreatitis published from 1990 to 2015 and classified these cases into groups according to the weight of published evidence for each agent" "**Risperidone, which was previously categorized as a Class IV, was moved to Class II.**" "Class II drugs are those with at least four reports in the literature and consistent latency (time between drug initiation and illness)"

**Sources Cited Page**:

*1: Vítek L, Carey MC. New pathophysiological concepts underlying pathogenesis of pigment gallstones. Clin Res Hepatol Gastroenterol. 2012 Apr;36(2):122-9. Doi: 10.1016/j.clinre.2011.08.010. Epub 2011 Oct 5. PMID: 21978438; PMCID: PMC3311771

https://pmc.ncbi.nlm.nih.gov/articles/PMC3311771/

*2: Carey MC. Pathogenesis of gallstones. Recenti Prog Med. 1992 JulAug;83(78):379-91. PMID: 1529152. https://pubmed.ncbi.nlm.nih.gov/1529152/

*3: Clinical and Research Information on Drug-Induced Liver Injury [Internet]. Bethesda (MD): National Institute of Diabetes and Digestive and Kidney Diseases; 2012-. Risperidone. [Updated 2023 Jun 5]. Available from: https://www.ncbi.nlm.nih.gov/books/NBK548906/

*4: A. Erdogan, N. Yurteri, A.E. Tufan, H. Ankarali, E. Demirci,P01-279 – Liver function tests and one year risperidone treatment in children and adolescents,European Psychiatry,Volume 26, Supplement 1,2011, Page 280, ISSN 0924-9338,

(https://www.sciencedirect.com/science/article/pii/S0924933811719903)

*5: Alberto Russu, PhD, Global Clinical Pharmacology, Quantitative Sciences, Janssen Research & Development, a Division of Janssen Pharmaceutica NV, Beerse, Belgium.

**Sources Cited Page Cont.**

Maintenance dose conversion between oral risperidone and paliperidone palmitate 1 month: Practical guidance based on pharmacokinetic simulations 2018 Apr 30

https://pmc.ncbi.nlm.nih.gov/articles/PMC6175146/#:~:text=Oral%20risperidone%20doses%20of%201,from%20oral%20risperidone%20to%20PP1M

*6: Kentaro Kawabe, MD. Department of Neuropsychiatry, Graduate School of  Medicine, Ehime University A Case of Acute Pancreatitis Associated with Risperidone Treatment
https://pmc.ncbi.nlm.nih.gov/articles/PMC4022769/#:~:text=Gallstones%20were%20present%2C%20which%20were,serum%20amylase%20and%20lipase%20independently.

*7: Michael Gibson M.S., M.D., Professor of Medicine, Harvard Medical School Founder and Chairman of the Board, WikiDoc Foundation (a 509 (a)(1) Charitable Organization.
https://www.wikidoc.org/index.php/Risperidone_side_effects#Premarketing_evaluation

*8) Dr.Aseel Al-Ibrahim from Kuwait Centre for Mental Health in Psychiatry Research Case Reports Volume 3, Issue 1, June 2024 Titled A case of recurrent acute pancreatitis due to paliperidone palmitate long-acting injectables (LAI)
https://www.sciencedirect.com/science/article/pii/S2773021223001013

*9) M-X Yan, Y-Q Li, Department of Gastroenterology, Shandong University Qilu Hospital, Shandong Province, China study on The Labeled, "Gall stones and chronic pancreatitis: the black box in between": Postgrad Med J. 2006 Apr;82(966):254–258.  https://pmc.ncbi.nlm.nih.gov/articles/PMC2579631/

*10) Matthew Silva, Pharm.D., R.Ph., B.C.P.S., a professor of pharmacy practice at MCPHS University in Worcester, Mass. Published Online: Antipsychotics May Contribute to Cases of Acute Pancreatitis on 18 March 2016

https://psychiatryonline.org/doi/full/10.1176/appi.pn.2016.PP3b1#:~:text=D.%2C%20and%20colleagues%20say%20long,and%20combination%20therapy%20is%20necessary.%E2%80%9D

(7)

Signature For Plaintiff:  _____ 12/22/2025  10:45am _____

Signature For Court Clerk:  _____

Signature For Defendant:  _____

**Brandon Ward**

**Product Liability Addendum**

**"Cholelithiasis via inhibition of monocytes from Risperdal: The Meta-analysis "**

1) According to Dr. Xingwu Liu in an article written in The National Library of Medicine article, **"Association between monocyte-to-high-density lipoprotein-cholesterol ratio and gallstones in U.S. adults: findings from the National Health and Nutrition Examination Survey 2017–2020"** Studies have indicated that monocyteto-high-density lipoprotein cholesterol ratio (MHR) can be a reliable indicator of various diseases." "Gallstone prevalence positively associated with elevated MHR, indicating that MHR can be employed as a clinical indicator to assess gallstone prevalence." "Inflammatory cytokines can alter the absorptive and secretory functions of human gallbladder epithelial cells, leading to gallstone formation."

   https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/

   https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/#:~:text=High%2Ddensity%20lipoprotein%20cholesterol%20(HDL,between%20MHR%20levels%20and%20gallstones

2) According Dr. Ibrahim Hawwari at the European Research Council In 2024, with others, wrote an essay called, **"Platelet transcription factors license the pro-inflammatory cytokine response of human monocytes:** "Monocytes secrete highly inflammatory cytokines that are critical for a proper immune response but can also lead to excessive inflammation when dysregulated" "While aberrant monocyte activity triggers hyperinflammation and cytokine storms"

   https://www.embopress.org/doi/full/10.1038/s44321-024-00093-3

3) According to Rajiv P. Sharma, Professor from The Psychiatric Institute, University of Illinois in a study titled, **"Treatment with the antipsychotic risperidone is associated with increased M1-like JAK-STAT1 signature gene expression in PBMCs from participants with psychosis and in THP-1 monocytes and macrophages."** Collectively these data indicate that risperidone may contribute to increases in expression of JAK-STAT1 signature genes in participants with a longer illness duration and may skew myeloid cells to a more proinflammatory phenotype. Risperidone consistently increased expression of the "M1" (JAK-STAT1) genes CXCL10, IRF1 and STAT1 across different cellular differentiation states, including both monocytes and monocyte-derived macrophages, Alterations to immune parameters in psychosis are not static, rather they appear to fluctuate in relation illnessrelated variables. This is perhaps not surprising given the plasticity of the immune

   (1)

system, And particularly cells of the myeloid lineage, to previous and current signals present in the tissue milieu,

including pharmacological agents such as antipsychotic drugs.

https://pmc.ncbi.nlm.nih.gov/articles/PMC8792805/#:~:text=*%20Risperidone%20treated%20subjects%20with%20chronic%20psychosis,Risperidone%20decreases%20%E2%80%9CM2%E2%80%9D%20gene%20expression%20in%20macrophages.

4) Dr. Edward A. Fisher wrote, **"Inflammation—a Critical Appreciation of the Role of Myeloid Cells"** in American Society for Microbiology on journals.asm.org In the widely used mouse zymosan peritonitis model, resident F4/80hi macrophages leave the serosal cavity to local lymph nodes within 60 min of inflammagen injection and neutrophil recruitment peaks at 4 h. PMN recruitment is followed by a wave of inflammatory Ly6Chi monocytes, which peaks in between 16 and 24 h. In this model, neutrophil and monocyte numbers in the cavity return to baseline within 96 h, but these timings and the absolute number of myeloid cells depend on the dose and nature of the inflammagen. A recent paper from the group of Derek Gilroy (35) extended analysis of the classic zymosan peritonitis model out past this 96-h window and showed that a true return to tissue homeostasis following clearance of zymosan particles took more than 3 weeks. After disappearance of PMNs from the peritoneum, Newson et al. (35) observed changes in monocyte-derived macrophage subsets and a significant increase in the number of B and T lymphocytes in the peritoneum. The recruitment and retention of this collection of lymphoid and myeloid cells long after the disappearance of the inciting sterile stimulus is intriguing. Myeloid cells (macrophages, monocytes, dendritic cells, and granulocytes) survey the body for signs of infection and tissue damage and regulate tissue homeostasis, organogenesis, and immunity. They express receptors that initiate the inflammatory response, send signals that alter the vascular and cytokine milieu, and oversee the recruitment, differentiation, and activation of other myeloid and adaptive immune cells. Their activation must therefore be tightly regulated, optimized for maximal innate immune protection with a minimum of collateral tissue damage or disorganization

https://pmc.ncbi.nlm.nih.gov/articles/PMC8648988/

(2)

Sources Cited:

1. Dr. Xingwu Liu National Library of Medicine article, "**Association between monocyteto-high-density lipoprotein-cholesterol ratio and gallstones in U.S. adults: findings from the National Health and Nutrition Examination Survey 2017–2020**" **https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/**

2. Dr. Ibrahim Hawwari wrote an essay," **Platelet transcription factors license the proinflammatory cytokine response of human monocytes:**" https://www.embopress.org/doi/full/10.1038/s44321-024-00093-3

3. Rajiv P. Sharma, Professor from The Psychiatric Institute, University of Illinois in a study titled, **"Treatment with the antipsychotic risperidone is associated with increased M1-like JAK-STAT1 signature gene expression in PBMCs from participants with psychosis and in THP-1 monocytes and macrophages."**

   https://pmc.ncbi.nlm.nih.gov/articles/PMC8792805/#:~:text=*%20Risperidone%20treated%20subjects%20with%20chronic%20psychosis,Risperidone%20decreases%20%E2%80%9CM2%E2%80%9D%20gene%20expression%20in%20macrophages

4. Dr. Edward A. Fisher wrote **Inflammation—a Critical Appreciation of the Role of Myeloid Cells** https://pmc.ncbi.nlm.nih.gov/articles/PMC8648988/

(3)

Plaintiff Signature ~~Randall W~~ 12/22/2025 10:45am _____

Defendant Signature _____

Court Clerk Signature _____

***CONFIDENTIAL***

### CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE



**2.    Recitals**



CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

*CONFIDENTIAL*



**3.**     **Consideration**



**4.**     **Confidentiality of Agreement**



***CONFIDENTIAL***



**5.**   **Complete, Final, and Full Release of All Claims**



*CONFIDENTIAL*



6.    **Indemnity, Responsibility for Reimbursement to Providers and Satisfaction of Liens**



***CONFIDENTIAL***



*CONFIDENTIAL*



7.    **Miscellaneous**



*__CONFIDENTIAL__*



Dated: _____        _____,

                            RELEASOR

Approved as to Form and Content:

Dated: _____        PATTERSON BELKNAP WEBB & TYLER LLP

                            By: _____

                               John D. Winter, Esq.

                            Attorney for Defendants
                            JANSSEN PHARMACEUTICALS, INC., JOHNSON
                            & JOHNSON, JANSSEN RESEARCH AND
                            DEVELOPMENT, LLC AND MCKESSON
                            CORPORATION

*CONFIDENTIAL*

STATE OF _____     )
                                )
COUNTY OF _____     )


On this _____ day of _____, 2022, before me, a duly commissioned and sworn Notary Public in and for the State and County, did appear _____ and before me signed the within instrument.  I know that said signer of the within instrument is the person whose name is subscribed.

IN WITNESS THEREOF, I have hereunto signed my name and affixed my official seal in the above-named County on this date.


Signed, sealed and delivered before me this ___ day of _____, 2022.


_____
NOTARY PUBLIC

The Following Are Medical Records That Read From Last To First Page

Ward, Brandon

DOB: ███████    Sex: M

Ward, Brandon                    DOB:              Sex: M







Printed on: 11/04/2021











## RESOURCES

- **<u>SEC Order</u>**

"Whether it's in your employment contracts, settlement agreements or elsewhere, you simply cannot include provisions that prevent individuals from contacting the SEC with evidence of wrongdoing," said Gurbir S. Grewal, Director of the SEC's Division of Enforcement. "But that's exactly what we allege J.P. Morgan did here. For several years, it forced certain clients into the untenable position of choosing between receiving settlements or credits from the firm and reporting potential securities law violations to the SEC. This either-or proposition not only undermined critical investor protections and placed investors at risk, but was also illegal."

"Investors, whether retail or otherwise, must be free to report complaints to the SEC without any interference," said Corey Schuster, Co-Chief of the Enforcement Division's Asset Management Unit. "Those drafting or using confidentiality agreements need to ensure that they do not include provisions that impede potential whistleblowers."

The SEC's order finds that JPMS violated Rule 21F-17(a) under the Securities Exchange Act of 1934, a whistleblower protection rule that prohibits taking any action to impede an individual from communicating directly with the SEC staff about possible securities law violations. Without admitting or denying the SEC's findings, JPMS agreed to be censured, to cease and desist from violating the whistleblower protection rule, and to pay the $18 million civil penalty.

The SEC's investigation was conducted by Marie DeBonis and Jessica Neiterman, with assistance from John Farinacci, and supervised by Virginia Rosado Desilets, Brianna Ripa, Mr. Schuster, and Andrew Dean, all of the SEC's Asset Management Unit. Rua Kelly of the Trial Unit also assisted in the investigation.

The SEC strongly encourages the public to submit any tips, complaints, and referrals via https://www.sec.gov/tcr (https://www.sec.gov/tcr).

###

Last Reviewed or Updated: Jan. 16, 2024



**U.S. Securities and Exchange Commission**

Home / Newsroom / Press Releases / J.P. Morgan to Pay $18 Million for Violating Whistleblower Protection Rule

PRESS RELEASE

# J.P. Morgan to Pay $18 Million for Violating Whistleblower Protection Rule

## Firm's confidential agreements impeded clients from communicating with the SEC

**FOR IMMEDIATE RELEASE** | 2024-7

Washington D.C., Jan. 16, 2024 — The Securities and Exchange Commission today announced settled charges against J.P. Morgan Securities LLC (JPMS) for impeding hundreds of advisory clients and brokerage customers from reporting potential securities law violations to the SEC. JPMS agreed to pay an $18 million civil penalty to settle the charges.

According to the SEC's order, from March 2020 through July 2023, JPMS regularly asked retail clients to sign confidential release agreements if they had been issued a credit or settlement from the firm of more than $1,000. The agreements required the clients to keep confidential the settlement, all underlying facts relating to the settlement, and all information relating to the account at issue. In addition, even though the agreements permitted clients to respond to SEC inquiries, they did not permit clients to voluntarily contact the SEC.

Clinical Review
G. Mannheim, MD
NDA22-264, S015
INVEGA® SUSTENNA® (paliperidone palmitate) Extended-Release Injectable Suspension

# 1 Recommendations/Risk Benefit Assessment

## 1.1 Recommendation on Regulatory Action

The data examined and discussed at FDA's Regulatory Briefing suggests that the current data is inconclusive at present to recommend approval. Despite, paliperidone palmitate suggesting superiority to treatment with oral antipsychotics in delaying time to first treatment failure in subjects with schizophrenia who had been incarcerated (primary endpoint), the presence of 31.3 % of the patients discontinuing early and being lost to follow-up, make such an interpretation unproven. In addition, there was a larger percent of patients who discontinued in the paliperidone palmitate group, and they were not completed followed up. No trend in favor of the paliperidone palmitate arm was demonstrated in terms of PSP total score and in CGI-S at month 15.

Implicitly, one would assume that giving injectable antipsychotics to non-compliant patients would be of more benefit than if they were asked to take oral antipsychotics. However, the present study does not clearly demonstrate this.

An additional study is recommended.

## 1.2 Risk Benefit Assessment

No clear benefit could be established in delaying time to first treatment failure in subjects with schizophrenia who had been incarcerated (primary endpoint). Risks associated with paliperidone and other second-generation antipsychotics include weight gain, dyslipidemias, glycemic abnormalities, hyperprolactinemia, movement disorders and cardiovascular events. Extrapyramidal motor side effects, tardive dyskinesia, etc. are also present. At present, based upon the current study, benefits cannot be said to exceed risks ███████████████████████.

## 1.3 Recommendations for Postmarketing Risk Evaluation and Mitigation Strategies

None are recommended at this time.

## 1.4 Recommendations for Postmarketing Requirements and Commitments

None are recommended at this time.

# 2 Introduction and Regulatory Background

4

# CLINICAL REVIEW

|  |  |
|---|---|
| Application Type | Supplement |
| Application Number(s) | NDA 22-264, S015 |
| Priority or Standard | Standard |
| Submit Date(s) | July 11, 2014 |
| Received Date(s) | July 11, 2014 |
| PDUFA Goal Date | May 11, 2015 |
| Division / Office | OND-I/DPP |
| Reviewer Name(s) | Glenn B. Mannheim, MD |
| Review Completion Date | April 03, 2015 |
| Established Name | INVEGA SUSTENNA (paliperidone palmitate) Extended-Release Injectable Suspension |
| Therapeutic Class | Anti-Psychotics |
| Applicant | Janssen Pharmaceuticals, Inc. |
| Formulation(s) | Intramuscular |
| Dosing Regimen | 39, 78, 117, 156, 234 mg |
| Indication(s) | Comparison with Oral Antipsychotics in Delaying Time to Treatment Failure in Adults with Schizophrenia Who Have Been Incarcerated |
| Intended Population(s) | Previously Incarcerated Schizophrenics |

NDA 22264/S-015
Page 2

Overall, 39.8% of subjects in the paliperidone palmitate group and 53.7% of subjects in the comparator group met the definition for treatment failure ($p<0.05$). In our view, however, these results are not interpretable.

A total of 139 patients (31.3%) discontinued the study early without meeting the definition of a treatment failure, and, importantly, there were more discontinuations in the paliperidone palmitate group (n=81, 35.8%) than in the oral antipsychotic group (n=58, 26.6%). Furthermore, in 60 patients (26.5%) in the paliperidone palmitate group and 42 patients (19.3%) in the oral antipsychotic group, the reasons for discontinuation reported in the case report forms were either "lost to follow-up" or "withdrawal by subject" in the case report forms. Thus, there is no way to know whether or not these patients experienced treatment failure, and the relatively large differences between treatment groups undermine the interpretability of the results. To place this problem into perspective, in the paliperidone palmitate group, 39.8% of subjects were categorized as treatment failures and, as such, had endpoint events, whereas the disposition of a relatively large proportion of subjects, 26.5%, was unknown.

To assess the potential impact of the discontinuations, we performed two exploratory analyses on the explanatory Intent-to-Treat (eITT) set: 1) categorizing all 139 dropouts without an event as treatment failures; and 2) categorizing the 102 dropouts assessed as "lost to follow-up" or "withdrawal by subject" as treatment failures. Neither analysis yielded a statistically significant difference in delaying time to treatment failure (the $p$-values were 0.28 and 0.19, respectively). These analyses underscore the considerable uncertainty of the study's conclusions, given the high numbers of discontinuations and the disparity between treatment groups. Thus, we reached the conclusion that study R092670-SCH-3006 failed to provide substantial evidence in support of the intended labeling revisions.

2. We recognize the potential importance of improved compliance with antipsychotic treatment, but substantial evidence of effectiveness would be needed to support this sNDA approval. We would reconsider the requested labeling revisions if you could provide another similar, but more clearly positive, study to address the dropout concern, and we strongly encourage you to seek our guidance during the planning stage.

## SAFETY UPDATE

When you respond to the above deficiencies, include a safety update as described at 21 CFR 314.50(d)(5)(vi)(*b*). The safety update should include data from all nonclinical and clinical studies/trials of the drug under consideration regardless of indication, dosage form, or dose level.

1. Describe in detail any significant changes or findings in the safety profile.

2. When assembling the sections describing discontinuations due to adverse events, serious adverse events, and common adverse events, incorporate new safety data as follows:

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Food and Drug Administration
Silver Spring MD 20993

NDA 22264/S-015

**COMPLETE RESPONSE**

Janssen Pharmaceuticals, Inc.
Attention: Beth Geter-Douglass, Ph.D.
Associate Director, Regulatory Affairs
1125 Trenton-Harbourton Road
Titusville, NJ 08560

Dear Dr. Geter-Douglass:

Please refer to your Supplemental New Drug Application (sNDA) dated and received July 11,
2014, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for
Invega Sustenna (paliperidone palmitate) extended-release injectable suspension 39, 78, 117,
156, 234 mg.

We acknowledge receipt of your amendments dated August 21, 2014, September 24, 2014,
December 19, 2014, and February 25, 2015.

This "Prior Approval" efficacy supplemental new drug application proposes revisions to the
product label based on findings from study R092670-SCH-3006 titled "A Fifteen-Month,
Prospective, Randomized, Active-Controlled, Open-Label, Flexible-Dose Study of Paliperidone
Palmitate Compared with Oral Antipsychotic Treatment in Delaying Time to Treatment Failure
in Adults with Schizophrenia Who Have Been Incarcerated."

We have completed the review of your application, as amended, and have determined that we
cannot approve this application in its present form. We have described our reasons for this action
below and, where possible, our recommendations to address these issues.

1. In our view, study R092670-SCH-3006 does not provide substantial evidence that
   paliperidone palmitate delays time to treatment failure in adults with schizophrenia who
   have been incarcerated, even though the results, on face, seem to demonstrate superiority
   of paliperidone palmitate based on the pre-specified primary endpoint and analysis.

   Treatment failure was defined as: 1) arrest/incarceration; 2) psychiatric hospitalization; 3)
   suicide; 4) discontinuation of antipsychotic treatment due to inadequate efficacy or poor
   tolerability; 6) treatment supplementation with another antipsychotic due to inadequate
   efficacy; and/or 7) increase in psychiatric services to prevent imminent psychiatric
   hospitalization.

IND 31,931; RISPERDAL® (risperidone) tablets and oral solution
Record of Contact: Minutes of March 3, 2000 Meeting with FDA                          Page 3

- Are the proposed studies RIS-USA-161 and RIS-USA-222 adequately designed to evaluate the safety and efficacy of risperidone in non-mentally retarded children with conduct spectrum disorder?
- Are the available data and data from the proposed trials adequate to support a new indication for risperidone for the treatment of conduct spectrum disorder in pediatric patients (ages 5-16) without mental retardation?

FDA questioned the validity of conduct disorder (CD) as a diagnosis and even the concept of CD as a disorder. They don't believe it is well accepted outside the child psychiatrist community. FDA acknowledged CD as a valid clinical entity as it is included in DSM-IV, however elevation of a disorder to permanent status in DSM does not make it a disorder warranting an indication in the label.

FDA believes CD is synonymous with aggression and thinks we are trying to get approval of aggression under the guise of CD. Although we strongly disagreed, FDA indicated that they feel the problem is in the nature of the diagnosis because it is just a "list of behaviors", mainly aggressive behaviors that annoy others. If CD is just a form of aggressive behavior, they recommended that we study this from a symptom approach and look at aggression straight on. If the symptom approach were taken, FDA would expect us to look at the effects of RISPERDAL in three models. The suggested populations to examine were dementia, mental retardation, and conduct disorder. However, the first step in looking at aggression would be to get agreement publicly (e.g., an advisory committee meeting) on how to define aggression and the best way to measure it. FDA acknowledged it would take time to get public agreement and that this approach may not be the easiest way to get approval.

FDA commented that they do not often question a diagnosis, but in the case of CD they are. They feel a public hearing is needed to define how to look at CD and if it is an indication that society is willing to treat. Their main concern is that RISPERDAL or any other product would be used as a chemical straight jacket. Although CD has been discussed publicly at several conferences, the conference audiences have been only child psychiatrists. FDA would require this type of issue to be discussed by a wider scope of psychiatrists, so that the entire psychiatric community can weigh in on the decision, similar to discussions regarding behavioral disturbances in dementia at the March 9, 2000 Psychopharmacological Drug Advisory Committee meeting.

In the absence of a public hearing, either on aggression or CD itself, FDA could not assure us that we would be able to get an indication in the label, even with two positive trials. They emphasized again that they are uncertain whether CD is a diagnosis that merits treatment.

In regards to the two trials proposed (RIS-USA-161, RIS-USA-222), the FDA commented that they have no experience with the scale selected (Nisonger Behavior Rating Form). Based on the information we provided, (Attachment 1), they did not feel the subscale of the Nisonger mapped well to CD, and it was more of a combination of Oppositional Defiant Disorder and CD. This is based on the questions "talks back to teacher, parents, or other adults," "stubborn, has to do things own way," and "disobedient". We commented that we have experience with the Nisonger scale and believe it has a better CD subscale than the Conners rating scale does.

FDA asked about the validity and reliability of the Nisonger scale. We provided an article by Aman, et al (Attachment 2) to demonstrate validation in a mental retardation (MR) population. FDA indicated that they would not extrapolate from the MR population to the non-MR, and that we would have to validate the use of the scale in the non-MR population as well. We informed them we are in the process of doing the validation in the non-MR population. To address reliability, we offered to send the available clinical data we have generated along with any literature references. FDA requested that the clinical data provided include an item analysis.

Until FDA reviews the validation and reliability data, they can not accept the use of the Nisonger scale as the primary endpoint. We asked if they preferred us to use another scale (i.e. Conners), but they

CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION

RISP-REM-1702686

# JANSSEN

· PHARMACEUTICA ·
· RESEARCH FOUNDATION ·

## RECORD OF FDA CONTACT

**PRODUCT IDENTIFICATION: RISPERDAL® (risperidone) tablets and oral solution**

| ORIGINATOR/SIGNATURE: ▮▮▮▮▮▮ | DATE: 03 March 2000 |
|---|---|

| NDA NUMBER:<br>IND NUMBER:   31,931 | INITIATED BY: JANSSEN     X<br>FDA | BY TELEPHONE<br>IN PERSON  X |
|---|---|---|

| FDA PERSONNEL: See below | DIVISION: Neuropharmacological Drug Products<br>TELEPHONE:  (301) 594-5533 |
|---|---|

**SUBJECT:**   Minutes of March 3rd Meeting to Discuss RISPERDAL Pediatric Exclusivity and Development Program for Conduct Disorder

**Meeting Attendees:**
*FDA*                                                                 *Janssen Research Foundation (JRF)*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Summary:**  The objectives of this meeting were to discuss the requirements to obtain an additional six months market exclusivity as permitted under the FDA Modernization Act of 1997 and to discuss the clinical development plan for an indication in conduct disorder.  The key issues discussed were:

*Pediatric Exclusivity*
- Pediatric exclusivity is not possible based on safety and PK alone (as proposed).  Exclusivity must be based on the approved indication.
- FDA will issue a written request that contains a controlled trial in schizophrenia.  JRF will submit a proposal for this controlled trial in adolescents (>13 years old); younger children will not need to be studied.
- The proposed PK trial was acceptable and if needed, JRF could enroll a mixed diagnosis (conduct disorder, schizophrenia) population.

*Conduct Disorder (CD) as an indication*
- FDA questioned the validity of CD as a diagnosis and even the concept of CD as a disorder.
- They stated that even though CD is in DSM-IV that does not mean it is a disorder warranting an indication in the label.
- FDA feels a public hearing is needed to define how to look at CD.  Their main concern is that RISPERDAL or any other product would be used as a chemical straight jacket.  This is the reason the issue needs to be publicly debated.
- FDA believes aggression is synonymous with CD.
- We could proceed with the two trials proposed (RIS-USA-161, RIS-USA-222).  However, even if these trials are positive, they would want a consensus advisory committee meeting to confirm the disorder exists.  This advisory committee meeting would be triggered by the review of our supplemental application.
- The Division is willing to work with us to define scales for CD and would like to see our data to show their validity and reliability.

**CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION**

RISP-REM-1702684

NDA 20-272 (Cross-reference NDAs 20-588 and 21-444)                                    Page 2
RISPERDAL® (risperidone) Tablets
Special Supplement – Changes Being Effected

the labeling. This supplemental application provides for this single change to the cerebrovascular adverse event warning. We believe the proposed sentence contains all the essential elements of the current statement, i.e., specificity to RISPERDAL, the non-approval status, and a clear identification of the patient population. In addition, we believe this revision will allow us to better communicate the originally agreed upon educational intent of the sentence. A marked-up copy of the labeling is enclosed. The revision appears on page 7.

Since issuance of a "Dear Healthcare Professional Letter" in April and implementation of the revised labeling, we have consistently been faced with comments and/or actions by physicians, formulary committees and managed care organizations, which reflect a misinterpretation of the third sentence in this paragraph. The principle misinterpretation is that this is a statement by FDA of their conclusion following review of an application. The outcome of this misinterpretation is that the educational intent of the labeling is not being accurately communicated. Physicians may be making potentially harmful or inappropriate patient management decisions based upon an incorrect interpretation of the sentence.

Under separate cover this day we have ⊏                                        ⊐ to this file.

Please contact me at (609) 730-3486 if you have any questions regarding this submission.

Sincerely,

Edward G. Brann
Director, Regulatory Affairs

Enclosure
cc: S. Hardeman

*Johnson&Johnson*
PHARMACEUTICAL RESEARCH
& DEVELOPMENT, L.L.C.

**1 4 AUG 2003**

1125 Trenton-Harbourton Road
P.O. Box 200, Titusville, NJ 08560

ORIGINAL

NDA SUPPLEMENT

NDA NO. 20-272 REF NO. SLR-033
NDA SUPPL FOR Labeling

Russell Katz, MD, Director
Division of Neuropharmacological Drug Products
Center for Drug Evaluation and Research, HFD-120
U.S. Food and Drug Administration
**Attn: Document Control Room 10B-40**
1451 Rockville Pike
Rockville, MD 20852

**RECEIVED**

AUG 1 5 2003

HFD-120/CDER

Subject:    **NDA 20-272**
            **Cross-reference NDAs 20-588 and 21-444**
            **RISPERDAL® (risperidone) Tablets**
            **Special Supplement – Changes Being Effected**

Dear Dr. Katz:

Please refer to your approval letter of April 2, 2003 for NDA 21-444, RISPERDAL®
(risperidone) [        ] Tablets and the agreed-upon labeling.  The labeling
included a new subsection under WARNINGS regarding the occurrence of
cerebrovascular adverse events in elderly patients with dementia.  The text of this
subsection is as follows:

> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with
> Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including
> fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of
> risperidone in elderly patients with dementia-related psychosis.  In placebo-
> controlled trials there was a significantly higher incidence of cerebrovascular
> adverse events in patients treated with risperidone compared to patients treated with
> placebo.  RISPERDAL has not been shown to be safe or effective in the treatment
> of patients with dementia-related psychosis.

In addition, please refer to the meeting of August 13, 2003 between representatives of the
Division and J&J PRD, in which the Division agreed to the following proposed text to
replace the third sentence of the above statement.

> RISPERDAL is not approved for the treatment of patients with dementia-related
> psychosis.

Therefore, in accordance with 21 CFR 314.70(c)(2), we are submitting a supplemental
application to provide revised product labeling to improve the clarity of this sentence in

PRD-1C

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

# ADMINISTRATIVE and CORRESPONDENCE DOCUMENTS

**Storage and Handling**

RISPERDAL® tablets should be stored at controlled room temperature 15°-25°C (59°-77°F). Protect from light and moisture.

Keep out of reach of children.

RISPERDAL® 1 mg/mL oral solution should be stored at controlled room temperature 15°-25°C (59°-77°F). Protect from light and freezing.

Keep out of reach of children.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets should be stored at controlled room temperature 15°-25°C (59°-77°F).

Keep out of reach of children.

~~7503223~~7503224
US Patent 4,804,663
Revised ~~April~~ August 2003
©Janssen 2002

RISPERDAL® tablets are manufactured by:
JOLLC, Gurabo, Puerto Rico or
Janssen-Cilag, SpA, Latina, Italy

RISPERDAL® oral solution is manufactured by:
Janssen Pharmaceutica N.V.
Beerse, Belgium

RISPERDAL® M-TAB™ Orally Disintegrating Tablets are manufactured by:
JOLLC, Gurabo, Puerto Rico

RISPERDAL® tablets, RISPERDAL® M-TAB™ Orally Disintegrating Tablets, and oral solution are distributed by:
**Janssen Pharmaceutica Products, L.P.**
Titusville, NJ 08560

**Hearing and Vestibular Disorders**
*Rare:* tinnitus, hyperacusis, decreased hearing.

**Red Blood Cell Disorders**
*Infrequent:* anemia, hypochromic anemia. *Rare:* normocytic anemia.

**Reproductive Disorders, Male**
*Frequent:* erectile dysfunction*. *Infrequent:* ejaculation failure.

**White Cell and Resistance Disorders**
*Rare:* leukocytosis, lymphadenopathy, leucopenia, Pelger-Huet anomaly.

**Endocrine Disorders**
*Rare:* gynecomastia, male breast pain, antidiuretic hormone disorder.

**Special Senses**
*Rare:* bitter taste.

* Incidence based on elicited reports.

**Postintroduction Reports**
Adverse events reported since market introduction which were temporally (but not necessarily causally) related to RISPERDAL® therapy, include the following: anaphylactic reaction, angioedema, apnea, atrial fibrillation, cerebrovascular disorder, including cerebrovascular accident, hyperglycemia, diabetes mellitus aggravated, including diabetic ketoacidosis, intestinal obstruction, jaundice, mania, pancreatitis, Parkinson's disease aggravated, pulmonary embolism. There have been rare reports of sudden death and/or cardiopulmonary arrest in patients receiving RISPERDAL®. A causal relationship with RISPERDAL® has not been established. It is important to note that sudden and unexpected death may occur in psychotic patients whether they remain untreated or whether they are treated with other antipsychotic drugs.

## DRUG ABUSE AND DEPENDENCE
**Controlled Substance Class**
RISPERDAL® (risperidone) is not a controlled substance.

**Physical and Psychologic Dependence**
RISPERDAL® has not been systematically studied in animals or humans for its potential for abuse, tolerance, or physical dependence. While the clinical trials did not reveal any tendency for any drug-seeking behavior, these observations were not systematic and it is not possible to predict on the basis of this limited experience the extent to which a CNS-active drug will be misused, diverted, and/or abused once marketed. Consequently, patients should be evaluated carefully for a history of drug abuse, and such patients should be observed closely for signs of RISPERDAL® misuse or abuse (e.g., development of tolerance, increases in dose, drug-seeking behavior).

*Infrequent:* hyperventilation, bronchospasm, pneumonia, stridor. *Rare:* asthma, increased sputum, aspiration.

### Skin and Appendage Disorders
*Frequent:* increased pigmentation*, photosensitivity*. *Infrequent:* increased sweating, acne, decreased sweating, alopecia, hyperkeratosis, pruritus, skin exfoliation. *Rare:* bullous eruption, skin ulceration, aggravated psoriasis, furunculosis, verruca, dermatitis lichenoid, hypertrichosis, genital pruritus, urticaria.

### Cardiovascular Disorders
*Infrequent:* palpitation, hypertension, hypotension, AV block, myocardial infarction. *Rare:* ventricular tachycardia, angina pectoris, premature atrial contractions, T wave inversions, ventricular extrasystoles, ST depression, myocarditis.

### Vision Disorders
*Infrequent:* abnormal accommodation, xerophthalmia. *Rare:* diplopia, eye pain, blepharitis, photopsia, photophobia, abnormal lacrimation.

### Metabolic and Nutritional Disorders
*Infrequent:* hyponatremia, weight increase, creatine phosphokinase increase, thirst, weight decrease, diabetes mellitus. *Rare:* decreased serum iron, cachexia, dehydration, hypokalemia, hypoproteinemia, hyperphosphatemia, hypertriglyceridemia, hyperuricemia, hypoglycemia.

### Urinary System Disorders
*Frequent:* polyuria/polydipsia*. *Infrequent:* urinary incontinence, hematuria, dysuria. *Rare:* urinary retention, cystitis, renal insufficiency.

### Musculo-Skeletal System Disorders
*Infrequent:* myalgia. *Rare:* arthrosis, synostosis, bursitis, arthritis, skeletal pain.

### Reproductive Disorders, Female
*Frequent:* menorrhagia*, orgastic dysfunction*, dry vagina*. *Infrequent:* nonpuerperal lactation, amenorrhea, female breast pain, leukorrhea, mastitis, dysmenorrhea, female perineal pain, intermenstrual bleeding, vaginal hemorrhage.

### Liver and Biliary System Disorders
*Infrequent:* increased SGOT, increased SGPT. *Rare:* hepatic failure, cholestatic hepatitis, cholecystitis, cholelithiasis, hepatitis, hepatocellular damage.

### Platelet, Bleeding, and Clotting Disorders
*Infrequent:* epistaxis, purpura. *Rare:* hemorrhage, superficial phlebitis, thrombophlebitis, thrombocytopenia.

21

effect rating scale, and these events were not further categorized using standard terminology. (Note: These events are marked with an asterisk in the listings that follow.)

In the listings that follow, spontaneously reported adverse events were classified using World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 patients exposed to multiple doses of RISPERDAL® who experienced an event of the type cited on at least one occasion while receiving RISPERDAL®. All reported events are included, except those already listed in Table 1, those events for which a drug cause was remote, and those event terms which were so general as to be uninformative. It is important to emphasize that, although the events reported occurred during treatment with RISPERDAL®, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions: frequent adverse events are those occurring in at least 1/100 patients (only those not already listed in the tabulated results from placebo-controlled trials appear in this listing); infrequent adverse events are those occurring in 1/100 to 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients.

## Psychiatric Disorders
*Frequent:* increased dream activity*, diminished sexual desire*, nervousness. *Infrequent:* impaired concentration, depression, apathy, catatonic reaction, euphoria, increased libido, amnesia. *Rare:* emotional lability, nightmares, delirium, withdrawal syndrome, yawning.

## Central and Peripheral Nervous System Disorders
*Frequent:* increased sleep duration*. *Infrequent:* dysarthria, vertigo, stupor, paraesthesia, confusion. *Rare:* aphasia, cholinergic syndrome, hypoesthesia, tongue paralysis, leg cramps, torticollis, hypotonia, coma, migraine, hyperreflexia, choreoathetosis.

## Gastrointestinal Disorders
*Frequent:* anorexia, reduced salivation*. *Infrequent:* flatulence, diarrhea, increased appetite, stomatitis, melena, dysphagia, hemorrhoids, gastritis. *Rare:* fecal incontinence, eructation, gastroesophageal reflux, gastroenteritis, esophagitis, tongue discoloration, cholelithiasis, tongue edema, diverticulitis, gingivitis, discolored feces, GI hemorrhage, hematemesis.

## Body as a Whole/General Disorders
*Frequent:* fatigue. *Infrequent:* edema, rigors, malaise, influenza-like symptoms. *Rare:* pallor, enlarged abdomen, allergic reaction, ascites, sarcoidosis, flushing.

## Respiratory System Disorders

20

sleep, accommodation disturbances, orthostatic dizziness, palpitations, weight gain, erectile dysfunction, ejaculatory dysfunction, orgastic dysfunction, asthenia/lassitude/increased fatigability, and increased pigmentation.

*Vital Sign Changes*
RISPERDAL® is associated with orthostatic hypotension and tachycardia (see PRECAUTIONS).

*Weight Changes*
The proportions of RISPERDAL® and placebo-treated patients meeting a weight gain criterion of ≥7% of body weight were compared in a pool of 6 to 8-week, placebo-controlled trials, revealing a statistically significantly greater incidence of weight gain for RISPERDAL® (18%) compared to placebo (9%).

*Laboratory Changes*
A between-group comparison for 6 to 8-week placebo-controlled trials revealed no statistically significant RISPERDAL®/placebo differences in the proportions of patients experiencing potentially important changes in routine serum chemistry, hematology, or urinalysis parameters. Similarly, there were no RISPERDAL®/placebo differences in the incidence of discontinuations for changes in serum chemistry, hematology, or urinalysis. However, RISPERDAL® administration was associated with increases in serum prolactin (see PRECAUTIONS).

*ECG Changes*
The electrocardiograms of approximately 380 patients who received RISPERDAL® and 120 patients who received placebo in two double-blind, placebo-controlled trials were evaluated and revealed one finding of potential concern; i.e., 8 patients taking RISPERDAL® whose baseline QTc interval was less than 450 msec were observed to have QTc intervals greater than 450 msec during treatment (see WARNINGS). Changes of this type were not seen among about 120 placebo patients, but were seen in patients receiving haloperidol (3/126).

**Other Events Observed During the Premarketing Evaluation of RISPERDAL®**
During its premarketing assessment, multiple doses of RISPERDAL® (risperidone) were administered to 2607 patients in Phase 2 and 3 studies. The conditions and duration of exposure to RISPERDAL® varied greatly, and included (in overlapping categories) open-label and double-blind studies, uncontrolled and controlled studies, inpatient and outpatient studies, fixed-dose and titration studies, and short-term or longer-term exposure. In most studies, untoward events associated with this exposure were obtained by spontaneous report and recorded by clinical investigators using terminology of their own choosing. Consequently, it is not possible to provide a meaningful estimate of the proportion of individuals experiencing adverse events without first grouping similar types of untoward events into a smaller number of standardized event categories. In two large studies, adverse events were also elicited utilizing the UKU (direct questioning) side

19

**Tardive Dyskinesia**

A syndrome of potentially irreversible, involuntary, dyskinetic movements may develop in patients treated with antipsychotic drugs. Although the prevalence of the syndrome appears to be highest among the elderly, especially elderly women, it is impossible to rely upon prevalence estimates to predict, at the inception of antipsychotic treatment, which patients are likely to develop the syndrome. Whether antipsychotic drug products differ in their potential to cause tardive dyskinesia is unknown.

The risk of developing tardive dyskinesia and the likelihood that it will become irreversible are believed to increase as the duration of treatment and the total cumulative dose of antipsychotic drugs administered to the patient increase. However, the syndrome can develop, although much less commonly, after relatively brief treatment periods at low doses.

There is no known treatment for established cases of tardive dyskinesia, although the syndrome may remit, partially or completely, if antipsychotic treatment is withdrawn. Antipsychotic treatment, itself, however, may suppress (or partially suppress) the signs and symptoms of the syndrome and thereby may possibly mask the underlying process. The effect that symptomatic suppression has upon the long-term course of the syndrome is unknown.

Given these considerations, RISPERDAL® (risperidone) should be prescribed in a manner that is most likely to minimize the occurrence of tardive dyskinesia. Chronic antipsychotic treatment should generally be reserved for patients who suffer from a chronic illness that (1) is known to respond to antipsychotic drugs, and (2) for whom alternative, equally effective, but potentially less harmful treatments are not available or appropriate. In patients who do require chronic treatment, the smallest dose and the shortest duration of treatment producing a satisfactory clinical response should be sought. The need for continued treatment should be reassessed periodically.

If signs and symptoms of tardive dyskinesia appear in a patient treated on RISPERDAL®, drug discontinuation should be considered. However, some patients may require treatment with RISPERDAL® despite the presence of the syndrome.

**Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients With Dementia**

Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. RISPERDAL® ~~has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis.~~ RISPERDAL® is not approved for the treatment of patients with dementia-related psychosis.

7

# JANSSEN
**PHARMACEUTICA**
**PRODUCTS, L.P.**

## RISPERDAL®
**(RISPERIDONE)**
**TABLETS/ORAL SOLUTION**

## RISPERDAL® M-TAB™
**(RISPERIDONE)**
**ORALLY DISINTEGRATING TABLETS**

## DESCRIPTION

RISPERDAL® (risperidone) is a psychotropic agent belonging to the chemical class of benzisoxazole derivatives. The chemical designation is 3-[2-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl]-6,7,8,9-tetrahydro-2-methyl-4H-pyrido[1,2-a]pyrimidin-4-one. Its molecular formula is $C_{23}H_{27}FN_4O_2$ and its molecular weight is 410.49. The structural formula is:

(insert structure)

Risperidone is a white to slightly beige powder. It is practically insoluble in water, freely soluble in methylene chloride, and soluble in methanol and 0.1 $\underline{N}$ HCl.

RISPERDAL® tablets are available in 0.25 mg (dark yellow), 0.5 mg (red-brown), 1 mg (white), 2 mg (orange), 3 mg (yellow), and 4 mg (green) strengths. Inactive ingredients are colloidal silicon dioxide, hydroxypropyl methylcellulose, lactose, magnesium stearate, microcrystalline cellulose, propylene glycol, sodium lauryl sulfate, and starch (corn). Tablets of 0.25, 0.5, 2, 3, and 4 mg also contain talc and titanium dioxide. The 0.25 mg tablets contain yellow iron oxide; the 0.5 mg tablets contain red iron oxide; the 2 mg tablets contain FD&C Yellow No. 6 Aluminum Lake; the 3 mg and 4 mg tablets contain D&C Yellow No. 10; the 4 mg tablets contain FD&C Blue No. 2 Aluminum Lake.

RISPERDAL® is also available as a 1 mg/mL oral solution. The inactive ingredients for this solution are tartaric acid, benzoic acid, sodium hydroxide, and purified water.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets are available in 0.5 mg, 1.0 mg, and 2.0 mg strengths and are light coral in color.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets contain the following inactive ingredients: Amberlite® resin, gelatin, mannitol, glycine, simethicone, carbomer, sodium hydroxide, aspartame, red ferric oxide, and peppermint oil.

1

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*
# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

# <u>LABELING</u>

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

```
 /s/
---------------------
Russell Katz
9/10/03 08:42:08 AM
```

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004
Page 2

of the copies on heavy-weight paper or similar material. For administrative purposes, these submissions should be designated "FPL for approved supplement NDA 20-272 / S-033, NDA 20-588 / S-021, and NDA 21-444 / S-004." Approval of these submissions by FDA is not required before the labeling is used.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Steve Hardeman, R.Ph., Senior Regulatory Project Manager, at (301) 594-5525.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research



**DEPARTMENT OF HEALTH & HUMAN SERVICES**   Public Health Service

Food and Drug Administration
Rockville, MD 20857

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004

Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
Attention: Edward G. Brann
1125 Trenton-Harbourton Road
Titusville, NJ 08560-0200

Dear Mr. Brann:

Please refer to your supplemental new drug applications dated August 14, 2003, received August 15, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Risperdal (risperidone) tablets and oral solution, and Risperdal M-TAB (risperidone) orally disintegrating tablets.

These "Changes Being Effected" supplemental new drug applications provide for revised product labeling under **WARNINGS, Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia.**

We have completed our review of these applications and they are approved, effective on the date of this letter.

As agreed in the meeting of August 13, 2003, the last sentence of the following section is amended as follows:

> **WARNINGS**
> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. RISPERDAL® has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis. RISPERDAL is not approved for the treatment of patients with dementia-related psychosis.

The final printed labeling (FPL) must be identical to the above labeling (package insert submitted August 14, 2003).

Please submit the FPL electronically according to the guidance for industry titled Providing Regulatory Submissions in Electronic Format – NDA. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Please individually mount 15

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*
# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

# <u>APPROVAL LETTER</u>

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*
## NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

## CONTENTS

| Reviews / Information Included in this NDA Review. | |
|---|---|
| Approval Letter | X |
| Approvable Letter | |
| Labeling | X |
| Medical Review(s) | |
| Chemistry Review(s) | |
| Pharmacology Review(s) | |
| Statistical Review(s) | |
| Microbiology Review(s) | |
| Clinical Pharmacology/ Biopharmaceutics Review(s) | |
| Administrative and Correspondence Document(s) | X |

# CENTER FOR DRUG EVALUATION AND RESEARCH

## **Approval Package for:**

## *APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

*Trade Name:*    Risperdal Tablets, Risperdal Oral Solution & Risperdal M-Tab Orally Distintegrating Tablets

*Generic Name:*    risperidone

*Sponsor:*    Janssen Pharmaceutica

*Approval Date:*    09/10/03

# <u>Exhibit 2</u>

4 pages motion to produce
Defendant testimony

## IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA25-1784

Plaintiff: Mr. Brandon Tyler Ward

Defendant: Mr. John D. Winter Esq. (For Johnson & Johnson)

## "Motion To Produce Defendant Testimony"

Q.1:  Mr. John D. Winter Esq. how much did company Johnson & Johnson retain Your services for?

A.1:

Q.2: Is Attorney John D. Winter and Johnson & Johnson aware of SEC Rule 21F-17A?

A.2:

Q.3: Attorney John D. Winter if you would recall the number of clients listed beside your email visible during conversations with Me, Mr. Brandon Ward, in regards to $750?

A.3:

Q.4:  Are You Mr. John D. Winter Esq. & company Johnson & Johnson aware of the mass amount of one thousand dollar payments lawyer's for JP Morgan were sued by The Securities and Exchange Commission for making to employees for their silence conditioned on not telling Government Agencies, like The SEC?

(1)

A.4:

Q.5: Mr. John D. Winter Esq. do you recall denying liability for company Johnson & Johnson?

A.5:

Q.6:   Do You, Attorney John D. Winter, recall saying to some generalized regard the benefits of Paliperidone outweighed the risks according to my, Mr. Brandon T. Ward's, Doctor's and can You elaborate for The Honorable Court Your recollection of events surrounding soliciting a confidentiality agreement, from beginning to end, if you would?

A.6:

Q.7: Attorney John D. Winter did you actually speak to my, Mr. Brandon Tyler Ward's, Doctors or just read the medical records?

A.7:

Q.8: Attorney John D. Winter how long did you spend actually examining the medical records in my, Mr. Brandon Tyler Ward's, case?

A.8:

Q.9:  Mr. John D. Winter Esq. do You recall me, Mr. Brandon Tyler Ward, saying I could not find legal assistance understanding Your Confidentiality Agreement?

A.9:

(2)

Q.10: Attorney John D. Winter have you ever lived in California?

A.10:

Q.11: Attorney John D. Winter what state did You reside in when writing and coaching for my, Mr. Brandon Tyler Ward's, signature, in regards to The Confidentiality Agreement?

A.11:

Q.12: Mr. John D. Winter Esq. what member of company Johnson & Johnson contacted You in regards to me, Mr. Brandon Tyler Ward?

A.12:

Q.13: Do You Attorney John D. Winter or company Johnson & Johnson recall the 2003 Risperdal Patent from The FDA by Russell Katz M.D?

A.13:

Q.14: Do You Mr. John D. Winter Esq. or company Johnson & Johnson recall discussing that packaging for Paliperidone for years 2004-2020?

A.14:

Q.15: Are You, Attorney John D. Winter or Johnson & Johnson, aware that the Doctors for the 2003 FDA Risperdal Patent listed Cholelithiasis or Gallstones as symptoms of Paliperidone on page 20 and 21?

(3)

A.15:

Q.16: Do You, Johnson & Johnson or Attorney John D. Winter, recall including that data on the modern product packaging?

A.16:

(4)

# <u>Exhibit 3</u>

17 pages:

6 of Defendant Case background

11 of critical Case highlights

# In The New York Supreme Court Appellate Division
# First Judicial Department

### Docket No. 2025.3429

### Mr. Brandon Tyler Ward in The Matter of.
### Mr. John D. Winter Esq.  Duval County.
### Florida Courthouse & Florida Supreme Court

## This Presentation Contains The Following Cases , Statues and, Authorities:

1.      SEC Rule 21F-17A ................................................. Page 2,3,4

2.      S.623 - Sunshine in Litigation Act of 2011 .................................... Page  6

3.      American Bar Associations Model Rules of
       Professional Conduct 3.4(f), 5.6(b) and, 8.4(c-e) ............................... Page 4,5

4.      Jones v. Goodyear Tire & Rubber Co. ("Jones I"), 871 So. 2d 899 (Fla. 3d
       DCA 2003) ............................................................. Page 6

5.      Goodyear Tire & Rubber Co. v. Jones ("Jones II"), 929 So. 2d 1081 (Fla.
       3d DCA 2005) .......................................................... Page 6

6.      Goodyear Tire & Rubber Co. v. Schalmo, 987 So. 2d 142 (Fla. 2d DCA
       2008) ................................................................. Page 6

(1)

7.    TransUnion V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100975 / September 9, 2024 ................................................................................................ Page 4

8.    Acadia Healthcare Company, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100970 / September 9,  2024 ADMINISTRATIVE PROCEEDING File No. 3-22079 ................................................................................................ Page 4

9.    AppFolio, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100971 / September 9, 2024 ADMINISTRATIVE PROCEEDING File No. 3-22080 ................................................................................................ Page 4

10.    a.k.a. Brands Holding Corp. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100969 / September 9, 2024 ................................................................................................ Page 4

11.    Pledger v. Janssen Pharms., Inc., 198 A.3d 1126 .................. Page 3

12.    Yount v. Janssen October 2016 Judge Paula A. Patrick Pennsylvania Court of Common Pleas for Philadelphia County ............................. Page 3

Many companies are being forced to pay millions or hundreds of thousands of dollars to settle with The Securities and Exchange Commission for violation of S.E.C Rule 21F-17A. The S.E.C Rule 21F-17A comes from The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), enacted on July 21, 2010, amended The Exchange Act by adding Section 21F,  "Whistleblower Incentives and Protection." The congressional purpose underlying these provisions was,

"to encourage whistleblowers to report possible violations of the securities laws by providing financial incentives, prohibiting employment-related retaliation, and providing various confidentiality guarantees." See Implementation of the Whistleblower Provisions of Section 21F of the

(2)

Securities Exchange Act of 1934, Release No. 34-64545, at p. 197 (Aug. 12, 2011)."

Congress explicitly noted the importance of providing financial incentives to promote whistleblowing to the Commission as it determined that,

"a critical component of the Whistleblower Program is the minimum payout that any individual could look towards in determining whether to take the enormous risk of blowing the whistle in calling attention to fraud." See The Restoring American Financial Stability Act of 2010, Committee on Banking, Housing, and Urban Affairs (Apr. 30, 2010)."

To fulfill the Congressional purpose, The Securities and Exchange Commission adopted Rule 21F-17, which provides in relevant part,

"(a) No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications."

Rule 21F-17 became effective on August 12, 2011

Mr. John D. Winter Esq. and his Defendants Johnson and Johnson © broke this Government Rule and should be forced to pay out hundreds of thousands of dollars. The Company's product Paliperdone© is known for causing cholelithiasis and hyper-prolactin gynecomastia but Johnson and Johnson© has failed to properly alert the public via updating patent information, concealing/destroying Paliperdone© documents during Court or, in my case lawyer coercion of a non-client into a confidentiality agreement meant to invalidate future trials within The Courts or United States Government otherwise. I will show some of the communications today I had with Johnson and Johnson© lawyer John D. Winter Esq. (Yount v. Janssen October 2016 Judge Paula A. Patrick  Pennsylvania Court of Common Pleas for Philadelphia County, Pledger v. Janssen Pharms., Inc., 198 A.3d 1126)   (3)

Mr. John D. Winter Esq. in preparing, advising for and, paying for my 2022 Confidentiality Settlement Agreement broke American Bar Associations Model Rule of Professional Conduct Rule 8.4(e) and SEC Rule 21F-17(a) by implying an ability to influence, improperly, a government agency when he coerced,

"5.2 RELEASOR understands that upon execution of this Agreement, RELEASOR is forever barred from filing or causing to be filed any claim or litigation or proceeding in and before any agency, tribunal or court relating to any claim RELEASOR may have ever had or could have in the future against RELEASEES in any way arising out of or related to Claimant's Claims"

-Confidentiality Settlement Agreement Section 5.2 by Mr. John D Winter Esq.

Please see: (TransUnion V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100975 / September 9, 2024), (Acadia Healthcare Company, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100970 / September 9,  2024 ADMINISTRATIVE PROCEEDING File No. 3-22079), (AppFolio, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100971 / September 9, 2024 ADMINISTRATIVE PROCEEDING File No. 3-22080) and, (A.k.a. Brands Holding Corp. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100969 / September 9, 2024).

Mr. John D. Winter broke the American Bar Associations Model Rules of Professional Conduct Rule 8.4( d) by "engaging in conduct that is prejudicial to the administration of justice." By explicitly prohibiting being able to converse with other attorneys or there claimants as mentioned in Section 4.1 of the Confidentiality Agreement, Section 4.1 dually, "restricts a lawyers right to practice" which also violates the American Bar Associations Model Rule                    (4)

of Professional Conduct Rule 5.6(b), "A lawyer shall not participate in offering or making an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy."

"4.1....RELEASOR agrees that he will not make any statement, either directly or indirectly, by implication or innuendo, to anyone, including but not limited to the press or media or to other attorneys or claimants or potential claimants concerning the agreement terms or describing or characterizing the agreement terms in any way other than to say that the matter has been resolved"

Moreover, Mr. John D. Winter Esq. breaks American Bar Associations Model Rules of Professional Conduct Rule 8.4(c) for, "conduct involving dishonesty, fraud, deceit or misrepresentation" when he advises further confidentiality agreement terms such as Section 6.4 which reads,

"6.4....The RELEASOR further expressly agrees and covenants to release, discharge, forever indemnify, defend, and hold harmless RELEASEES and their attorneys from any liens and/or claims which may arise or may have heretofore arisen in favor of Medicare, Medicaid, any other government program or any other governmental entity, federal, state or local, by operation of law or equity, for medical expenses, disability benefits, or any other charge or expense, directly or indirectly relating to the alleged injuries caused by RELEASOR'S use of Risperdal® and/or Invega®. The indemnification set forth in this section specifically includes, but is not limited to, the payment of all reasonable costs and expenses of investigation, defense, settlement, attorney fees, judgments, court costs, and all other costs and expenses of defending such claims."

Furthermore, Mr. John D. Winter's 2022 Confidentiality Agreement Sections: 4.1, 5.2 and, 6.4 break A.B.A Model Rules of Professional Conduct Rule 3.4(f) Which state, "a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party."                    (5)

Finally, perhaps most importantly Mr. John D. Winter Esq. broke the bill congress passed known as S.623 - Sunshine in Litigation Act of 2011, which was adapted to Florida State Law Statue 69.081 The Sunshine in Litigation Act that prevents concealment of Public Hazards by non-disclosure, confidentiality or, settlement agreements. (Jones v. Goodyear Tire & Rubber Co. ("Jones I"), 871 So. 2d 899, (Fla. 3d DCA 2003, Goodyear Tire & Rubber Co. v. Jones ("Jones II"), 929 So. 2d 1081 (Fla. 3d DCA 2005) and, Goodyear Tire & Rubber Co. v. Schalmo, 987 So. 2d 142 (Fla. 2d DCA 2008) in all cases Florida District Court of Appeals upheld that confidentiality agreements concealing public hazards will not be respected in Court. As they have not been respected in Duval County Florida Courthouse Case 16-2025-DR-003127 Ward V. Trump Filing # 226206628 and Filing # 226244544 cross-examined with Case 16-2025-DR-002334 Ward V. Crawford Filing #226244538 then redirect examined with Case: Brandon Tyler Ward V. Eric Chase Roberson 16-2025-DR-002652's Filing # 226244553. All cases on Appeal To The Supreme Court in Washington D.C with no outstanding filing numbers to be submitted on my end. Clerk John A. Tomasino notes he will keep a file of my Appeal of Florida Supreme Court number SC2025-0986 and SC2025-0961 to Washington D.C Supreme Court.

(6)

Mr. Brandon Tyler Ward _____

July 18, 2025

**Entrapped Social Media Personality,**

**6x Federal Agent/U.S Army Coercion Situation Survivor,**

**100% Permanent and Total Service-Connected Gulf War**

**Era Marksmanship Badge Award-Winning Disabled Vet,**

**2x Sexual Trauma Survivor and, Invega Whistleblower**

**5501 University Club Blvd N. , APT 155, Jacksonville**

**Florida 32277 • (904) 815 - 2601**

   

leg.state.fl.us/Statute

**95.051    When limitations tolled.—**

(1)    The running of the time under any statute of limitations except ss. 95.281, 95.35, and 95.36 is tolled by:

(a)    Absence from the state of the person to be sued.

(b)    Use by the person to be sued of a false name that is unknown to the person entitled to sue so that process cannot be served on the person to be sued.

(c)    Concealment in the state of the person to be sued so that process cannot be served on him or her.

(d)    The adjudicated incapacity, before the cause of action accrued, of the person entitled to sue. In any event, the action must be begun within 7 years after the act, event, or occurrence giving rise to the cause of action.

 ⌂ ▲ leg.state.fl.us/statute + 43 ⋮



**Online Sunshine**

Official Internet Site of the Florida Legislature

January 5, 2025    Search Statutes: 2024 ▾ [          ] Search    Advanced Legislative Search and Browse

Select Year: 2024 ▾ Go

Home
Senate
House
Citator
Statutes, Constitution, & Laws of Florida
Florida Statutes
Search Statutes
Search Tips
Florida Constitution
Laws of Florida
Legislative & Executive Branch Lobbyists
Information Center
Joint Legislative Committees & Other Entities
Historical Committees
Florida Government Efficiency Task Force
Legislative Employment
Legistore
Links

Interpreter Services for the Deaf and Hard of Hearing

 Finding Florida Grades K-5

LIFE AS A LAWMAKER Grades 6+

**The 2024 Florida Statutes**

Title VI    Chapter 69    View Entire Chapter
CIVIL PRACTICE AND PROCEDURE    MISCELLANEOUS PROCEDURAL MATTERS

**69.081    Sunshine in litigation; concealment of public hazards prohibited.—**

(1)    This section may be cited as the "Sunshine in Litigation Act."

(2)    As used in this section, "public hazard" means an instrumentality, including but not limited to any device, instrument, person, procedure, product, or a condition of a device, instrument, person, procedure or product, that has caused and is likely to cause injury.

(3)    Except pursuant to this section, no court shall enter an order or judgment which has the purpose or effect of concealing a public hazard or any information concerning a public hazard, nor shall the court enter an order or judgment which has the purpose or effect of concealing any information which may be useful to members of the public in protecting themselves from injury which may result from the public hazard.

(4)    Any portion of an agreement or contract which has the purpose or effect of concealing a public hazard, any information concerning a public hazard, or any information which may be useful to members of the public in protecting themselves from injury which may result from the public hazard, is void, contrary to public policy, and may not be enforced.







**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Serv.

Food and Drug Administration
Rockville, MD 20857

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004

Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
Attention: Edward G. Brann
1125 Trenton-Harbourton Road
Titusville, NJ 08560-0200

Dear Mr. Brann:

Please refer to your supplemental new drug applications dated August 14, 2003, received August 15, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Risperdal (risperidone) tablets and oral solution, and Risperdal M-TAB (risperidone) orally disintegrating tablets.

These "Changes Being Effected" supplemental new drug applications provide for revised product labeling under WARNINGS, Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia.

We have completed our review of these applications and they are approved, effective on the date of this letter.

As agreed in the meeting of August 13, 2003, the last sentence of the following section is amended as follows:

> **WARNINGS**
> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. RISPERDAL® has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis. RISPERDAL is not approved for the treatment of patients with dementia-related psychosis.

The final printed labeling (FPL) must be identical to the above labeling (package insert submitted August 14, 2003).

Please submit the FPL electronically according to the guidance for industry titled Providing Regulatory Submissions in Electronic Format – NDA. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Please individually mount 15

---

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004
Page 2

of the copies on heavy-weight paper or similar material. For administrative purposes, these submissions should be designated "FPL for approved supplement NDA 20-272 / S-033, NDA 20-588 / S-021, and NDA 21-444 / S-004." Approval of these submissions by FDA is not required before the labeling is used.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Steve Hardeman, R.Ph., Senior Regulatory Project Manager, at (301) 594-5525.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 patients exposed to multiple doses of RISPERDAL® who experienced an event of the type cited on at least one occasion while receiving RISPERDAL®. All reported events are included, except those already listed in Table 1, those events for which a drug cause was remote, and those event terms which were so general as to be uninformative. It is important to emphasize that, although the events reported occurred during treatment with RISPERDAL®, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions: frequent adverse events are those occurring in at least 1/100 patients (only those not already listed in the tabulated results from placebo-controlled trials appear in this listing); infrequent adverse events are those occurring in 1/100 to 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients.

**Psychiatric Disorders**
*Frequent:* increased dream activity*, diminished sexual desire*, nervousness. *Infrequent:* impaired concentration, depression, apathy, catatonic reaction, euphoria, increased libido, amnesia. *Rare:* emotional lability, nightmares, delirium, withdrawal syndrome, yawning.

**Central and Peripheral Nervous System Disorders**
*Frequent:* increased sleep duration*. *Infrequent:* dysarthria, vertigo, stupor, paraesthesia, confusion. *Rare:* aphasia, cholinergic syndrome, hypoesthesia, tongue paralysis, leg cramps, torticollis, hypotonia, coma, migraine, hyperreflexia, choreoathetosis.

**Gastrointestinal Disorders**
*Frequent:* anorexia, reduced salivation*. *Infrequent:* flatulence, diarrhea, increased appetite, stomatitis, melena, dysphagia, hemorrhoids, gastritis. *Rare:* fecal incontinence, eructation, gastroesophageal reflux, gastroenteritis, esophagitis, tongue discoloration, cholelithiasis, tongue edema, diverticulitis, gingivitis, discolored feces, GI hemorrhage, hematemesis.

**Body as a Whole/General Disorders**
*Frequent:* fatigue. *Infrequent:* edema, rigors, malaise, influenza-like symptoms. *Rare:* pallor, enlarged abdomen, allergic reaction, ascites, sarcoidosis, flushing.

**Respiratory System Disorders**

20

*Infrequent:* hyperventilation, bronchospasm, pneumonia, stridor. *Rare:* asthma, increased sputum, aspiration.

**Skin and Appendage Disorders**
*Frequent:* increased pigmentation*, photosensitivity*. *Infrequent:* increased sweating, acne, decreased sweating, alopecia, hyperkeratosis, pruritus, skin exfoliation. *Rare:* bullous eruption, skin ulceration, aggravated psoriasis, furunculosis, verruca, dermatitis lichenoid, hypertrichosis, genital pruritus, urticaria.

**Cardiovascular Disorders**
*Infrequent:* palpitation, hypertension, hypotension, AV block, myocardial infarction. *Rare:* ventricular tachycardia, angina pectoris, premature atrial contractions, T wave inversions, ventricular extrasystoles, ST depression, myocarditis.

**Vision Disorders**
*Infrequent:* abnormal accommodation, xerophthalmia. *Rare:* diplopia, eye pain, blepharitis, photopsia, photophobia, abnormal lacrimation.

**Metabolic and Nutritional Disorders**
*Infrequent:* hyponatremia, weight increase, creatine phosphokinase increase, thirst, weight decrease, diabetes mellitus. *Rare:* decreased serum iron, cachexia, dehydration, hypokalemia, hypoproteinemia, hyperphosphatemia, hypertriglyceridemia, hyperuricemia, hypoglycemia.

**Urinary System Disorders**
*Frequent:* polyuria/polydipsia*. *Infrequent:* urinary incontinence, hematuria, dysuria. *Rare:* urinary retention, cystitis, renal insufficiency.

**Musculo-Skeletal System Disorders**
*Infrequent:* myalgia. *Rare:* arthrosis, synostosis, bursitis, arthritis, skeletal pain.

**Reproductive Disorders, Female**
*Frequent:* menorrhagia*, orgastic dysfunction*, dry vagina*. *Infrequent:* nonpuerperal lactation, amenorrhea, female breast pain, leukorrhea, mastitis, dysmenorrhea, female perineal pain, intermenstrual bleeding, vaginal hemorrhage.

**Liver and Biliary System Disorders**
*Infrequent:* increased SGOT, increased SGPT. *Rare:* hepatic failure, cholestatic hepatitis, cholecystitis, cholelithiasis, hepatitis, hepatocellular damage.

**Johnson-Johnson**
PHARMACEUTICAL RESEARCH
& DEVELOPMENT, L.L.C.

1 4 AUG 2003

1125 Trenton-Harbourton Road
P.O. Box 200, Titusville, NJ 08560

ORIGINAL

NDA SUPPLEMENT

NDA NO. 20-272   REF NO. SLR-033
NDA SUPPL FOR Labeling

Russell Katz, MD, Director
Division of Neuropharmacological Drug Products
Center for Drug Evaluation and Research, HFD-120
U.S. Food and Drug Administration
Attn: Document Control Room 10B-40
1451 Rockville Pike
Rockville, MD 20852

RECEIVED

AUG 1 5 2003

HFD-120/CDER

Subject:     NDA 20-272
             Cross-reference NDAs 20-588 and 21-444
             RISPERDAL® (risperidone) Tablets
             Special Supplement – Changes Being Effected

Dear Dr. Katz:

Please refer to your approval letter of April 2, 2003 for NDA 21-444, RISPERDAL®
(risperidone)[        ] Tablets and the agreed-upon labeling. The labeling
included a new subsection under WARNINGS regarding the occurrence of
cerebrovascular adverse events in elderly patients with dementia. The text of this
subsection is as follows:

> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with
> Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including
> fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of
> risperidone in elderly patients with dementia-related psychosis. In placebo-
> controlled trials there was a significantly higher incidence of cerebrovascular
> adverse events in patients treated with risperidone compared to patients treated with
> placebo. RISPERDAL has not been shown to be safe or effective in the treatment
> of patients with dementia-related psychosis.

In addition, please refer to the meeting of August 13, 2003 between representatives of the
Division and J&J PRD, in which the Division agreed to the following proposed text to
replace the third sentence of the above statement.

> RISPERDAL is not approved for the treatment of patients with dementia-related
> psychosis.

Therefore, in accordance with 21 CFR 314.70(c)(2), we are submitting a supplemental
application to provide revised product labeling to improve the clarity of this sentence in

PRD-1C

# Exhibit 4

14 pages:

Mr. John D. Winter esq. communications, 1 motion regarding My, Mr. Brandon Tyler Ward's, Florida Supreme Court Cases and Mr. John D Winter's involvement –He, Mr. Winter, and CEO Joaquin Duato left queue for Duval County service of documents and, some more communications between Company/Company Lawyer and I.

Reply

11:58

## Processing Completed for ^_Filin...

noreply@myflcourtaccess.com          June 30  ☆
(No Recipient) ⌄



Filing # 226244538 E-Filed 06/29/2025 07:29:24 AM

IN THE COUNTY COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA.

**Brandon Tyler Ward**
_____

Plaintiff(s)

Case No.: 16-2025-DR-003127
Division: DV-A

Vs.

**Donald John Trump**
**Seth Davis Crawford**
_____

Defendant(s)

## MOTION FOR/TO Arrest Seth C. & Pay Me 10 Million Mr. Trump

The [ X ] Plaintiff [  ] Defendant (check one) moves for entry of an order by the Court
Granting the following relief (explain what you want the Court to do):
**Order Payment of Several Million to 100% Permanent &**
**Total Service-Connected Marksmanship Badge**
**Award-Winning Disabled Army Veteran Brandon Tyler Ward**
**Arrest Seth Davis Crawford for Sex Abuse Recidivism**

The grounds or reason for this motion are (explain):
**Donald Trump's Accessory After The Fact Whistleblower**
**Retaliation With Dr. Wissam Hotiet and Obstruction of Justice**
**After That Fact Caused Sex Abuse Recidivism and Product**
**Liability; John Winter is His NDA Lawyer whose email is**
**Jwinter@pbwt.com. Also Florida Statue 69.081, 59.091(d)**
**and, Florida Statue 777.201(1) Trumps Sex Abuse Lawyer is**
**Angela M. Hatley in Fayetteville NC her email is**
**Angelaahatley@aol.com**

### Certificate of Service
I certify that a copy has been furnished to **Mr.Trump & Mr. Crawford** (name of other
party) at **stevesadow@gmail.c/samantha.r.autry@nccourts.org** (address or email)
by (email) mail / hand delivery (circle one) on **June 30th 2025** (date).

Signature

**Brandon Tyler Ward**
Name (Print)

**confidentiality clause due to sex abusers**
Address

**Sex Abuser Donald Trump & Seth Crawford**
City, State, Zip Code

**904-815-2601**
Telephone

4:16

← **Processing Completed for Filing ...**

This email verifies the processing of your Filing # 226206628 with the Duval County, Florida Domestic Relations/Family Division.

| | |
|---|---|
| Status: | Accepted |
| Filing Date/Time: | 06/27/2025 03:06:03 PM |
| UCN: | 162025DR003127AXXXMA |
| Clerk Case #: | 16-2025-DR-003127-AXXX-MA |
| Case Style: | WARD, BRANDON TYLER - TRUMP, DONALD JOHN |
| Matter #: | |
| Memo: | |
| Filing Fee: | $0.00 |
| Common Civil Codes Complaint: | $0.00 |
| Common Civil Codes Motion to Set for Trial: | $0.00 |
| Statutory Convenience Fee: | $0.00 |
| Total Paid: | $0.00 |
| Fee Status: | Processed |
| Paid By: | No payment required |
| Order #: | |
| Financial ID: | |

Documents

| # | Document Type | Status | Filing Date | Rejection Reason | Your Attachment |
|---|---|---|---|---|---|
| 1 | Common Civil Codes Complaint | Accepted | 06/27/2025 | | CourtPaper(2) (1) (1).PDF |
| | | Accepted | 06/2 | | CivilTrumpCase (1) |

🗑 Delete    ↩ Reply    ➡ Forward    ⬆ Move    ⋮ More

2:18

# Removal from Service List – Cas...

noreply@myflcourtaccess.com          2:16 PM  ☆
(No Recipient) ⌄

This is an automatic e-mail message generated by the ePortal system. Please DO NOT RESPOND to this e-mail as the mail box is unattended.

Removal From Service List

The following transaction was entered on 06/25/2025 02:16:27 PM ET.

Court:
Judicial Circuit in and for Duval County, Florida
Case #:
162025DR002334AXXXMA
Case Style:
WARD, BRANDON TYLER - CRAWFORD, SETH DAVIS
Filer:
Other Attorney/Interested Party 'Joaquin Duato' added by 'Brandon Ward' 904-815-2601 has selected not to receive electronic service on this case

This information has been electronically mailed to:

| Name | Primary Email | Alternate Email 1 | Alternate Email 2 |
|------|--------------|-------------------|-------------------|
| Brandon Ward | Mrward3740@aol.com | | |
| Sandra Williams | Williamsa@flcourts.org | | |

10:04 ⊘ 🖼 ▲                    🔋 5G📶 66 ◢

← **Processing Completed for Filing ...**

226244553 with the Duval County, Florida Domestic Relations/Family Division.

| | |
|---|---|
| Status: | Accepted |
| Filing Date/Time: | 06/29/2025 07:44:58 AM |
| UCN: | 162025DR002652AXXXMA |
| Clerk Case #: | 16-2025-DR-002652-AXXX-MA |
| Case Style: | WARD, BRANDON TYLER - ROBERSON, ERIC CHASE |
| Matter #: | |
| Memo: | |
| Filing Fee: | $0.00 |
| Common Civil Codes Motion: | $0.00 |
| Appellate Pleadings Notice of Appeal to Supreme Court (Fee Outstanding): | $0.00 |
| Statutory Convenience Fee: | $0.00 |
| Total Paid: | $0.00 |
| Fee Status: | Processed |
| Paid By: | No payment required |
| Order #: | |
| Financial ID: | |

Documents

| # | Document Type | Status | Filing Date | Rejection Reason | Your Attachment |
|---|---|---|---|---|---|
| 1 | C3 | Accepted | 06/29/2025 | | downloadfile(23).PDF |
| 2 | C7091P | Accepted | 06/29/2025 | | JudgeEricChaseR.PDF |
| | | | | | Case- |


Delete


Reply


Forward


Move


More

|||     ◯     ‹









1 group                    No friends yet

Wallet                     Transactions

You requested $999,999 from **Vanessa Broadhurst**
7024 8:30 AM

Jwinter @ pbwt. com

Please consider donating to help
a 100% Permanent & Total Service
Connected U.S Army Disabled Gulf War
Era Veteran, 37/40 Marksman Badge
Winner 1/3, Im asking for help with bills,
food, groceries
@MK_Brando999 on X
@Christian_Soldier_Brando on Insta

I AM A RISPERIDONE
PRODUCT LIABILITY
WHISTLE-BLOWER ALSO



Cancel          Remind

You requested $999,999 from **Vanessa Broadhurst**

Jwinter @ pbwt. com

Please consider donating to help
a 100% Permanent & Total Service
Connected U.S Army Disabled Gulf War
Era Veteran, 37/40 Marksman Badge
Winner 1/3, Im asking for help with bills,
food, groceries
@MK_Brando999 on X
@Christian_Soldier_Brando on Insta

Cancel          Remind

**You requested $1 from Joseph Wolk**

Please consider donating to help
a 100% Permanent & Total Service
Connected U.S Army Disabled Gulf War
Era Veteran, 37/40 Marksman Badge
Winner 1/3, Im asking for help with bills,
food, groceries

I AM A RISPERIDONE
PRODUCT LIABILITY
WHISTLE-BLOWER ALSO
TER 2016 TURNS 2018
HE COURTROOMS MIND. I

