# EXHIBIT B

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

**I.    CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>SEVENTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>ST. JOHNS</u>  COUNTY, FLORIDA

<u>Brandon Tyler Ward</u>
Plaintiff

Case # ___552025CA001784A000MX___

Judge _____

vs.

<u>Mr. John D Winter</u>
 Defendant

---

**II.    AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

**III.    TYPE OF CASE**      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**Accepted 12/23/2025 12:44 PM by the Clerk of the Circuit Court, St. Johns County, Florida, DIN: 3**

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☒ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☒ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

  2

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.    DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☒ yes
    ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Brandon Ward           Fla. Bar #
        Attorney or party                (Bar # if attorney)

Brandon Ward           12/22/2025
  (type or print name)           Date

_____ **IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT**_____

_____ **IN AND FOR ST. JOHN'S COUNTY, FLORIDA**_____

Case #: <u>552025CA001784A000MX</u>

Judge: _____

**Mr. Brandon Ward**

Plaintiff

**Complaint**:

**Product Liability**

**V.s**

**Johnson and Johnson**

Defendant

## 1. Claim

In 2022, Johnson and Johnson obstructed justice on an underlying Product Liability claim for Invega® which caused my emergency surgery that occurred in April 2019 – I am mentally incapacitated as a disabled veteran for purposes of **2024 Florida Statute 95.051(d)**. Indicating a 7 year statue of limitations tolling for disabled people leaving my Product Liability claim available for trial until April 2026. Johnson and Johnson herein referred to as J&J, committed an unprofessional legal coercion and concealment of a known hazardous product directly prohibited in **The Sunshine in Litigation Act or 2024 Florida Statue 69.081, SEC Rule 21F-17(a) and, American Bar Associations Model Rules of Professional Conduct 3.4(f), 5.6(b) and, 8.4(c-e**) via a Confidentiality Agreement solicited by Company Lawyer: Mr. John D. Winter esq. Mr. Winter is a partner in Patterson Belknap's Products Liability group who represents California jurisdiction for this claim while sending settlement documents to Tennessee before scope of liability was known and while I was under duress albeit the fact the Product Liability Surgery occurred in Ohio. It is for that reason I beg The State of Florida take jurisdiction and open this multi-million dollar Invega Sustena® Product Liability claim.

**This Complaint is Requesting Trial for Product Liability in the sum of $37 million dollars.**

**Defendant Lawyer for Confidentiality Agreement:  Mr. John D. Winter  ***

**1133 Avenue of the Americas.  jwinter@pbwt.com * New York, New York**

**10036.  (212)  336-2000**

(1)

## 2. <u>Claim details</u>

I, Mr. Brandon Ward, am a 100% Permanent & Total Service-Connected U.S Army Gulf War Era, Marksmanship Badge Award-Winning Disabled American Veteran and Sexual Trauma Survivor who suffered a Laparoscopic Cholecystectomy in April 2019 when J&J product Invega® caused excruciating brown gallstones or not stereotypical gallstones but, ones containing conjugate elevations of bilirubin[2]. In comparative contrast to previous J&J legal claims against Mr Andrew Yount or Mr. Austin Pledger with Risperdal®, Gynecomastia and, Prolactin. I after serious research/investigation into Invega® raising monocyte, blood bilirubin and, other levels found it being directly tied to gallstones. The Government and Company explicitly acknowledged Invega being directly linked to Gallstones in the 2003 Risperdal FDA patent for MTabs and injection active metabolite 'Paliperdone' during which Russell Katz M.D and J&J Dr. Edward Brann state twice the risk of gallstones on patent page 20 and 21. I tried to warn CEO(s): Mr. Alex Gorsky, Mr. Joaquin Duato and, J&J Board of

Directors through various Social Media namely Venmo, LinkedIn & Gmail that Invega® was dangerous and that they had excluded gallstones on more recent, more potent patents. The company has a grim past that demonstrated being worth existence in the public domain many times. I beg you, Honorable Judge stand with me against Invega® and force J&J to bear notice in there annual reports once again to profound litigation. J&J has caused numerous deaths of sensitive populations, paying millions of dollars to product liability victims some suffering from diabetes, gynecomastia/the resulting surgery or, those like me who need emergency surgery for non-cosmetic reasons. J&J even after D.O.J sanctions worth billions devise more potent, longer-lasting versions of Invega® thusly raising the overall number of adverse events for Invega®

J&J lawyer Mr. John Winter in preparing, advising for and, paying for my 2022 Confidentiality Settlement Agreement obstructed justice and broke. **'American Bar Associations Model Rule of Professional Conduct Rule 8.4( e)** by implying an ability to influence improperly a government agency

*" 5.2 RELEASOR understands that upon execution of this Agreement, RELEASOR is forever barred from filing or causing to be filed any claim or litigation or proceeding in and before any agency, tribunal or court relating to any claim RELEASOR may have ever had or could have in the future against RELEASEES in any way arising out of or related to Claimant's Claims "*

'Confidentiality Settlement Agreement section 5.2' by J&J Lawyer Mr. Winter **also violates SEC Rule 21F-17(a)** which provides that "[n]o person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing or threatening to enforce a confidentiality agreement...with respect to such communications."

(2)

## 3. Claim Details Continued

J&J Defense Lawyer Mr.John Winter **broke the American Bar Associations Model Rules of Professional Conduct Rule 8.4( d)** by engaging in conduct that is prejudicial to the administration of justice. Not being able to converse with other attorneys or there Claimants as laid out in Section 4.1 of the Confidentiality Agreement also restricts a lawyers right to practice which **violates the American Bar Associations Model Rules of Professional Conduct Rule 5.6(b)** A lawyer shall not participate in offering or making an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.

"4.1....*RELEASOR agrees that he will not make any statement, either directly or indirectly, by implication or innuendo, to anyone, including but not limited to the press or media or to other attorneys or Claimants or potential Claimants concerning the Agreement Terms or describing or characterizing the Agreement Terms in any way other than to say that the matter has been resolved"*

Furthermore J&J Lawyer John Winter **breaks 'American Bar Associations Model Rules of Professional Conduct Rule 8.4( c)** by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;' when he advises further Confidentiality Agreement Terms such as:

"6.4....*The RELEASOR further expressly agrees and covenants to release, discharge, forever indemnify, defend, and hold harmless RELEASEES and their attorneys from any liens and/or claims which may arise or may have heretofore arisen in favor of Medicare, Medicaid, any other government program or any other governmental entity, federal, state or local, by operation of law or equity, for medical expenses, disability benefits, or any other charge or expense, directly or indirectly relating to the alleged injuries caused by RELEASOR'S use of Risperdal® and/or Invega®. The indemnification set forth in this section specifically includes, but is not limited to, the payment of all reasonable costs and expenses of investigation, defense, settlement, attorney fees, judgments, court costs, and all other costs and expenses of defending such claims*."

All 3 sections of Mr. John D. Winters 2022 Confidentiality Agreement: 4.1, 5.2 and, 6.4 **break American Bar Associations Model Rules of Professional Conduct Rule 3.4(f)** which states a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party

## 3. Personal Evidence of Injury and Obstruction

1. 2022 Confidentiality Settlement Agreement
2. 2022 Emails with John D. Winter ESQ.
3. 2019 Toledo Flower Hospital-State Hospital Inpatient Document
4. 2019 Harbor Behavioral Health in Toledo Ohio Invega Injection Records
5. 2019 Laparoscopic Cholecystectomy & Pathophysiological Findings
6. Early 2000's-2019 Company Prior Record Court Documents
   6a. 2003 risperdal FDA Patent states risperdal causes cholesestatis

(3)

4. <u>**Scientific Evidence For Claim**</u>

1) National Library of Medicine, PubMed study titled **New Pathophysiological Concepts Underlying Pathogenesis of Pigment Gallstones** [1], "Pigment gallstones, which are much less frequent than cholesterol stones, are classified descriptively as 'black' or 'brown'. They are composed mostly of calcium hydrogen bilirubinate,
Ca(HUCB)2."

2) National Library of Medicine, PubMed Study, **Pathogenesis of Gallstones**[2]. "Gallstones are composed principally of cholesterol monohydrate crystals (cholesterol stones) or the acid salt of calcium bilirubinate (pigment stones). Cholesterol stones and the black variety of pigment gallstones form in sterile gallbladder bile whereas brown pigment gallstones form in infected bile. **Biliary supersaturation is the principal pathophysiological defect and is hepatic in origin. Supersaturation results from excessive secretion of cholesterol or bilirubin conjugates**, the precursors of unconjugated bilirubin, and/or, deficient secretion of bile salt and lecithin, the solubilizers of these otherwise insoluble lipids" This Study further states, "Chemical compositions of brown and black pigment stones are different: In black stones, calcium bilirubinate is polymerized and oxidatively degraded **but in brown stones, calcium bilirubinate is present as the unpolymerised salt."**

3) The National Library of Medicine further states in a study Titled **LiverTox: Clinical and Research Information on Drug-Induced Liver Injury,**[3] "Risperidone is an atypical antipsychotic that is used widely in the treatment of mania and schizophrenia. Risperidone therapy is associated with serum aminotransferase elevations and in rare instances has been linked to clinically apparent acute liver injury." The Study further states, **"Liver test abnormalities may occur in up to 30% of patients on long term therapy with risperidone..The pattern of serum enzyme elevations is typically cholestatic**, but cases with hepatocellular and mixed patterns have also been described"

4) According to sciencedirect.com, Medical Faculty and Medical Scholars associated with European Psychiatry Volume 26, Supplement 1 conducted a study Titled **P01279 – Liver function tests and one year Risperidone treatment in children and adolescents** "Asymptomatic liver function test abnormalities mostly ALP elevation was found **in subjects treated with risperidone. The mean levels of liver enzymes and billuribin of the patients were significantly higher after one year of treatment than the baseline.** Also the mean levels of liver enzymes and billuribin of the patients were significantly higher after one year of treatment than the six months. **There was significant association between changes in weight, risperidone dose and liver enzymes and billuribin levels.**

(4)

5) According to Conversion guidance written on National Library of Medicine Government website in study, "**Maintenance dose conversion between oral risperidone and paliperidone palmitate 1 month: Practical guidance based on pharmacokinetic simulations**" from J&J  Dr. Russu," **Patients taking risperidone are therefore exposed as well to paliperidone f**ollowing in vivo conversion and **the clinical effects of oral risperidone result from the combined concentrations of risperidone and paliperidone (ie activemoiety)**.5  [According to 21 CFR § 314.3 an Active moiety is the molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt.]

6) In a study published on the government website The National Library of Medicine in a study by Kentaro Kawabe, MD. Department of Neuropsychiatry, Graduate School of Medicine, Ehime University titled "**A Case of Acute Pancreatitis Associated with Risperidone Treatmen**t" the team stated, "**Gallstones were present, which were due to an adverse effect of risperidone** because the two separate risperidone administrations elevated serum amylase and lipase independently."

7) C.. Michael Gibson M.S., M.D., Professor of Medicine, Harvard Medical School Founder and Chairman of the Board, WikiDoc Foundation (a 509 (a)(1) Charitable Organization); Chief Executive Officer, Baim Institute for Clinical Research says in his website wikidoc.org, "During its premarketing assessment, multiple doses of Risperdal® were administered to 2607 adult patients with schizophrenia and 1923 pediatric patients in Phase 2 and 3 studies...In the listings that follow, spontaneously reported adverse events were classified using World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 adult or 1923 pediatric patients exposed to multiple doses of Risperdal® who experienced an event of the type cited on at least one occasion while receiving Risperdal®.. (which then lists under) a.
**Gastrointestinal** (symptoms)  b.
**Cholelithiasis** (gallstones)

8) Dr.Aseel Al-Ibrahim stated in Psychiatry Research Case Reports Volume 3, Issue 1, June 2024 **A case of recurrent acute pancreatitis due to paliperidone palmitate long-acting injectables (LAI),** "Our patient experienced recurrent **acute pancreatitis five days after her paliperidone injection dates, pointing to a consistent latency**. All other possible causes were eliminated, rendering paliperidone a class IA drug based on the level of evidence (Badalov et al., 2007).)

9) M-X Yan, Y-Q Li, Department of Gastroenterology, Shandong University Qilu Hospital, Shandong Province, China study on The Labeled, "**Gall stones and chronic pancreatitis: the black box in between**": "77% of gallstone patients, while 47% of non-gallstone patients were found to have chronic pancreatitis according to the Cambridge classification" "Secondly, a connection between gall stones and chronic inflammation of the pancreas might exist. **Numerous studies or investigations have shown that changes associated with chronic pancreatitis are common in gallstone patients."**

10) Matthew Silva, Pharm.D., R.Ph., B.C.P.S., a professor of pharmacy practice at MCPHS University in Worcester, Mass., and colleagues published:
'**Antipsychotics May Contribute to Cases of Acute Pancreatitis'** stating, "they reviewed case reports of antipsychotic pancreatitis published from 1990 to 2015 and classified these cases into groups according to the weight of published evidence for each agent"  "**Risperidone, which was previously categorized as a Class IV, was moved to Class II.**" "Class II drugs are those with at least four reports in the literature and consistent latency (time between drug initiation and illness)"

**Sources Cited Page**:

*1: Vítek L, Carey MC. New pathophysiological concepts underlying pathogenesis of pigment gallstones. Clin Res Hepatol Gastroenterol. 2012 Apr;36(2):122-9. Doi: 10.1016/j.clinre.2011.08.010. Epub 2011 Oct 5. PMID: 21978438; PMCID: PMC3311771

https://pmc.ncbi.nlm.nih.gov/articles/PMC3311771/

*2: Carey MC. Pathogenesis of gallstones. Recenti Prog Med. 1992 JulAug;83(78):379-91. PMID: 1529152. https://pubmed.ncbi.nlm.nih.gov/1529152/

*3: Clinical and Research Information on Drug-Induced Liver Injury [Internet]. Bethesda (MD): National Institute of Diabetes and Digestive and Kidney Diseases; 2012-. Risperidone. [Updated 2023 Jun 5]. Available from: https://www.ncbi.nlm.nih.gov/books/NBK548906/

*4: A. Erdogan, N. Yurteri, A.E. Tufan, H. Ankarali, E. Demirci,P01-279 – Liver function tests and one year risperidone treatment in children and adolescents,European Psychiatry,Volume 26, Supplement 1,2011, Page 280, ISSN 0924-9338,

(https://www.sciencedirect.com/science/article/pii/S0924933811719903)

*5: Alberto Russu, PhD, Global Clinical Pharmacology, Quantitative Sciences, Janssen Research & Development, a Division of Janssen Pharmaceutica NV, Beerse, Belgium.

**Sources Cited Page Cont.**

Maintenance dose conversion between oral risperidone and paliperidone palmitate 1 month: Practical guidance based on pharmacokinetic simulations 2018 Apr 30

https://pmc.ncbi.nlm.nih.gov/articles/PMC6175146/#:~:text=Oral%20risperidone%20doses%20of%201,from%20oral%20risperidone%20to%20PP1M

*6: Kentaro Kawabe, MD. Department of Neuropsychiatry, Graduate School of Medicine, Ehime University A Case of Acute Pancreatitis Associated with Risperidone Treatment

https://pmc.ncbi.nlm.nih.gov/articles/PMC4022769/#:~:text=Gallstones%20were%20present%2C%20which%20were,serum%20amylase%20and%20lipase%20independently.

*7: Michael Gibson M.S., M.D., Professor of Medicine, Harvard Medical School Founder and Chairman of the Board, WikiDoc Foundation (a 509 (a)(1) Charitable Organization.

https://www.wikidoc.org/index.php/Risperidone_side_effects#Premarketing_evaluation

*8) Dr.Aseel Al-Ibrahim from Kuwait Centre for Mental Health in Psychiatry Research Case Reports Volume 3, Issue 1, June 2024 Titled A case of recurrent acute pancreatitis due to paliperidone palmitate long-acting injectables (LAI)

https://www.sciencedirect.com/science/article/pii/S2773021223001013

*9) M-X Yan, Y-Q Li, Department of Gastroenterology, Shandong University Qilu Hospital, Shandong Province, China study on The Labeled, "Gall stones and chronic pancreatitis: the black box in between": Postgrad Med J. 2006 Apr;82(966):254–258. https://pmc.ncbi.nlm.nih.gov/articles/PMC2579631/

*10) Matthew Silva, Pharm.D., R.Ph., B.C.P.S., a professor of pharmacy practice at MCPHS University in Worcester, Mass. Published Online: Antipsychotics May Contribute to Cases of Acute Pancreatitis on 18 March 2016

https://psychiatryonline.org/doi/full/10.1176/appi.pn.2016.PP3b1#:~:text=D.%2C%20and%20colleagues%20say%20long,and%20combination%20therapy%20is%20necessary. %E2%80%9D

(7)

Signature For Plaintiff: _____ 12/22/2025  10:45am_____

Signature For Court Clerk: _____

Signature For Defendant: _____

**Brandon Ward**

**Product Liability Addendum**

**"Cholelithiasis via inhibition of monocytes from Risperdal: The Meta-analysis "**

1) According to Dr. Xingwu Liu in an article written in The National Library of Medicine article, "**Association between monocyte-to-high-density lipoprotein-cholesterol ratio and gallstones in U.S. adults: findings from the National Health and Nutrition Examination Survey 2017–2020"** Studies have indicated that monocyteto-high-density lipoprotein cholesterol ratio (MHR) can be a reliable indicator of various diseases." "Gallstone prevalence positively associated with elevated MHR, indicating that MHR can be employed as a clinical indicator to assess gallstone prevalence." "Inflammatory cytokines can alter the absorptive and secretory functions of human gallbladder epithelial cells, leading to gallstone formation."

   https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/

   https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/#:~:text=High%2Ddensity%20lipoprotein%20cholesterol%20(HDL,between%20MHR%20levels%20and%20gallstones

2) According Dr. Ibrahim Hawwari at the European Research Council In 2024, with others, wrote an essay called, "**Platelet transcription factors license the pro-inflammatory cytokine response of human monocytes:** "Monocytes secrete highly inflammatory cytokines that are critical for a proper immune response but can also lead to excessive inflammation when dysregulated" "While aberrant monocyte activity triggers hyperinflammation and cytokine storms"

   https://www.embopress.org/doi/full/10.1038/s44321-024-00093-3

3) According to Rajiv P. Sharma, Professor from The Psychiatric Institute, University of Illinois in a study titled, "Treatment with the antipsychotic risperidone is associated with increased M1-like JAK–STAT1 signature gene expression in PBMCs from participants with psychosis and in THP-1 monocytes and macrophages." Collectively these data indicate that risperidone may contribute to increases in expression of JAK-STAT1 signature genes in participants with a longer illness duration and may skew myeloid cells to a more proinflammatory phenotype. Risperidone consistently increased expression of the "M1" (JAK-STAT1) genes CXCL10, IRF1 and STAT1 across different cellular differentiation states, including both monocytes and monocyte-derived macrophages,  Alterations to immune parameters in psychosis are not static, rather they appear to fluctuate in relation illnessrelated variables. This is perhaps not surprising given the plasticity of the immune

   .                                      (1)

system, And particularly cells of the myeloid lineage, to previous and current signals present in the tissue milieu,

including pharmacological agents such as antipsychotic drugs.

https://pmc.ncbi.nlm.nih.gov/articles/PMC8792805/#:~:text=*%20Risperidone%20treated%20subjects%20with%20chronic%20psychosis,Risperidone%20decreases%20%E2%80%9CM2%E2%80%9D%20gene%20expression%20in%20macrophages.

4) Dr. Edward A. Fisher wrote, **"Inflammation—a Critical Appreciation of the Role of Myeloid Cells"** in American Society for Microbiology on journals.asm.org In the widely used mouse zymosan peritonitis model, resident F4/80hi macrophages leave the serosal cavity to local lymph nodes within 60 min of inflammagen injection and neutrophil recruitment peaks at 4 h. PMN recruitment is followed by a wave of inflammatory Ly6Chi monocytes, which peaks in between 16 and 24 h. In this model, neutrophil and monocyte numbers in the cavity return to baseline within 96 h, but these timings and the absolute number of myeloid cells depend on the dose and nature of the inflammagen. A recent paper from the group of Derek Gilroy (35) extended analysis of the classic zymosan peritonitis model out past this 96-h window and showed that a true return to tissue homeostasis following clearance of zymosan particles took more than 3 weeks. After disappearance of PMNs from the peritoneum, Newson et al. (35) observed changes in monocyte-derived macrophage subsets and a significant increase in the number of B and T lymphocytes in the peritoneum. The recruitment and retention of this collection of lymphoid and myeloid cells long after the disappearance of the inciting sterile stimulus is intriguing. Myeloid cells (macrophages, monocytes, dendritic cells, and granulocytes) survey the body for signs of infection and tissue damage and regulate tissue homeostasis, organogenesis, and immunity. They express receptors that initiate the inflammatory response, send signals that alter the vascular and cytokine milieu, and oversee the recruitment, differentiation, and activation of other myeloid and adaptive immune cells. Their activation must therefore be tightly regulated, optimized for maximal innate immune protection with a minimum of collateral tissue damage or disorganization

https://pmc.ncbi.nlm.nih.gov/articles/PMC8648988/

(2)

Sources Cited:

1. Dr. Xingwu Liu National Library of Medicine article, **"Association between monocyteto-high-density lipoprotein-cholesterol ratio and gallstones in U.S. adults: findings from the National Health and Nutrition Examination Survey 2017–2020"**
   **https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/**

2. Dr. Ibrahim Hawwari wrote an essay," **Platelet transcription factors license the proinflammatory cytokine response of human monocytes:"**
   https://www.embopress.org/doi/full/10.1038/s44321-024-00093-3

3. Rajiv P. Sharma, Professor from The Psychiatric Institute, University of Illinois in a study titled, **"Treatment with the antipsychotic risperidone is associated with increased M1-like JAK-STAT1 signature gene expression in PBMCs from participants with psychosis and in THP-1 monocytes and macrophages."**

   https://pmc.ncbi.nlm.nih.gov/articles/PMC8792805/#:~:text=*%20Risperidone%20treated%20subjects%20with%20chronic%20psychosis,Risperidone%20decreases%20%E2%80%9CM2%E2%80%9D%20gene%20expression%20in%20macrophages

4. Dr. Edward A. Fisher wrote **Inflammation—a Critical Appreciation of the Role of Myeloid Cells** https://pmc.ncbi.nlm.nih.gov/articles/PMC8648988/

(3)

Plaintiff Signature _Bandow W_ 12/22/2025 10:45am _____

Defendant Signature _____

Court Clerk Signature _____

*__CONFIDENTIAL__*

**CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE**

1.    <u>Parties</u>



2.    <u>Recitals</u>

***CONFIDENTIAL***



**3.**     **Consideration**



**4.**     **Confidentiality of Agreement**



***CONFIDENTIAL***



5.    **Complete, Final, and Full Release of All Claims**



**_CONFIDENTIAL_**



6.      **Indemnity, Responsibility for Reimbursement to Providers and Satisfaction of Liens**

*CONFIDENTIAL*





7. **Miscellaneous**



*CONFIDENTIAL*



███████████████████████████████

Dated: _____          _____,

                                        RELEASOR

Approved as to Form and Content:

Dated: _____          PATTERSON BELKNAP WEBB & TYLER LLP


                              By: _____

                                   John D. Winter, Esq.


                              Attorney for Defendants
                              JANSSEN PHARMACEUTICALS, INC., JOHNSON
                              & JOHNSON, JANSSEN RESEARCH AND
                              DEVELOPMENT, LLC AND MCKESSON
                              CORPORATION

***CONFIDENTIAL***

STATE OF _____          )
                                    )
COUNTY OF _____            )


      On this _____ day of _____, 2022, before me, a duly commissioned and sworn Notary Public in and for the State and County, did appear _____ and before me signed the within instrument.  I know that said signer of the within instrument is the person whose name is subscribed.

      IN WITNESS THEREOF, I have hereunto signed my name and affixed my official seal in the above-named County on this date.


      Signed, sealed and delivered before me this ___ day of _____, 2022.


_____

NOTARY PUBLIC



Printed on: 11/04/2021

## RESOURCES

- **SEC Order**

"Whether it's in your employment contracts, settlement agreements or elsewhere, you simply cannot include provisions that prevent individuals from contacting the SEC with evidence of wrongdoing," said Gurbir S. Grewal, Director of the SEC's Division of Enforcement. "But that's exactly what we allege J.P. Morgan did here. For several years, it forced certain clients into the untenable position of choosing between receiving settlements or credits from the firm and reporting potential securities law violations to the SEC. This either-or proposition not only undermined critical investor protections and placed investors at risk, but was also illegal."

"Investors, whether retail or otherwise, must be free to report complaints to the SEC without any interference," said Corey Schuster, Co-Chief of the Enforcement Division's Asset Management Unit. "Those drafting or using confidentiality agreements need to ensure that they do not include provisions that impede potential whistleblowers."

The SEC's order finds that JPMS violated Rule 21F-17(a) under the Securities Exchange Act of 1934, a whistleblower protection rule that prohibits taking any action to impede an individual from communicating directly with the SEC staff about possible securities law violations. Without admitting or denying the SEC's findings, JPMS agreed to be censured, to cease and desist from violating the whistleblower protection rule, and to pay the $18 million civil penalty.

The SEC's investigation was conducted by Marie DeBonis and Jessica Neiterman, with assistance from John Farinacci, and supervised by Virginia Rosado Desilets, Brianna Ripa, Mr. Schuster, and Andrew Dean, all of the SEC's Asset Management Unit. Rua Kelly of the Trial Unit also assisted in the investigation.

The SEC strongly encourages the public to submit any tips, complaints, and referrals via https://www.sec.gov/tcr (https://www.sec.gov/tcr).

### 

Last Reviewed or Updated: Jan. 16, 2024



**U.S. Securities and Exchange Commission**

Home  /  Newsroom  /  Press Releases  /  J.P. Morgan to Pay $18 Million for Violating Whistleblower Protection Rule

PRESS RELEASE

# J.P. Morgan to Pay $18 Million for Violating Whistleblower Protection Rule

Firm's confidential agreements impeded clients from communicating with the SEC

**FOR IMMEDIATE RELEASE**  │  2024-7

Washington D.C., Jan. 16, 2024 — The Securities and Exchange Commission today announced settled charges against J.P. Morgan Securities LLC (JPMS) for impeding hundreds of advisory clients and brokerage customers from reporting potential securities law violations to the SEC. JPMS agreed to pay an $18 million civil penalty to settle the charges.

According to the SEC's order, from March 2020 through July 2023, JPMS regularly asked retail clients to sign confidential release agreements if they had been issued a credit or settlement from the firm of more than $1,000. The agreements required the clients to keep confidential the settlement, all underlying facts relating to the settlement, and all information relating to the account at issue. In addition, even though the agreements permitted clients to respond to SEC inquiries, they did not permit clients to voluntarily contact the SEC.

Clinical Review
G. Mannheim, MD
NDA22-264, S015
INVEGA® SUSTENNA® (paliperidone palmitate) Extended-Release Injectable Suspension

# 1 Recommendations/Risk Benefit Assessment

## 1.1 Recommendation on Regulatory Action

The data examined and discussed at FDA's Regulatory Briefing suggests that the current data is inconclusive at present to recommend approval. Despite, paliperidone palmitate suggesting superiority to treatment with oral antipsychotics in delaying time to first treatment failure in subjects with schizophrenia who had been incarcerated (primary endpoint), the presence of 31.3 % of the patients discontinuing early and being lost to follow-up, make such an interpretation unproven. In addition, there was a larger percent of patients who discontinued in the paliperidone palmitate group, and they were not completed followed up. No trend in favor of the paliperidone palmitate arm was demonstrated in terms of PSP total score and in CGI-S at month 15.

Implicitly, one would assume that giving injectable antipsychotics to non-compliant patients would be of more benefit than if they were asked to take oral antipsychotics. However, the present study does not clearly demonstrate this.

An additional study is recommended.

## 1.2 Risk Benefit Assessment

No clear benefit could be established in delaying time to first treatment failure in subjects with schizophrenia who had been incarcerated (primary endpoint). Risks associated with paliperidone and other second-generation antipsychotics include weight gain, dyslipidemias, glycemic abnormalities, hyperprolactinemia, movement disorders and cardiovascular events. Extrapyramidal motor side effects, tardive dyskinesia, etc. are also present. At present, based upon the current study, benefits cannot be said to exceed risks                               (b) (4).

## 1.3 Recommendations for Postmarketing Risk Evaluation and Mitigation Strategies

None are recommended at this time.

## 1.4 Recommendations for Postmarketing Requirements and Commitments

None are recommended at this time.

# 2 Introduction and Regulatory Background

Reference ID: 3737381

# CLINICAL REVIEW

| | |
|---|---|
| Application Type | Supplement |
| Application Number(s) | NDA 22-264, S015 |
| Priority or Standard | Standard |
| Submit Date(s) | July 11, 2014 |
| Received Date(s) | July 11, 2014 |
| PDUFA Goal Date | May 11, 2015 |
| Division / Office | OND-I/DPP |
| Reviewer Name(s) | Glenn B. Mannheim, MD |
| Review Completion Date | April 03, 2015 |
| Established Name | INVEGA SUSTENNA (paliperidone palmitate) Extended-Release Injectable Suspension |
| Therapeutic Class | Anti-Psychotics |
| Applicant | Janssen Pharmaceuticals, Inc. |
| Formulation(s) | Intramuscular |
| Dosing Regimen | 39, 78, 117, 156, 234 mg |
| Indication(s) | Comparison with Oral Antipsychotics in Delaying Time to Treatment Failure in Adults with Schizophrenia Who Have Been Incarcerated |
| Intended Population(s) | Previously Incarcerated Schizophrenics |

NDA 22264/S-015
Page 2

Overall, 39.8% of subjects in the paliperidone palmitate group and 53.7% of subjects in the comparator group met the definition for treatment failure ($p<0.05$). In our view, however, these results are not interpretable.

A total of 139 patients (31.3%) discontinued the study early without meeting the definition of a treatment failure, and, importantly, there were more discontinuations in the paliperidone palmitate group (n=81, 35.8%) than in the oral antipsychotic group (n=58, 26.6%). Furthermore, in 60 patients (26.5%) in the paliperidone palmitate group and 42 patients (19.3%) in the oral antipsychotic group, the reasons for discontinuation reported in the case report forms were either "lost to follow-up" or "withdrawal by subject" in the case report forms. Thus, there is no way to know whether or not these patients experienced treatment failure, and the relatively large differences between treatment groups undermine the interpretability of the results. To place this problem into perspective, in the paliperidone palmitate group, 39.8% of subjects were categorized as treatment failures and, as such, had endpoint events, whereas the disposition of a relatively large proportion of subjects, 26.5%, was unknown.

To assess the potential impact of the discontinuations, we performed two exploratory analyses on the explanatory Intent-to-Treat (eITT) set: 1) categorizing all 139 dropouts without an event as treatment failures; and 2) categorizing the 102 dropouts assessed as "lost to follow-up" or "withdrawal by subject" as treatment failures. Neither analysis yielded a statistically significant difference in delaying time to treatment failure (the $p$-values were 0.28 and 0.19, respectively). These analyses underscore the considerable uncertainty of the study's conclusions, given the high numbers of discontinuations and the disparity between treatment groups. Thus, we reached the conclusion that study R092670-SCH-3006 failed to provide substantial evidence in support of the intended labeling revisions.

2.  We recognize the potential importance of improved compliance with antipsychotic treatment, but substantial evidence of effectiveness would be needed to support this sNDA approval. We would reconsider the requested labeling revisions if you could provide another similar, but more clearly positive, study to address the dropout concern, and we strongly encourage you to seek our guidance during the planning stage.

## SAFETY UPDATE

When you respond to the above deficiencies, include a safety update as described at 21 CFR 314.50(d)(5)(vi)(*b*). The safety update should include data from all nonclinical and clinical studies/trials of the drug under consideration regardless of indication, dosage form, or dose level.

1.  Describe in detail any significant changes or findings in the safety profile.

2.  When assembling the sections describing discontinuations due to adverse events, serious adverse events, and common adverse events, incorporate new safety data as follows:



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

_____

Food and Drug Administration
Silver Spring MD 20993

NDA 22264/S-015

**COMPLETE RESPONSE**

Janssen Pharmaceuticals, Inc.
Attention: Beth Geter-Douglass, Ph.D.
Associate Director, Regulatory Affairs
1125 Trenton-Harbourton Road
Titusville, NJ 08560

Dear Dr. Geter-Douglass:

Please refer to your Supplemental New Drug Application (sNDA) dated and received July 11, 2014, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Invega Sustenna (paliperidone palmitate) extended-release injectable suspension 39, 78, 117, 156, 234 mg.

We acknowledge receipt of your amendments dated August 21, 2014, September 24, 2014, December 19, 2014, and February 25, 2015.

This "Prior Approval" efficacy supplemental new drug application proposes revisions to the product label based on findings from study R092670-SCH-3006 titled "A Fifteen-Month, Prospective, Randomized, Active-Controlled, Open-Label, Flexible-Dose Study of Paliperidone Palmitate Compared with Oral Antipsychotic Treatment in Delaying Time to Treatment Failure in Adults with Schizophrenia Who Have Been Incarcerated."

We have completed the review of your application, as amended, and have determined that we cannot approve this application in its present form. We have described our reasons for this action below and, where possible, our recommendations to address these issues.

1. In our view, study R092670-SCH-3006 does not provide substantial evidence that paliperidone palmitate delays time to treatment failure in adults with schizophrenia who have been incarcerated, even though the results, on face, seem to demonstrate superiority of paliperidone palmitate based on the pre-specified primary endpoint and analysis.

   Treatment failure was defined as: 1) arrest/incarceration; 2) psychiatric hospitalization; 3) suicide; 4) discontinuation of antipsychotic treatment due to inadequate efficacy or poor tolerability; 6) treatment supplementation with another antipsychotic due to inadequate efficacy; and/or 7) increase in psychiatric services to prevent imminent psychiatric hospitalization.

- Are the proposed studies RIS-USA-161 and RIS-USA-222 adequately designed to evaluate the safety and efficacy of risperidone in non-mentally retarded children with conduct spectrum disorder?
- Are the available data and data from the proposed trials adequate to support a new indication for risperidone for the treatment of conduct spectrum disorder in pediatric patients (ages 5-16) without mental retardation?

FDA questioned the validity of conduct disorder (CD) as a diagnosis and even the concept of CD as a disorder. They don't believe it is well accepted outside the child psychiatrist community. FDA acknowledged CD as a valid clinical entity as it is included in DSM-IV, however elevation of a disorder to permanent status in DSM does not make it a disorder warranting an indication in the label.

FDA believes CD is synonymous with aggression and thinks we are trying to get approval of aggression under the guise of CD. Although we strongly disagreed, FDA indicated that they feel the problem is in the nature of the diagnosis because it is just a "list of behaviors", mainly aggressive behaviors that annoy others. If CD is just a form of aggressive behavior, they recommended that we study this from a symptom approach and look at aggression straight on. If the symptom approach were taken, FDA would expect us to look at the effects of RISPERDAL in three models. The suggested populations to examine were dementia, mental retardation, and conduct disorder. However, the first step in looking at aggression would be to get agreement publicly (e.g., an advisory committee meeting) on how to define aggression and the best way to measure it. FDA acknowledged it would take time to get public agreement and that this approach may not be the easiest way to get approval.

FDA commented that they do not often question a diagnosis, but in the case of CD they are. They feel a public hearing is needed to define how to look at CD and if it is an indication that society is willing to treat. Their main concern is that RISPERDAL or any other product would be used as a chemical straight jacket. Although CD has been discussed publicly at several conferences, the conference audiences have been only child psychiatrists. FDA would require this type of issue to be discussed by a wider scope of psychiatrists, so that the entire psychiatric community can weigh in on the decision, similar to discussions regarding behavioral disturbances in dementia at the March 9, 2000 Psychopharmacological Drug Advisory Committee meeting.

In the absence of a public hearing, either on aggression or CD itself, FDA could not assure us that we would be able to get an indication in the label, even with two positive trials. They emphasized again that they are uncertain whether CD is a diagnosis that merits treatment.

In regards to the two trials proposed (RIS-USA-161, RIS-USA-222), the FDA commented that they have no experience with the scale selected (Nisonger Behavior Rating Form). Based on the information we provided, (Attachment 1), they did not feel the subscale of the Nisonger mapped well to CD, and it was more of a combination of Oppositional Defiant Disorder and CD. This is based on the questions "talks back to teacher, parents, or other adults," "stubborn, has to do things own way," and "disobedient". We commented that we have experience with the Nisonger scale and believe it has a better CD subscale than the Conners rating scale does.

FDA asked about the validity and reliability of the Nisonger scale. We provided an article by Aman, et al (Attachment 2) to demonstrate validation in a mental retardation (MR) population. FDA indicated that they would not extrapolate from the MR population to the non-MR, and that we would have to validate the use of the scale in the non-MR population as well. We informed them we are in the process of doing the validation in the non-MR population. To address reliability, we offered to send the available clinical data we have generated along with any literature references. FDA requested that the clinical data provided include an item analysis.

Until FDA reviews the validation and reliability data, they can not accept the use of the Nisonger scale as the primary endpoint. We asked if they preferred us to use another scale (i.e., Conners), but they



# **JANSSEN** · PHARMACEUTICA · · RESEARCH FOUNDATION ·

## RECORD OF FDA CONTACT

PRODUCT IDENTIFICATION: RISPERDAL® (risperidone) tablets and oral solution

| ORIGINATOR/SIGNATURE: | | DATE: 03 March 2000 | |
|---|---|---|---|
| **NDA NUMBER:** <br> **IND NUMBER:**  31,931 | **INITIATED BY: JANSSEN** <br> FDA | X | **BY TELEPHONE** <br> **IN PERSON X** |
| **FDA PERSONNEL: See below** | **DIVISION: Neuropharmacological Drug Products** <br> **TELEPHONE: (301) 594-5533** | | |

SUBJECT:  Minutes of March 3rd Meeting to Discuss RISPERDAL Pediatric Exclusivity and Development Program for Conduct Disorder

**Meeting Attendees:**

*FDA*                                                    *Janssen Research Foundation (JRF)*

**Summary:** The objectives of this meeting were to discuss the requirements to obtain an additional six months market exclusivity as permitted under the FDA Modernization Act of 1997 and to discuss the clinical development plan for an indication in conduct disorder. The key issues discussed were:

*Pediatric Exclusivity*
- Pediatric exclusivity is not possible based on safety and PK alone (as proposed).  Exclusivity must be based on the approved indication.
- FDA will issue a written request that contains a controlled trial in schizophrenia. JRF will submit a proposal for this controlled trial in adolescents (>13 years old); younger children will not need to be studied.
- The proposed PK trial was acceptable and if needed, JRF could enroll a mixed diagnosis (conduct disorder, schizophrenia) population.

*Conduct Disorder (CD) as an indication*
- FDA questioned the validity of CD as a diagnosis and even the concept of CD as a disorder.
- They stated that even though CD is in DSM-IV that does not mean it is a disorder warranting an indication in the label.
- FDA feels a public hearing is needed to define how to look at CD. Their main concern is that RISPERDAL or any other product would be used as a chemical straight jacket. This is the reason the issue needs to be publicly debated.
- FDA believes aggression is synonymous with CD.
- We could proceed with the two trials proposed (RIS-USA-161, RIS-USA-222). However, even if these trials are positive, they would want a consensus advisory committee meeting to confirm the disorder exists. This advisory committee meeting would be triggered by the review of our supplemental application.
- The Division is willing to work with us to define scales for CD and would like to see our data to show their validity and reliability.

the labeling.  This supplemental application provides for this single change to the cerebrovascular adverse event warning.  We believe the proposed sentence contains all the essential elements of the current statement, i.e., specificity to RISPERDAL, the non-approval status, and a clear identification of the patient population.  In addition, we believe this revision will allow us to better communicate the originally agreed upon educational intent of the sentence.  A marked-up copy of the labeling is enclosed.  The revision appears on page 7.

Since issuance of a "Dear Healthcare Professional Letter" in April and implementation of the revised labeling, we have consistently been faced with comments and/or actions by physicians, formulary committees and managed care organizations, which reflect a misinterpretation of the third sentence in this paragraph.  The principle misinterpretation is that this is a statement by FDA of their conclusion following review of an application.  The outcome of this misinterpretation is that the educational intent of the labeling is not being accurately communicated.  Physicians may be making potentially harmful or inappropriate patient management decisions based upon an incorrect interpretation of the sentence.

Under separate cover this day we have ⊏                              ⊐ to this file.

Please contact me at (609) 730-3486 if you have any questions regarding this submission.

Sincerely,

Edward G. Brann
Director, Regulatory Affairs

Enclosure
cc: S. Hardeman

*Johnson&Johnson*

PHARMACEUTICAL RESEARCH
& DEVELOPMENT, L.L.C.

14 AUG 2003

ORIGINAL

1125 Trenton-Harbourton Road
P.O. Box 200, Titusville, NJ 08560

NDA SUPPLEMENT

NDA NO. 20-272 REF NO. SLR-033
NDA SUPPL FOR Labeling

Russell Katz, MD, Director
Division of Neuropharmacological Drug Products
Center for Drug Evaluation and Research, HFD-120
U.S. Food and Drug Administration
**Attn: Document Control Room 10B-40**
1451 Rockville Pike
Rockville, MD 20852

RECEIVED

AUG 1 5 2003

HFD-120/CDER

Subject:    **NDA 20-272**
            Cross-reference NDAs 20-588 and 21-444
            **RISPERDAL® (risperidone) Tablets**
            **Special Supplement – Changes Being Effected**

Dear Dr. Katz:

Please refer to your approval letter of April 2, 2003 for NDA 21-444, RISPERDAL®
(risperidone) [        ] Tablets and the agreed-upon labeling. The labeling
included a new subsection under WARNINGS regarding the occurrence of
cerebrovascular adverse events in elderly patients with dementia. The text of this
subsection is as follows:

> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with**
> **Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including
> fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of
> risperidone in elderly patients with dementia-related psychosis. In placebo-
> controlled trials there was a significantly higher incidence of cerebrovascular
> adverse events in patients treated with risperidone compared to patients treated with
> placebo. RISPERDAL has not been shown to be safe or effective in the treatment
> of patients with dementia-related psychosis.

In addition, please refer to the meeting of August 13, 2003 between representatives of the
Division and J&J PRD, in which the Division agreed to the following proposed text to
replace the third sentence of the above statement.

> RISPERDAL is not approved for the treatment of patients with dementia-related
> psychosis.

Therefore, in accordance with 21 CFR 314.70(c)(2), we are submitting a supplemental
application to provide revised product labeling to improve the clarity of this sentence in

PRD-1C

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

# <u>ADMINISTRATIVE and CORRESPONDENCE DOCUMENTS</u>

## Storage and Handling

RISPERDAL® tablets should be stored at controlled room temperature 15°-25°C (59°-77°F). Protect from light and moisture.

Keep out of reach of children.

RISPERDAL® 1 mg/mL oral solution should be stored at controlled room temperature 15°-25°C (59°-77°F). Protect from light and freezing.

Keep out of reach of children.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets should be stored at controlled room temperature 15°-25°C (59°-77°F).

Keep out of reach of children.

~~7503223~~**7503224**
US Patent 4,804,663
Revised ~~April~~ **August** 2003
©Janssen 2002

RISPERDAL® tablets are manufactured by:
JOLLC, Gurabo, Puerto Rico or
Janssen-Cilag, SpA, Latina, Italy

RISPERDAL® oral solution is manufactured by:
Janssen Pharmaceutica N.V.
Beerse, Belgium

RISPERDAL® M-TAB™ Orally Disintegrating Tablets are manufactured by:
JOLLC, Gurabo, Puerto Rico

RISPERDAL® tablets, RISPERDAL® M-TAB™ Orally Disintegrating Tablets, and oral solution are distributed by:
**Janssen Pharmaceutica Products, L.P.**
Titusville, NJ 08560

### Hearing and Vestibular Disorders
*Rare:* tinnitus, hyperacusis, decreased hearing.

### Red Blood Cell Disorders
*Infrequent:* anemia, hypochromic anemia. *Rare:* normocytic anemia.

### Reproductive Disorders, Male
*Frequent:* erectile dysfunction*. *Infrequent:* ejaculation failure.

### White Cell and Resistance Disorders
*Rare:* leukocytosis, lymphadenopathy, leucopenia, Pelger-Huet anomaly.

### Endocrine Disorders
*Rare:* gynecomastia, male breast pain, antidiuretic hormone disorder.

### Special Senses
*Rare:* bitter taste.

* Incidence based on elicited reports.

### Postintroduction Reports
Adverse events reported since market introduction which were temporally (but not necessarily causally) related to RISPERDAL® therapy, include the following: anaphylactic reaction, angioedema, apnea, atrial fibrillation, cerebrovascular disorder, including cerebrovascular accident, hyperglycemia, diabetes mellitus aggravated, including diabetic ketoacidosis, intestinal obstruction, jaundice, mania, pancreatitis, Parkinson's disease aggravated, pulmonary embolism. There have been rare reports of sudden death and/or cardiopulmonary arrest in patients receiving RISPERDAL®. A causal relationship with RISPERDAL® has not been established. It is important to note that sudden and unexpected death may occur in psychotic patients whether they remain untreated or whether they are treated with other antipsychotic drugs.

## DRUG ABUSE AND DEPENDENCE
### Controlled Substance Class
RISPERDAL® (risperidone) is not a controlled substance.

### Physical and Psychologic Dependence
RISPERDAL® has not been systematically studied in animals or humans for its potential for abuse, tolerance, or physical dependence. While the clinical trials did not reveal any tendency for any drug-seeking behavior, these observations were not systematic and it is not possible to predict on the basis of this limited experience the extent to which a CNS-active drug will be misused, diverted, and/or abused once marketed. Consequently, patients should be evaluated carefully for a history of drug abuse, and such patients should be observed closely for signs of RISPERDAL® misuse or abuse (e.g., development of tolerance, increases in dose, drug-seeking behavior).

22

*Infrequent:* hyperventilation, bronchospasm, pneumonia, stridor. *Rare:* asthma, increased sputum, aspiration.

### Skin and Appendage Disorders
*Frequent:* increased pigmentation\*, photosensitivity\*. *Infrequent:* increased sweating, acne, decreased sweating, alopecia, hyperkeratosis, pruritus, skin exfoliation. *Rare:* bullous eruption, skin ulceration, aggravated psoriasis, furunculosis, verruca, dermatitis lichenoid, hypertrichosis, genital pruritus, urticaria.

### Cardiovascular Disorders
*Infrequent:* palpitation, hypertension, hypotension, AV block, myocardial infarction. *Rare:* ventricular tachycardia, angina pectoris, premature atrial contractions, T wave inversions, ventricular extrasystoles, ST depression, myocarditis.

### Vision Disorders
*Infrequent:* abnormal accommodation, xerophthalmia. *Rare:* diplopia, eye pain, blepharitis, photopsia, photophobia, abnormal lacrimation.

### Metabolic and Nutritional Disorders
*Infrequent:* hyponatremia, weight increase, creatine phosphokinase increase, thirst, weight decrease, diabetes mellitus. *Rare:* decreased serum iron, cachexia, dehydration, hypokalemia, hypoproteinemia, hyperphosphatemia, hypertriglyceridemia, hyperuricemia, hypoglycemia.

### Urinary System Disorders
*Frequent:* polyuria/polydipsia\*. *Infrequent:* urinary incontinence, hematuria, dysuria. *Rare:* urinary retention, cystitis, renal insufficiency.

### Musculo-Skeletal System Disorders
*Infrequent:* myalgia. *Rare:* arthrosis, synostosis, bursitis, arthritis, skeletal pain.

### Reproductive Disorders, Female
*Frequent:* menorrhagia\*, orgastic dysfunction\*, dry vagina\*. *Infrequent:* nonpuerperal lactation, amenorrhea, female breast pain, leukorrhea, mastitis, dysmenorrhea, female perineal pain, intermenstrual bleeding, vaginal hemorrhage.

### Liver and Biliary System Disorders
*Infrequent:* increased SGOT, increased SGPT. *Rare:* hepatic failure, cholestatic hepatitis, cholecystitis, cholelithiasis, hepatitis, hepatocellular damage.

### Platelet, Bleeding, and Clotting Disorders
*Infrequent:* epistaxis, purpura. *Rare:* hemorrhage, superficial phlebitis, thrombophlebitis, thrombocytopenia.

effect rating scale, and these events were not further categorized using standard terminology. (Note: These events are marked with an asterisk in the listings that follow.)

In the listings that follow, spontaneously reported adverse events were classified using World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 patients exposed to multiple doses of RISPERDAL® who experienced an event of the type cited on at least one occasion while receiving RISPERDAL®. All reported events are included, except those already listed in Table 1, those events for which a drug cause was remote, and those event terms which were so general as to be uninformative. It is important to emphasize that, although the events reported occurred during treatment with RISPERDAL®, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions: frequent adverse events are those occurring in at least 1/100 patients (only those not already listed in the tabulated results from placebo-controlled trials appear in this listing); infrequent adverse events are those occurring in 1/100 to 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients.

### Psychiatric Disorders
*Frequent:* increased dream activity*, diminished sexual desire*, nervousness. *Infrequent:* impaired concentration, depression, apathy, catatonic reaction, euphoria, increased libido, amnesia. *Rare:* emotional lability, nightmares, delirium, withdrawal syndrome, yawning.

### Central and Peripheral Nervous System Disorders
*Frequent:* increased sleep duration*. *Infrequent:* dysarthria, vertigo, stupor, paraesthesia, confusion. *Rare:* aphasia, cholinergic syndrome, hypoesthesia, tongue paralysis, leg cramps, torticollis, hypotonia, coma, migraine, hyperreflexia, choreoathetosis.

### Gastrointestinal Disorders
*Frequent:* anorexia, reduced salivation*. *Infrequent:* flatulence, diarrhea, increased appetite, stomatitis, melena, dysphagia, hemorrhoids, gastritis. *Rare:* fecal incontinence, eructation, gastroesophageal reflux, gastroenteritis, esophagitis, tongue discoloration, cholelithiasis, tongue edema, diverticulitis, gingivitis, discolored feces, GI hemorrhage, hematemesis.

### Body as a Whole/General Disorders
*Frequent:* fatigue. *Infrequent:* edema, rigors, malaise, influenza-like symptoms. *Rare:* pallor, enlarged abdomen, allergic reaction, ascites, sarcoidosis, flushing.

### Respiratory System Disorders

sleep, accommodation disturbances, orthostatic dizziness, palpitations, weight gain, erectile dysfunction, ejaculatory dysfunction, orgastic dysfunction, asthenia/lassitude/increased fatigability, and increased pigmentation.

### Vital Sign Changes

RISPERDAL® is associated with orthostatic hypotension and tachycardia (see PRECAUTIONS).

### Weight Changes

The proportions of RISPERDAL® and placebo-treated patients meeting a weight gain criterion of ≥7% of body weight were compared in a pool of 6 to 8-week, placebo-controlled trials, revealing a statistically significantly greater incidence of weight gain for RISPERDAL® (18%) compared to placebo (9%).

### Laboratory Changes

A between-group comparison for 6 to 8-week placebo-controlled trials revealed no statistically significant RISPERDAL®/placebo differences in the proportions of patients experiencing potentially important changes in routine serum chemistry, hematology, or urinalysis parameters. Similarly, there were no RISPERDAL®/placebo differences in the incidence of discontinuations for changes in serum chemistry, hematology, or urinalysis. However, RISPERDAL® administration was associated with increases in serum prolactin (see PRECAUTIONS).

### ECG Changes

The electrocardiograms of approximately 380 patients who received RISPERDAL® and 120 patients who received placebo in two double-blind, placebo-controlled trials were evaluated and revealed one finding of potential concern; i.e., 8 patients taking RISPERDAL® whose baseline QTc interval was less than 450 msec were observed to have QTc intervals greater than 450 msec during treatment (see WARNINGS). Changes of this type were not seen among about 120 placebo patients, but were seen in patients receiving haloperidol (3/126).

### Other Events Observed During the Premarketing Evaluation of RISPERDAL®

During its premarketing assessment, multiple doses of RISPERDAL® (risperidone) were administered to 2607 patients in Phase 2 and 3 studies. The conditions and duration of exposure to RISPERDAL® varied greatly, and included (in overlapping categories) open-label and double-blind studies, uncontrolled and controlled studies, inpatient and outpatient studies, fixed-dose and titration studies, and short-term or longer-term exposure. In most studies, untoward events associated with this exposure were obtained by spontaneous report and recorded by clinical investigators using terminology of their own choosing. Consequently, it is not possible to provide a meaningful estimate of the proportion of individuals experiencing adverse events without first grouping similar types of untoward events into a smaller number of standardized event categories. In two large studies, adverse events were also elicited utilizing the UKU (direct questioning) side

**Tardive Dyskinesia**

A syndrome of potentially irreversible, involuntary, dyskinetic movements may develop in patients treated with antipsychotic drugs. Although the prevalence of the syndrome appears to be highest among the elderly, especially elderly women, it is impossible to rely upon prevalence estimates to predict, at the inception of antipsychotic treatment, which patients are likely to develop the syndrome. Whether antipsychotic drug products differ in their potential to cause tardive dyskinesia is unknown.

The risk of developing tardive dyskinesia and the likelihood that it will become irreversible are believed to increase as the duration of treatment and the total cumulative dose of antipsychotic drugs administered to the patient increase. However, the syndrome can develop, although much less commonly, after relatively brief treatment periods at low doses.

There is no known treatment for established cases of tardive dyskinesia, although the syndrome may remit, partially or completely, if antipsychotic treatment is withdrawn. Antipsychotic treatment, itself, however, may suppress (or partially suppress) the signs and symptoms of the syndrome and thereby may possibly mask the underlying process. The effect that symptomatic suppression has upon the long-term course of the syndrome is unknown.

Given these considerations, RISPERDAL® (risperidone) should be prescribed in a manner that is most likely to minimize the occurrence of tardive dyskinesia. Chronic antipsychotic treatment should generally be reserved for patients who suffer from a chronic illness that (1) is known to respond to antipsychotic drugs, and (2) for whom alternative, equally effective, but potentially less harmful treatments are not available or appropriate. In patients who do require chronic treatment, the smallest dose and the shortest duration of treatment producing a satisfactory clinical response should be sought. The need for continued treatment should be reassessed periodically.

If signs and symptoms of tardive dyskinesia appear in a patient treated on RISPERDAL®, drug discontinuation should be considered. However, some patients may require treatment with RISPERDAL® despite the presence of the syndrome.

**Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients With Dementia**

Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. ~~RISPERDAL® has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis.~~ RISPERDAL® is not approved for the treatment of patients with dementia-related psychosis.

# JANSSEN
**PHARMACEUTICA
PRODUCTS, L.P.**

# RISPERDAL®
**(RISPERIDONE)
TABLETS/ORAL SOLUTION**

# RISPERDAL® M-TAB™
**(RISPERIDONE)
ORALLY DISINTEGRATING TABLETS**

## DESCRIPTION

RISPERDAL® (risperidone) is a psychotropic agent belonging to the chemical class of benzisoxazole derivatives. The chemical designation is 3-[2-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl]-6,7,8,9-tetrahydro-2-methyl-4H-pyrido[1,2-a]pyrimidin-4-one. Its molecular formula is $C_{23}H_{27}FN_4O_2$ and its molecular weight is 410.49. The structural formula is:

**(insert structure)**

Risperidone is a white to slightly beige powder. It is practically insoluble in water, freely soluble in methylene chloride, and soluble in methanol and 0.1 $\underline{N}$ HCl.

RISPERDAL® tablets are available in 0.25 mg (dark yellow), 0.5 mg (red-brown), 1 mg (white), 2 mg (orange), 3 mg (yellow), and 4 mg (green) strengths. Inactive ingredients are colloidal silicon dioxide, hydroxypropyl methylcellulose, lactose, magnesium stearate, microcrystalline cellulose, propylene glycol, sodium lauryl sulfate, and starch (corn). Tablets of 0.25, 0.5, 2, 3, and 4 mg also contain talc and titanium dioxide. The 0.25 mg tablets contain yellow iron oxide; the 0.5 mg tablets contain red iron oxide; the 2 mg tablets contain FD&C Yellow No. 6 Aluminum Lake; the 3 mg and 4 mg tablets contain D&C Yellow No. 10; the 4 mg tablets contain FD&C Blue No. 2 Aluminum Lake.

RISPERDAL® is also available as a 1 mg/mL oral solution. The inactive ingredients for this solution are tartaric acid, benzoic acid, sodium hydroxide, and purified water.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets are available in 0.5 mg, 1.0 mg, and 2.0 mg strengths and are light coral in color.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets contain the following inactive ingredients: Amberlite® resin, gelatin, mannitol, glycine, simethicone, carbomer, sodium hydroxide, aspartame, red ferric oxide, and peppermint oil.

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

# <u>LABELING</u>

---------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
---------------------------------------------------------------------

```
 /s/
---------------------
Russell Katz
9/10/03 08:42:08 AM
```

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004
Page 2

of the copies on heavy-weight paper or similar material. For administrative purposes, these submissions should be designated "FPL for approved supplement NDA 20-272 / S-033, NDA 20-588 / S-021, and NDA 21-444 / S-004." Approval of these submissions by FDA is not required before the labeling is used.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Steve Hardeman, R.Ph., Senior Regulatory Project Manager, at (301) 594-5525.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

**DEPARTMENT OF HEALTH & HUMAN SERVICES**    Public Health Service

_____

Food and Drug Administration
Rockville, MD  20857

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004

Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
Attention:  Edward G. Brann
1125 Trenton-Harbourton Road
Titusville, NJ  08560-0200

Dear Mr. Brann:

Please refer to your supplemental new drug applications dated August 14, 2003, received August 15, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Risperdal (risperidone) tablets and oral solution, and Risperdal M-TAB (risperidone) orally disintegrating tablets.

These "Changes Being Effected" supplemental new drug applications provide for revised product labeling under **WARNINGS, Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia**.

We have completed our review of these applications and they are approved, effective on the date of this letter.

As agreed in the meeting of August 13, 2003, the last sentence of the following section is amended as follows:

> **WARNINGS**
> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. RISPERDAL® has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis. RISPERDAL is not approved for the treatment of patients with dementia-related psychosis.

The final printed labeling (FPL) must be identical to the above labeling (package insert submitted August 14, 2003).

Please submit the FPL electronically according to the guidance for industry titled Providing Regulatory Submissions in Electronic Format – NDA.  Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed.  Please individually mount 15

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

# <u>APPROVAL LETTER</u>

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*
## NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

## CONTENTS

| Reviews / Information Included in this NDA Review. | |
|---|---|

| | |
|---|---|
| **Approval Letter** | **X** |
| **Approvable Letter** | |
| **Labeling** | **X** |
| **Medical Review(s)** | |
| **Chemistry Review(s)** | |
| **Pharmacology Review(s)** | |
| **Statistical Review(s)** | |
| **Microbiology Review(s)** | |
| **Clinical Pharmacology/ Biopharmaceutics Review(s)** | |
| **Administrative and Correspondence Document(s)** | **X** |

# CENTER FOR DRUG EVALUATION AND RESEARCH

## <u>Approval Package for:</u>

### *APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

*Trade Name:*   Risperdal Tablets, Risperdal Oral Solution & Risperdal M-Tab Orally Distintegrating Tablets

*Generic Name:*   risperidone

*Sponsor:*   Janssen Pharmaceutica

*Approval Date:*   09/10/03

# **Exhibit 1**

Appeal of John Winter Final

10 Pages of Obstructing, Unprofessionally Coercive
Communications From Johnson & Johnson Attorney John.
D. Winter Regarding The Sunshine-in-Litigation Act or
Florida Statue 69.081

Filing # PM

← **Removal from Service List – Cas...**

noreply@myflcourtaccess.com    2:16 PM ☆
(No Recipient) ⌄

This is an automatic e-mail message generated by the ePortal system. Please DO NOT RESPOND to this e-mail as the mail box is unattended.

Removal From Service List

The following transaction was entered on 06/25/2025 02:16:27 PM ET.

Court:
Judicial Circuit in and for Duval County, Florida
Case #:
162025DR002334AXXXMA
Case Style:
WARD, BRANDON TYLER - CRAWFORD, SETH DAVIS
Filer:
Other Attorney/Interested Party 'Joaquin Duato' added by 'Brandon Ward' 904-815-2601 has selected not to receive electronic service on this case

This information has been electronically mailed to:

| Name | Primary Email | Alternate Email 1 | Alternate Email 2 |
|------|---------------|-------------------|-------------------|
| Brandon Ward | Mrward3740@aol.com | | |
| Sandra Williams | Williamsa@flcourts.org | | |



1 group　　　　　No friends yet

Wallet　　　　　Transactions

Pending

 You requested **$999,999** from **Vanessa Broadhurst**
Apr 1, 2024 8:20 AM

Jwinter @ pbwt. com

Please consider donating to help
a 100% Permanent & Total Service
Connected U.S Army Disabled Gulf War
Era Veteran, 37/40 Marksman Badge
Winner 1/3, Im asking for help with bills,
food, groceries
@MK_Brando999 on X
@Christian_Soldier_Brando on Insta



I AM A RISPERIDONE
PRODUCT LIABILITY
WHISTLE-BLOWER ALSO
TER 2016 TURNS 2018

Cancel    Remind

**You requested $999,999 from Vanessa Broadhurst**
Apr 1, 2024 8:20 AM

Jwinter @ pbwt. com

Please consider donating to help a 100% Permanent & Total Service Connected U.S Army Disabled Gulf War Era Veteran, 37/40 Marksman Badge Winner 1/3, Im asking for help with bills, food, groceries @MK_Brando999 on X @Christian_Soldier_Brando on Insta

Cancel    Remind

**You requested $1 from Joseph Wolk**
Apr 1, 2024 8:18 AM

Please consider donating to help a 100% Permanent & Total Service Connected U.S Army Disabled Gulf War Era Veteran, 37/40 Marksman Badge Winner 1/3, Im asking for help with bills, food, groceries @MK_Brando999 on X

I AM A RISPERIDONE PRODUCT LIABILITY WHISTLE-BLOWER ALSO TER 2016 TURNS 2019 HE COURTROOMS MIND. I

# Exhibit 2

Docket From New York Supreme Court Appellate
Division:

Debating Lawyer John. D. Winter Unprofessional,
Illegal Conduct For His Bar In New York. 6 pages of
Rhetoric Then 11 of Important Case Statues And
Medical Facts

# In The New York Supreme Court Appellate Division
# First Judicial Department

### Docket No. 2025.3429

### Mr. Brandon Tyler Ward in The Matter of.
### Mr. John D. Winter Esq.  Duval County.
### Florida Courthouse & Florida Supreme Court

## This Presentation Contains The Following Cases , Statues and, Authorities:

1.    SEC Rule 21F-17A .............................................................. Page 2,3,4

2.    S.623 - Sunshine in Litigation Act of 2011 .................................. Page  6

3.    American Bar Associations Model Rules of
      Professional Conduct 3.4(f), 5.6(b) and, 8.4(c-e) .............................. Page 4,5

4.    Jones v. Goodyear Tire & Rubber Co. ("Jones I"), 871 So. 2d 899 (Fla. 3d
      DCA 2003) ...................................................................... Page 6

5.    Goodyear Tire & Rubber Co. v. Jones ("Jones II"), 929 So. 2d 1081 (Fla.
      3d DCA 2005) ................................................................... Page 6

6.    Goodyear Tire & Rubber Co. v. Schalmo, 987 So. 2d 142 (Fla. 2d DCA
      2008) .......................................................................... Page 6

(1)

7.    **TransUnion V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100975 / September 9, 2024** ......................................................................................... **Page 4**

8.    **Acadia Healthcare Company, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100970 / September 9,  2024 ADMINISTRATIVE PROCEEDING File No. 3-22079** ......................................................................................... **Page 4**

9.    **AppFolio, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100971 / September 9, 2024 ADMINISTRATIVE PROCEEDING File No. 3-22080** ......................................................................................... **Page 4**

10.    **a.k.a. Brands Holding Corp. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100969 / September 9, 2024** ................................................................................. **Page 4**

11.    **Pledger v. Janssen Pharms., Inc., 198 A.3d 1126** .................. **Page 3**

12.    **Yount v. Janssen October 2016 Judge Paula A. Patrick Pennsylvania Court of Common Pleas for Philadelphia County** ............................. **Page 3**

Many companies are being forced to pay millions or hundreds of thousands of dollars to settle with The Securities and Exchange Commission for violation of S.E.C Rule 21F-17A. The S.E.C Rule 21F-17A comes from The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), enacted on July 21, 2010, amended The Exchange Act by adding Section 21F,  "Whistleblower Incentives and Protection." The congressional purpose underlying these provisions was,

"to encourage whistleblowers to report possible violations of the securities laws by providing financial incentives, prohibiting employment-related retaliation, and providing various confidentiality guarantees." See Implementation of the Whistleblower Provisions of Section 21F of the

(2)

Securities Exchange Act of 1934, Release No. 34-64545, at p. 197 (Aug. 12, 2011)."

Congress explicitly noted the importance of providing financial incentives to promote whistleblowing to the Commission as it determined that,

"a critical component of the Whistleblower Program is the minimum payout that any individual could look towards in determining whether to take the enormous risk of blowing the whistle in calling attention to fraud." See The Restoring American Financial Stability Act of 2010, Committee on Banking, Housing, and Urban Affairs (Apr. 30, 2010)."

To fulfill the Congressional purpose, The Securities and Exchange Commission adopted Rule 21F-17, which provides in relevant part,

"(a) No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications."

Rule 21F-17 became effective on August 12, 2011

Mr. John D. Winter Esq. and his Defendants Johnson and Johnson © broke this Government Rule and should be forced to pay out hundreds of thousands of dollars. The Company's product Paliperdone© is known for causing cholelithiasis and hyper-prolactin gynecomastia but Johnson and Johnson© has failed to properly alert the public via updating patent information, concealing/destroying Paliperdone© documents during Court or, in my case lawyer coercion of a non-client into a confidentiality agreement meant to invalidate future trials within The Courts or United States Government otherwise. I will show some of the communications today I had with Johnson and Johnson© lawyer John D. Winter Esq. (Yount v. Janssen October 2016 Judge Paula A. Patrick  Pennsylvania Court of Common Pleas for Philadelphia County, Pledger v. Janssen Pharms., Inc., 198 A.3d 1126)    (3)

Mr. John D. Winter Esq. in preparing, advising for and, paying for my 2022 Confidentiality Settlement Agreement broke American Bar Associations Model Rule of Professional Conduct Rule 8.4(e) and SEC Rule 21F-17(a) by implying an ability to influence, improperly, a government agency when he coerced,

"5.2 RELEASOR understands that upon execution of this Agreement, RELEASOR is forever barred from filing or causing to be filed any claim or litigation or proceeding in and before any agency, tribunal or court relating to any claim RELEASOR may have ever had or could have in the future against RELEASEES in any way arising out of or related to Claimant's Claims"

-Confidentiality Settlement Agreement Section 5.2 by Mr. John D Winter Esq.

Please see: (TransUnion V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100975 / September 9, 2024), (Acadia Healthcare Company, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100970 / September 9,  2024 ADMINISTRATIVE PROCEEDING File No. 3-22079), (AppFolio, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100971 / September 9, 2024 ADMINISTRATIVE PROCEEDING File No. 3-22080) and, (A.k.a. Brands Holding Corp. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100969 / September 9, 2024).

Mr. John D. Winter broke the American Bar Associations Model Rules of Professional Conduct Rule 8.4( d) by "engaging in conduct that is prejudicial to the administration of justice."  By explicitly prohibiting being able to converse with other attorneys or there claimants as mentioned in Section 4.1 of the Confidentiality Agreement, Section 4.1 dually, "restricts a lawyers right to practice" which also violates the American Bar Associations Model Rule                (4)

of Professional Conduct Rule 5.6(b), "A lawyer shall not participate in offering or making an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy."

"4.1....RELEASOR agrees that he will not make any statement, either directly or indirectly, by implication or innuendo, to anyone, including but not limited to the press or media or to other attorneys or claimants or potential claimants concerning the agreement terms or describing or characterizing the agreement terms in any way other than to say that the matter has been resolved"

Moreover, Mr. John D. Winter Esq. breaks American Bar Associations Model Rules of Professional Conduct Rule 8.4(c) for, "conduct involving dishonesty, fraud, deceit or misrepresentation" when he advises further confidentiality agreement terms such as Section 6.4 which reads,

"6.4....The RELEASOR further expressly agrees and covenants to release, discharge, forever indemnify, defend, and hold harmless RELEASEES and their attorneys from any liens and/or claims which may arise or may have heretofore arisen in favor of Medicare, Medicaid, any other government program or any other governmental entity, federal, state or local, by operation of law or equity, for medical expenses, disability benefits, or any other charge or expense, directly or indirectly relating to the alleged injuries caused by RELEASOR'S use of Risperdal® and/or Invega®. The indemnification set forth in this section specifically includes, but is not limited to, the payment of all reasonable costs and expenses of investigation, defense, settlement, attorney fees, judgments, court costs, and all other costs and expenses of defending such claims."

Furthermore, Mr. John D. Winter's 2022 Confidentiality Agreement Sections: 4.1, 5.2 and, 6.4 break A.B.A Model Rules of Professional Conduct Rule 3.4(f) Which state, "a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party."                    (5)

Finally, perhaps most importantly Mr. John D. Winter Esq. broke the bill congress passed known as S.623 - Sunshine in Litigation Act of 2011, which was adapted to Florida State Law Statue 69.081 The Sunshine in Litigation Act that prevents concealment of Public Hazards by non-disclosure, confidentiality or, settlement agreements. (Jones v. Goodyear Tire & Rubber Co. ("Jones I"), 871 So. 2d 899, (Fla. 3d DCA 2003, Goodyear Tire & Rubber Co. v. Jones ("Jones II"), 929 So. 2d 1081 (Fla. 3d DCA 2005) and, Goodyear Tire & Rubber Co. v. Schalmo, 987 So. 2d 142 (Fla. 2d DCA 2008) in all cases Florida District Court of Appeals upheld that confidentiality agreements concealing public hazards will not be respected in Court.  As they have not been respected in Duval County Florida Courthouse Case 16-2025-DR-003127 Ward V.  Trump Filing # 226206628 and Filing # 226244544 cross-examined with Case 16-2025-DR-002334 Ward V. Crawford Filing #226244538 then redirect examined with Case: Brandon Tyler Ward V. Eric Chase Roberson 16-2025-DR-002652's Filing # 226244553. All cases on Appeal To The Supreme Court in Washington D.C with no outstanding filing numbers to be submitted on my end. Clerk John A. Tomasino notes he will keep a file of my Appeal of Florida Supreme Court number SC2025-0986 and SC2025-0961 to Washington D.C Supreme Court.

(6)

**Mr. Brandon Tyler Ward**_____

July 18, 2025

**Entrapped Social Media Personality,**

**6x Federal Agent/U.S Army Coercion Situation Survivor,**

**100% Permanent and Total Service-Connected Gulf War**

**Era Marksmanship Badge Award-Winning Disabled Vet,**

**2x Sexual Trauma Survivor and, Invega Whistleblower**

**5501 University Club Blvd N. , APT 155, Jacksonville**

**Florida 32277 • (904) 815 - 2601**

**95.051    When limitations tolled.—**

(1)    The running of the time under any statute of limitations except ss. 95.281, 95.35, and 95.36 is tolled by:

(a)    Absence from the state of the person to be sued.

(b)    Use by the person to be sued of a false name that is unknown to the person entitled to sue so that process cannot be served on the person to be sued.

(c)    Concealment in the state of the person to be sued so that process cannot be served on him or her.

(d)    The adjudicated incapacity, before the cause of action accrued, of the person entitled to sue. In any event, the action must be begun within 7 years after the act, event, or occurrence giving rise to the cause of action.



leg.state.fl.us/statute      



Online Sunshine

*Official Internet Site of the Florida Legislature*

January 5, 2025    Search Statutes: 2024 ▾ [ ] [Search]    Advanced Legislative Search and Browse

| | Select Year: 2024 ▾ [Go] | |

**Home**
**Senate**
**House**
**Citator**
**Statutes, Constitution, & Laws of Florida**
Florida Statutes
Search Statutes
Search Tips
Florida Constitution
Laws of Florida
**Legislative & Executive Branch Lobbyists**
**Information Center**
**Joint Legislative Committees & Other Entities**
**Historical Committees**
**Florida Government Efficiency Task Force**
**Legislative Employment**
Legistore
Links

Interpreter Services for the Deaf and Hard of Hearing







The 2024 Florida Statutes

Title VI            Chapter 69            View Entire Chapter
CIVIL PRACTICE AND PROCEDURE   MISCELLANEOUS PROCEDURAL MATTERS

**69.081    Sunshine in litigation; concealment of public hazards prohibited.**—

(1)   This section may be cited as the "Sunshine in Litigation Act."

(2)   As used in this section, "public hazard" means an instrumentality, including but not limited to any device, instrument, person, procedure, product, or a condition of a device, instrument, person, procedure or product, that has caused and is likely to cause injury.

(3)   Except pursuant to this section, no court shall enter an order or judgment which has the purpose or effect of concealing a public hazard or any information concerning a public hazard, nor shall the court enter an order or judgment which has the purpose or effect of concealing any information which may be useful to members of the public in protecting themselves from injury which may result from the public hazard.

(4)   Any portion of an agreement or contract which has the purpose or effect of concealing a public hazard, any information concerning a public hazard, or any information which may be useful to members of the public in protecting themselves from injury which may result from the public hazard, is void, contrary to public policy, and may not be enforced.







DEPARTMENT OF HEALTH & HUMAN SERVICES    Public Health Service

Food and Drug Administration
Rockville, MD 20857

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004

Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
Attention: Edward G. Brann
1125 Trenton-Harbourton Road
Titusville, NJ 08560-0200

Dear Mr. Brann:

Please refer to your supplemental new drug applications dated August 14, 2003, received August 15, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Risperdal (risperidone) tablets and oral solution, and Risperdal M-TAB (risperidone) orally disintegrating tablets.

These "Changes Being Effected" supplemental new drug applications provide for revised product labeling under **WARNINGS, Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia.**

We have completed our review of these applications and they are approved, effective on the date of this letter.

As agreed in the meeting of August 13, 2003, the last sentence of the following section is amended as follows:

> **WARNINGS**
> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. RISPERDAL® ~~has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis.~~ RISPERDAL is not approved for the treatment of patients with dementia-related psychosis.

The final printed labeling (FPL) must be identical to the above labeling (package insert submitted August 14, 2003).

Please submit the FPL electronically according to the guidance for industry titled Providing Regulatory Submissions in Electronic Format – NDA. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Please individually mount 15

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004
Page 2

of the copies on heavy-weight paper or similar material. For administrative purposes, these submissions should be designated "FPL for approved supplement NDA 20-272 / S-033, NDA 20-588 / S-021, and NDA 21-444 / S-004." Approval of these submissions by FDA is not required before the labeling is used.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Steve Hardeman, R.Ph., Senior Regulatory Project Manager, at (301) 594-5525.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 patients exposed to multiple doses of RISPERDAL® RISPERDAL®. All reported events are included, except those already listed in Table 1, those events for which a drug cause was remote, and those event terms which were so general as to be uninformative. It is important to emphasize that, although the events reported occurred during treatment with RISPERDAL®, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions: frequent adverse events are those occurring in at least 1/100 patients (only those not already listed in the tabulated results from placebo-controlled trials appear in this listing); infrequent adverse events are those occurring in 1/100 to 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients.

### Psychiatric Disorders
*Frequent:* increased dream activity*, diminished sexual desire*, nervousness. *Infrequent:* impaired concentration, depression, apathy, catatonic reaction; euphoria, increased libido, amnesia. *Rare:* emotional lability, nightmares, delirium, withdrawal syndrome, yawning.

### Central and Peripheral Nervous System Disorders
*Frequent:* increased sleep duration*. *Infrequent:* dysarthria, vertigo, stupor, paraesthesia, confusion. *Rare:* aphasia, cholinergic syndrome, hypoesthesia, tongue paralysis, leg cramps, torticollis, hypotonia, coma, migraine, hyperreflexia, choreoathetosis.

### Gastrointestinal Disorders
*Frequent:* anorexia, reduced salivation*. *Infrequent:* flatulence, diarrhea, increased appetite, stomatitis, melena, dysphagia, hemorrhoids, gastritis. *Rare:* fecal incontinence, eructation, gastroesophageal reflux, gastroenteritis, esophagitis, tongue discoloration, cholelithiasis, tongue edema, diverticulitis, gingivitis, discolored feces, GI hemorrhage, hematemesis.

### Body as a Whole/General Disorders
*Frequent:* fatigue. *Infrequent:* edema, rigors, malaise, influenza-like symptoms. *Rare:* pallor, enlarged abdomen, allergic reaction, ascites, sarcoidosis, flushing.

### Respiratory System Disorders

20

*Infrequent:* hyperventilation, bronchospasm, pneumonia, stridor. *Rare:* asthma, increased sputum, aspiration.

### Skin and Appendage Disorders
*Frequent:* increased pigmentation*, photosensitivity*. *Infrequent:* increased sweating, acne, decreased sweating, alopecia, hyperkeratosis, pruritus, skin exfoliation. *Rare:* bullous eruption, skin ulceration, aggravated psoriasis, furunculosis, verruca, dermatitis lichenoid, hypertrichosis, genital pruritus, urticaria.

### Cardiovascular Disorders
*Infrequent:* palpitation, hypertension, hypotension, AV block, myocardial infarction. *Rare:* ventricular tachycardia, angina pectoris, premature atrial contractions, T wave inversions, ventricular extrasystoles, ST depression, myocarditis.

### Vision Disorders
*Infrequent:* abnormal accommodation, xerophthalmia. *Rare:* diplopia, eye pain, blepharitis, photopsia, photophobia, abnormal lacrimation.

### Metabolic and Nutritional Disorders
*Infrequent:* hyponatremia, weight increase, creatine phosphokinase increase, thirst, weight decrease, diabetes mellitus. *Rare:* decreased serum iron, cachexia, dehydration, hypokalemia, hypoproteinemia, hyperphosphatemia, hypertriglyceridemia, hyperuricemia, hypoglycemia.

### Urinary System Disorders
*Frequent:* polyuria/polydipsia*. *Infrequent:* urinary incontinence, hematuria, dysuria. *Rare:* urinary retention, cystitis, renal insufficiency.

### Musculo-Skeletal System Disorders
*Infrequent:* myalgia. *Rare:* arthrosis, synostosis, bursitis, arthritis, skeletal pain.

### Reproductive Disorders, Female
*Frequent:* menorrhagia*, orgastic dysfunction*, dry vagina*. *Infrequent:* nonpuerperal lactation, amenorrhea, female breast pain, leukorrhea, mastitis, dysmenorrhea, female perineal pain, intermenstrual bleeding, vaginal hemorrhage.

### Liver and Biliary System Disorders
*Infrequent:* increased SGOT, increased SGPT. *Rare:* hepatic failure, cholestatic hepatitis, cholecystitis, cholelithiasis, hepatitis, hepatocellular damage.

Johnson & Johnson

PHARMACEUTICAL RESEARCH
& DEVELOPMENT, L.L.C.

14 AUG 2003

ORIGINAL

1125 Trenton-Harbourton Road
P.O. Box 200, Titusville, NJ 08560

NDA SUPPLEMENT

NDA NO. 20-272 REF NO. SLR-033

Russell Katz, MD, Director
Division of Neuropharmacological Drug Products    NDA SUPPL FOR Labeling
Center for Drug Evaluation and Research, HFD-120
U.S. Food and Drug Administration
**Attn: Document Control Room 10B-40**                RECEIVED
1451 Rockville Pike
Rockville, MD 20852                                    AUG 1 5 2003

                                                      HFD-120/CDER

Subject:    **NDA 20-272**
            Cross-reference NDAs 20-588 and 21-444
            **RISPERDAL® (risperidone) Tablets**
            **Special Supplement – Changes Being Effected**

Dear Dr. Katz:

Please refer to your approval letter of April 2, 2003 for NDA 21-444, RISPERDAL®
(risperidone) [          ] Tablets and the agreed-upon labeling. The labeling
included a new subsection under WARNINGS regarding the occurrence of
cerebrovascular adverse events in elderly patients with dementia. The text of this
subsection is as follows:

> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with**
> **Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including
> fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of
> risperidone in elderly patients with dementia-related psychosis. In placebo-
> controlled trials there was a significantly higher incidence of cerebrovascular
> adverse events in patients treated with risperidone compared to patients treated with
> placebo. RISPERDAL has not been shown to be safe or effective in the treatment
> of patients with dementia-related psychosis.

In addition, please refer to the meeting of August 13, 2003 between representatives of the
Division and J&J PRD, in which the Division agreed to the following proposed text to
replace the third sentence of the above statement.

> RISPERDAL is not approved for the treatment of patients with dementia-related
> psychosis.

Therefore, in accordance with 21 CFR 314.70(c)(2), we are submitting a supplemental
application to provide revised product labeling to improve the clarity of this sentence in

PRD-1C

CA25-1784

## IN THE CIRCUIT COURT, SEVENTH JUDICIAL
## CIRCUIT, IN AND FOR ST. JOHNS COUNTY, FLORIDA

### PRACTICES AND PROCEDURES STANDING ORDER FOR CIVIL
### CASES IN DIVISION 59

The following practices and procedures apply to all civil cases pending in Division 59. These procedures are designed to assist the parties in having their cases handled as efficiently as possible. If you have questions regarding the requirements set forth herein, please contact the judicial assistant for the division at mlapinski@circuit7.org or (904) 827-5654.

1.    **Orders on Unopposed Matters**: Orders on consented matters which do not need a hearing may be forwarded to the Judge. The motion and proposed order must specify that the relief sought has been agreed to by all parties. The order must be submitted electronically utilizing the procedures set forth below in paragraph 5.

2.    **Orders on Ex Parte Motions**:  The Court will consider the following *ex parte* motions:

A.    *Motions to Cancel Foreclosure Sales:* The Court will consider motions to cancel or reschedule foreclosure sales on an *ex parte* basis, only if the following requirements are met: (a) the written motion is received by the Court no less than five (5) business days before the scheduled sale date and served on all parties; (b) the motion must contain specific facts setting forth the reasons for the postponement; and (c) the motion must have supporting documentation attached (e.g. sale contract, loan modification information, etc.). Motions will not be granted as a matter of right and will only be granted on a limited basis upon a determination of good cause.

B.    *Motions to Withdraw by Counsel:* Counsel may seek withdrawal from representation upon filing of an appropriate motion. Notice must be provided to all parties and their client. The motion must set forth the reasons for withdrawal and the client's last known address. *If the client does not consent to the withdrawal in writing, a hearing will need to be scheduled.*

C.    *Motions to Substitute Counsel:* Motions to substitute counsel must comply with Fla. R. Gen. Prac. & Jud. Adm. 2.505 and contain the client's written consent.

3.    **Motions to Compel Discovery**:

A.    Unless there has been a complete failure to respond or object to written discovery requests, motions to compel discovery must include in the body of the motion in quotation, each interrogatory, deposition question, request for admission, or request for production to which the motion is addressed, followed by quotation, in full, of the answer or response which is asserted to be insufficient, or the objection and grounds stated by the opposing party. Merely attaching the request and alleged deficient response to the motion will not suffice.

B.    If there has been a complete failure to respond to discovery requirements, a party may utilize the procedures in Seventh Judicial Circuit Administrative Order CV-22-004-SC to obtain an order compelling discovery.

*C.*      Discovery disputes called up for a hearing and determined to not be meritorious, failure to respond to discovery, or objections to discovery that have no legitimate basis will result in sanctions, in accordance with Fla. R. Civ. P. 1.380.

**4.**    **Hearings:**

*A.*    **Scheduling Hearings**

i.      All hearings need to be coordinated among all counsel and scheduled through the Benchmark internet scheduling system. Instructions for using Benchmark can be found on the Judge's webpage at www.circuit7.org.  **Hearings may not be scheduled on the Court's calendar less than 10 days before the scheduled hearing date without the Court's consent.**

ii.     No hearing shall be scheduled on motions that have not yet been filed. Hearings scheduled on unfiled motions will be stricken. A Notice of Hearing must be filed *immediately* upon securing hearing time.

iii.    ***No hearing may be scheduled for longer than one hour on Benchmark.*** Any hearing requiring more than one hour may only be scheduled through the judicial assistant. If a hearing is scheduled for more than one hour without prior authorization from the Court, the hearing will be stricken.

iv.     Multiple motions in the same case may not be scheduled at non-sequential times throughout the same day.

v.      Counsel must assure that enough time is reserved to allow for arguments by all parties. All parties will receive equal time during hearings. Hearings scheduled with insufficient time to hear all parties' arguments will be stricken and continued until sufficient time is available.

vi.     Other parties in a case are not permitted to notice a hearing on a different motion at the same time as the scheduled hearing without the consent of the party that reserved the time. Hearings set in such a manner will be stricken.

*B.*    **Chambers Copies of Motions:** If the motion(s) scheduled for hearing exceed(s) 15 pages, including attachments, the movant shall submit a chambers copy, in hard copy, of the motion(s) and attachments to the Court, which must be received by the Court *no later than ten (10) business days prior to the hearing***.** Failure to timely submit a chambers copy of the motion as directed herein may result in canceling of the hearing, or the Court's inability to review the motion prior to the hearing due to the Court's busy hearing schedule.

*C.*    **Legal Memoranda:** If parties desire to submit legal memoranda, or responses in oppositions to motions upcoming for hearing, in addition to filing the memoranda or response, ***regardless of length a chambers copy must be delivered to the judge no later than ten (10) business days prior to the hearing***. Responses or memoranda in opposition to motions are not required unless mandated by the Florida Rules of Civil Procedure. Responses or memoranda in opposition to motions shall not exceed twenty (20) typewritten pages without leave of Court.

Replies to responses in opposition to motions are not permitted absent leave of Court. Untimely submissions or submissions not delivered to the Court will not be considered.

*D.* **Conferral Certification:** All motions shall conform to the conferral requirements of Fla. R. Civ. P. 1.202. Motions that fail to comply with Rule 1.202 may be summarily denied. A non-movant's purposeful failure to respond to conferral attempts may be considered consent to the relief sought.

*E.* **Hearing Cancellations:** If a hearing is cancelled, a Notice of Cancellation must be filed ***and*** the judicial assistant must be ***immediately*** notified of the cancellation so the time may be made available for litigants in other cases. Only the party that scheduled a hearing may cancel that hearing.

*F.* **Court Reporters:** Parties arranging a court reporter for attendance at a hearing must assure the court reporter meets the requirements set forth in Seventh Judicial Circuit Administrative Order G-23-041-SC. Court reporters not satisfying these requirements will not be permitted to report the proceedings but the hearing will proceed as scheduled. Court reporters must appear in person if counsel for the parties appear in person, in order to assure the court reporter can hear all the participants.

*G.* **Emergency Motions:** Emergency hearings must be requested in writing, setting forth in the introductory or first paragraph the reasons why the matter is considered an "emergency." The request must be delivered to the Judge's chambers. Generally, emergencies exist where persons or property face the threat of imminent harm without court intervention. Hearings scheduled on emergency motions must be attended in-person by all counsel and necessary witnesses, unless the Court permits otherwise. The unwarranted designation of a motion as an emergency will result in summary denial of the motion and may result in additional sanctions.

*H.* **In-Person and Remote Appearances:** All hearings regardless of the number of matters to be heard, scheduled for one hour or longer or that are evidentiary must be attended in-person. Non-evidentiary hearings scheduled for less than one hour may be attended in person or through audio-video communication technology, as defined in Rule 2.530(a)(2), Fla. R. Gen. Prac. & Jud. Admin. Parties and/or counsel planning to attend a hearing via audio-video communication technology must file at least 24-hours prior to the hearing a notice of their intention to do so.

*I.* **Remote Appearance Zoom Procedures:** Audio-video communication technology is conducted using the Zoom platform. Zoom is accessible via the Court's Zoom meeting number 386 329 0263; no password is required. The following shall be strictly adhered to during authorized appearances made over Zoom:

i.     Hearings conducted on Zoom are official court proceedings, and proper courtroom decorum must be followed, ***including appropriate courtroom attire***.

ii.     Unauthorized recording of Zoom proceedings is not permitted.

iii.     If a court reporter is present they must meet the requirements in Seventh Judicial Circuit Administrative Order G-23-041-SC.

iv.     Participants shall not move their device around during the Zoom proceedings.

v.    Participants shall limit distractions during the hearing. Find a quiet place to participate in the hearing.

vi.    All participants shall assure, that they are ***properly identified by name***. Zoom identifiers such as "iPhone" are insufficient.

vii.    Participants who interrupt the proceedings, or create a distraction, will be disconnected.

*J.*    **Hearing Notices:**  All notices of hearing must identify the specific hearing room or courtroom where the hearing will take place and shall not indicate the hearing is a remote hearing. For non-evidentiary hearings scheduled for less than one hour, the notice shall additionally specify "parties and/or counsel may appear by Zoom in lieu of in-person appearance and must strictly adhere to the Zoom attendance guidelines."  An example of a proper notice of hearing can be found on the Court's website.

**5.**    **Submission of Proposed Orders:**

*A.*    All proposed orders must be sent to the Court electronically by email at division59@circuit7.org.  The subject line of the email must state "Proposed Order," and include the case style and case number. The proposed order must be an attachment to the email in MS Word format. Proposed orders shall not be filed thru the e-filing portal. Do not send proposed orders in pdf format.

*B.*    Executed orders will be served upon counsel of record in the case at their designated email addresses; thus, it is imperative all counsel keep their email addresses up to date. Unrepresented parties who have designated an email address will receive the executed orders at their email address. Unrepresented parties who have been excused from designating an email address will receive orders through the mail.

*C.*    Proposed orders following a hearing at which the judge announced a ruling and directed a party to submit a proposed order reflecting that ruling must be presented to opposing counsel prior to submission to the Court. The email to the Court with the attached proposed order must indicate whether the proposed order had been shown to opposing counsel for review and whether opposing counsel agrees to its content.

*D.*    Proposed orders following a hearing at which the judge did not announce a ruling shall only be submitted if the Court requested the parties to do so.

**6.**    **Setting Cases for Trial**:  Parties seeking to set a case for trial do not need to schedule a hearing with the Court but should file a Notice of Trial that complies with Fla. R. Civ. P. 1.440. A copy of the Notice must be sent to the Judge's chambers. If a specific trial term is agreed to by the parties, the Notice should so specify. The Notice of Trial must specify whether the trial is by jury or non-jury, and the expected length of the trial.   Parties shall carefully read the Court's Order Setting Case for Trial and the Uniform Case Management Order to comply with the requirements and deadlines therein.

**7.**    **Motions for Summary Judgment:** Motions for summary judgment, and responses thereto, shall strictly adhere to the time requirements in Fla. R. Civ. P. 1.510 and the Uniform Case Management Order.  Motions and/or responses that do not adhere to the time

specifications will not be considered. Replies by movants to a non-movant's response in opposition to a motion for summary judgment are not permitted absent an order from the Court. Replies filed without Court authorization will not be considered.

8.    **Motions to Continue Trials**: A motion to continue must comply with the requirements in Rule 1.460, Fla. R. Civ. P. and Rule 2.545(e), Fla. R. Gen. Prac. & Jud. Adm. No continuance is granted as a matter of right and the parties should not assume that a continuance will be granted, even if all parties consent. Motions to continue trials are disfavored and rarely granted. Lack of due diligence in preparing for trial is not good cause to continue a trial.

9.    **Settlements:** If a case set for trial settles, counsel must notify the judicial assistant.

10.    **Witness Testimony by Audio-Video Communication Technology:** All witness testimony at hearings or trial shall be in-person unless otherwise authorized by Court order. If a party seeks to have a witness testify via audio-video communication technology, a motion must be filed that complies with Rule 2.530, Fla. R. Gen. Prac. & Jud. Admin. Parties calling a witness to testify via audio-video communications technology shall assure the witness is provided a copy of the Court's procedures governing Zoom appearances.

11.    **Trials:** The following procedures are for jury trials before the Court. These procedures supplement the requirements set forth in the order setting the case for trial.

A.    Counsel shall stand when court is opened, recessed, or adjourned, the jury enters or retires from the courtroom, addressing or being addressed by the Court, examining witnesses, or making objections.

B.    All objections and remarks shall be directed to the Court, and not to opposing counsel. Disparaging personal remarks or acrimony toward opposing counsel will not be tolerated. Refer to all persons (including witnesses, other counsel, and parties) by their surnames, not by their first names. Exceptions may be made in the case of children.

C.    Counsel making objections shall state only the legal grounds for the objections, withholding further comment or argument unless requested by the Court. Speaking objections (other than legal basis) are not permitted. The proponent of the question should not make argument regarding the objection unless the Court requests a response.

D.    Any paper or other tangible object not yet received into evidence shall be marked for identification by the clerk and shown to opposing counsel before tendered to a witness.

E.    All exhibits must be pre-marked for identification by the clerk ***before trial***. Exhibits marked for identification shall be identified by letter. Exhibits will be assigned a number upon admission into evidence.

F.    One attorney for each party shall examine or cross-examine any one witness. The attorney who examines or cross-examines shall make any objections.

*G.*      Offers or requests for stipulations must be made outside the presence of the jury.  Suggestions of counsel relating to the comfort or convenience of jurors must be made outside the presence of the jury.

*H.*      Do not ask the Court to declare a witness to be an expert, or "tender" a witness as an expert.

*I.*      Motions in limine shall be limited to case specific anticipated evidentiary issues.  Boilerplate motions in limine not addressing case specific anticipated evidentiary issues will not be considered.  *See State Farm Mut. Auto. Ins. Co. v. Davis,* 336 So.3d 392, 397 n.5 (Fla. 5th DCA 2022).

*J.*      Counsel for the Plaintiff shall bring one ream of letter size (8x11) paper on the first day of trial and hand it to the clerk.  This paper will be used to prepare jury instructions and verdict forms.

*K.*      Counsel for the Defendant shall bring enough standard letter size (8x11) pads, envelopes to hold the pads, and pens, for each of the jurors, including alternate juror(s), to be used for juror note taking.

*L.*      Prior to jury selection, counsel for all parties shall confer and generate **one joint set** of jury instructions for use at the charge conference.  Instructions that are agreed to shall be so designated; instructions not agreed to should be labeled as the Plaintiff's or Defendant's requested instructions within the **joint** set.  Citations to the source of the instructions should be noted therein.  Plaintiff's counsel (unless Plaintiff is unrepresented, in which case defense counsel) is responsible for creating the **joint** set of proposed instructions.  The **joint** set of instructions should be given to the Court on paper and electronically (e.g. flash drive, email, etc.) in Microsoft Word format.  Proposed verdict forms should be submitted the same way.

*M.*      Counsel and parties shall be prepared to try their cases anytime during the scheduled trial term.

*N.*      Please refer to the trial order and Uniform Case Management Order for additional requirements and deadlines.

DONE AND ORDERED in St. Augustine, St. Johns County, Florida.

_____
                Kenneth J. Janesk, II Circuit Judge

*Revised January 2025*

IN THE CIRCUIT/COUNTY COURT OF FLORIDA, SEVENTH JUDICIAL CIRCUIT,
IN AND FOR FLAGLER, PUTNAM, ST. JOHNS AND VOLUSIA COUNTIES

## UNIFORM CASE MANAGEMENT ORDER

**NOTICE:  The deadlines referenced in this Order will be strictly enforced.**

This Case Management Order is issued in accordance with Fla. R. Civ. P. 1.200 and Administrative Order(s) of the Seventh Judicial Circuit Court. The deadlines referenced herein apply in conjunction with the trial date specified in the Order Setting Trial.

### A.    CASE DESIGNATION

All civil cases will be assigned a designation as follows: Civil cases in which trials by jury are demanded are designated as "General," except those cases in which all defendants have been defaulted. Civil cases designated as "Complex" pursuant to Rule 1.201, Fla. R. Civ. P., are exempted from the requirements of this Order and will follow the procedures outlined in the Rule. All other civil cases are designated as "Streamlined." Parties may move for redesignation in accordance with Fla. R. Civ. P. 1.200 (c)(1). Civil actions specified in Fla. R. Civ. P. 1.200(a)(1-18) are likewise exempted from the requirements of this order.

### B.    PROJECTED TRIAL PERIOD

The projected trial period for "General" cases will be no later than eighteen (18) months from case filing. The projected trial period for "Streamlined" cases will be no later than twelve (12) months from case filing. The parties may move the Court to fix a trial period on or before the projected trial period. For cases in which no trial order has been issued, the parties seeking affirmative relief must notify the Court no later than seventy-five (75) days before the expiration of the projected trial period that no trial order has been issued.

### C.    SERVICE OF PROCESS

Plaintiff(s) are required to serve each defendant with initial process and pleading no later than one hundred twenty (120) days from case filing as provided in Fla. R. Civ. P. 1.070(j). Proof of service of process is to be promptly filed with the Clerk of Court. Motions for extension of time to complete service of process must be filed no later than ten (10) days prior to the expiration of the initial time allotted for service. The motions must specify the reasons why service could not be performed within 120 days and what attempts had been made at service during that period. In its discretion, the presiding judge may grant the plaintiff(s) an additional ninety (90) days to serve any remaining defendant(s). After the expiration of the time for service, including any extensions, any unserved defendant(s) may be dismissed from the action without further notice.

### D.    ADDING NEW PARTIES

The deadline for adding new parties to an action is 120 days after the completion of service of process on the initial defendants in cases designated as "General" and 90 days after the completion of service of process on the initial defendants in cases designated as "Streamlined." Parties may not be added to actions after these deadlines absent a showing of good cause.

1

## E.    OBJECTIONS TO PLEADINGS

Motions objecting to pleadings must be called up for hearing no later than 120 days after the filing of the motion. Motions objecting to pleadings not called up for hearing within the time specified herein, absent a showing of good cause, may be deemed waived or abandoned.

## F.    DISCOVERY/DISCLOSURE DEADLINES

All discovery is to be completed according to the following schedule:

| Action or Event | General | Streamlined |
|---|---|---|
| Mandatory Initial Disclosures | As provided in Fla. R. Civ. P. 1.280(a) | As provided in Fla. R. Civ. P. 1.280(a) |
| Disclosure of expert witnesses | 120 days before docket sounding for parties seeking affirmative relief; 90 days before docket sounding for parties not seeking affirmative relief | 90 days before docket sounding for parties seeking affirmative relief; 60 days before docket sounding for parties not seeking affirmative relief |
| Disclosure of fact witnesses | 60 days before docket sounding | 60 days before docket sounding |
| Service of written discovery requests | 45 days before docket sounding | 45 days before docket sounding |
| Completion of all discovery | 10 days before docket sounding | 10 days before docket sounding |

## G.    DISPOSITIVE MOTIONS

Dispositive motions must be filed and served no later than 120 days prior to the scheduled or projected trial period for "General" cases and 90 days prior to the scheduled or projected trial period for "Streamlined." cases. Motions for summary judgment and responses in opposition must comply with the deadlines set forth in Fla. R. Civ. P. 1.510. Movants must promptly call up dispositive motions for hearing, but no sooner than the time specified in Rule 1.510. Replies to responses in opposition to dispositive motions are only permitted upon leave of Court.

## H. EXPERT WITNESS MOTIONS

Expert witness-related motions or objections (e.g., *Daubert* motions) must be filed no later than 60 days prior to the start of the scheduled or projected trial period for "General" cases and forty-five (45) days prior to the start of the specified or projected trial period for "Streamlined" cases.

## I. PRETRIAL MOTIONS

All pretrial motions, other than dispositive motions and motions directed at expert witnesses, must be filed no later than thirty (30) days prior to the trial date. Pretrial motions filed within 30 days of trial will not be considered if predicated on matters the movant knew or should have known with the exercise of reasonable diligence at least 30 days prior to the trial date. Compliance by counsel (not staff) with the conferral requirements in Fla. R. Civ. P. 1.202 is required. Failure to comply with conferral requirements may result in summary denial of motions. Because of busy court calendars, hearing time may not be available to consider motions filed close to the deadline. The inability of a party to obtain hearing time will generally not constitute grounds for a continuance of the trial.

## J. MEDIATION

Unless excused by the Court or excluded pursuant to Fla. R. Civ. P. 1.710(b), mediation is to be conducted in all cases. Mediation must be concluded, and a report filed prior to docket sounding.

## K. EXTENSIONS/MODIFICATIONS OF DEADLINES

The deadlines specified herein will be strictly enforced unless modified by Court order. The parties may submit an agreed order to extend disclosure and/or discovery deadlines; however, all remaining deadlines will remain in place absent a Court order. Continuances of deadlines are strongly discouraged.

## L. SERVICE OF THIS ORDER

Plaintiff is required to serve a copy of this Order on all other parties and file a notice of service with the Clerk within 30 days of the date of its issuance.

**DONE AND ORDERED** in Flagler, Putnam, St. Johns, and Volusia counties.

Leah R. Case
Chief Judge

Effective: January 1, 2025
Adopted: December 2024

3

## St. Johns County Receipt of Transaction
## Receipt # 2025054860

Brandon J. Patty

St. Johns County Clerk of the Circuit Court and Comptroller

4010 Lewis Speedway, St. Augustine, FL 32084

904-819-3600

WARD, BRANDON
143 RIBERIA STREET
A
SAINT JOHNS, FL 32080

Cashiered by: djarrard
On: 12/29/2025  9:10 am
Transaction # 1203375

**CASE NUMBER   CA25-1784**

**Judge   KENNETH J JANESK II**

**BRANDON WARD   *VS*   JOHNSON AND JOHNSON**

| Fee Description | | Fee | Prior Paid | Waived | Due | Paid | Balance |
|---|---|---|---|---|---|---|---|
| (320) PRODUCT LIABILITY | | 400.00 | 0.00 | 0.00 | 400.00 | 400.00 | 0.00 |
| | Total | 400.00 | 0.00 | 0.00 | 400.00 | 400.00 | 0.00 |
| | Grand Total | 400.00 | 0.00 | 0.00 | 400.00 | 400.00 | 0.00 |

**PAYMENTS**

| Payment Type | Reference | | Amount | Refund | Overage | Change | Net Amount |
|---|---|---|---|---|---|---|---|
| ACH - CIVIL | 17394216 | OK | 400.00 | 0.00 | 0.00 | 0.00 | 400.00 |
| | Total | | 400.00 | 0.00 | 0.00 | 0.00 | 400.00 |

# IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA25-1784

Plaintiff: Mr. Brandon Tyler Ward

Defendant: Mr. John D. Winter Esq. (For Johnson & Johnson)

## "Motion To Subpoena Defendant Compliance "

Since opening this case I have been humiliated by Mr. John D. Winter and NYC Undersheriff Anthony Yang. My hard work writing and my spent, by Undersheriff Yang, $57 check are gone and all that remains is tons of work and no closure. Please entered the following as evidence for my Plea for Defendant Compliance:

NYC Civil-Unit Sheriff's Officers at the discretion of Undersheriff Yang went to try to serve papers at: 1133 Avenue of the Americas New York, New York 10036 for St. Johns County, Florida Court Case CA25-1784 on Defendant Mr. John D. Winter esq. of Patterson Belknap Webb & Tyler LLP. Mr. Winter swayed Undersheriff Yang's young female officers that Yang sent even though I wrote him a check for more then $50. (4/19/2019 Laparoscopic Cholecystectomy from Paliperidone – Toledo, Ohio Dr. Wissam Hotiet chemical straight-jacket whistleblower retaliation, Sunshine-in-Litigation Act and, Florida Statue 69.081.)

Furthermore, Undersheriff Yang allowed the Defendant, Mr. Winter, to deny the acceptance of Official Court Case paperwork St. Johns County, Florida Court Case CA25-1784; Influence hindering the normal process of justice with malice aforethought or "Obstruction of Justice," a Felony, that

(1)

NYC Undersheriff Yang is now Accessory After The Fact in. (18 U.S.C Chapter 73, Florida Supreme Court Case SC2025-0986, Federal Rules of Evidence 404, Florida Statue 90.404, Underlying Sex Abuse and, Florida Statue 777.03(2)(a).

Finally, this is not the first time Mr. John D Winter has maliciously influenced justice proceedings. This is my humble plea for The Honorable Court to mandate Defendant Compliance. I hope my story is not to long and I appreciate Your Time Sir or Ma'am

_Brandon W Ward_ 12/06/2026

Mr. Brandon Tyler Ward

100% Permanent and Total Service-Connected Gulf War

Era Marksmanship Badge Award-Winning Disabled American Army Veteran

(2)

## Ward V. Winter St. Johns County Florida Case Number CA25-1784

1 message

**Winter, John D. (x2836)** · ██████████████                                    Mon, Jan 5, 2026 at 1:41 PM
To: Brandon Ward <ihatelife3740@gmail.com>
Cc ████████████████████

Happy New Year

Two individuals from NYC's Sheriff's Office came to the firm today attempting to serve the papers Mr. Ward emailed on December 23.

After I saw what was in one officer's hand, I politely told the two officers that what they wanted to service was improper as there was no jurisdiction for the officers to deliver them. One officer wrote "no jurisdiction" and my name on a sheet of paper (one officer asked "who should I write down as saying no jurisdiction—and I gave her my name) and they left without leaving any papers.

Let me know if you have any questions.

**From:** Brandon Ward <ihatelife3740@gmail.com>
**Sent:** Tuesday, December 23, 2025 3:25 PM
**To:** Winter, John D. (x2836) · ████████████████ ·
**Cc:** ████████████████
**Subject:** Ward V. Winter St. Johns County Florida Case Number CA25-1784

Privileged/Confidential Information may be contained in this message. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer do not consent to receiving email messages of this kind.

# Exhibit 1

"FLStatue69.081Complaint…pdf"

115 pages of opening arguments, medical records and, patents/patent-related communications

__IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT_____

_____IN AND FOR ST. JOHN'S COUNTY, FLORIDA_____

Case #:___CA25-1784_____

Judge:___Judge Kenneth J. Janesk, II

**Mr. Brandon Ward**

Plaintiff

**Complaint**:

**Product Liability**

**V.s**

**Johnson and Johnson**

Defendant

## 1. **Claim**

In 2022, Johnson and Johnson obstructed justice on an underlying Product Liability claim for Invega® which caused my emergency surgery that occurred in April 2019 – I am mentally incapacitated as a disabled veteran for purposes of **2024 Florida Statute 95.051(d)**. Indicating a 7 year statue of limitations tolling for disabled people leaving my Product Liability claim available for trial until April 2026. Johnson and Johnson herein referred to as J&J, committed an unprofessional legal coercion and concealment of a known hazardous product directly prohibited in **The Sunshine in Litigation Act or 2024 Florida Statue 69.081, SEC Rule 21F-17(a) and, American Bar Associations Model Rules of Professional Conduct 3.4(f), 5.6(b) and, 8.4(c-e**) via a Confidentiality Agreement solicited by Company Lawyer: Mr. John D. Winter esq. Mr. Winter is a partner in Patterson Belknap's Products Liability group who represents California jurisdiction for this claim while sending settlement documents to Tennessee before scope of liability was known and while I was under duress albeit the fact the Product Liability Surgery occurred in Ohio. It is for that reason I beg The State of Florida take jurisdiction and open this multi-million dollar Invega Sustena® Product Liability claim.

**This Complaint is Requesting Trial for Product Liability in the sum of $37 million dollars.**

Defendant Lawyer for Confidentiality Agreement:__ Mr. John D. Winter  *

**1133 Avenue of the Americas.** ████████████ * New York, New York

**10036.  (212)  336-2000**

(1)

## 2. <u>Claim details</u>

I, Mr. Brandon Ward, am a 100% Permanent & Total Service-Connected U.S Army Gulf War Era, Marksmanship Badge Award-Winning Disabled American Veteran and Sexual Trauma Survivor who suffered a Laparoscopic Cholecystectomy in April 2019  when J&J product Invega® caused excruciating brown gallstones or not stereotypical gallstones but, ones containing conjugate elevations of bilirubin[2]. In comparative contrast to previous J&J legal claims against Mr Andrew Yount or Mr. Austin Pledger with Risperdal®, Gynecomastia and, Prolactin. I after serious research/investigation into Invega® raising monocyte, blood bilirubin and, other levels found it being directly tied to gallstones. The Government and Company explicitly acknowledged Invega being directly linked to Gallstones in the 2003 Risperdal FDA patent for MTabs and injection active metabolite 'Paliperdone' during which Russell Katz M.D and J&J Dr. Edward Brann state twice the risk of gallstones on patent page 20 and 21. I tried to warn CEO(s): Mr. Alex Gorsky, Mr. Joaquin Duato and, J&J Board of

Directors through various Social Media namely Venmo, LinkedIn & Gmail that Invega® was dangerous and that they had excluded gallstones on more recent, more potent patents. The company has a grim past that demonstrated being worth existence in the public domain many times. I beg you, Honorable Judge stand with me against Invega® and force J&J to bear notice in there annual reports once again to profound litigation. J&J has caused numerous deaths of sensitive populations, paying millions of dollars to product liability victims some suffering from diabetes, gynecomastia/the resulting surgery or, those like me who need emergency surgery for non-cosmetic reasons. J&J even after D.O.J sanctions worth billions devise more potent, longer-lasting  versions of Invega® thusly raising  the overall number of adverse events for Invega®

J&J lawyer Mr. John Winter in preparing, advising for and, paying for my 2022 Confidentiality Settlement Agreement obstructed justice and broke. **'American Bar Associations Model Rule of Professional Conduct Rule 8.4( e)** by implying an ability to influence improperly a government agency

*" 5.2 RELEASOR understands that upon execution of this Agreement, RELEASOR is forever barred from filing or causing to be filed any claim or litigation or proceeding in and before any agency, tribunal or court relating to any claim RELEASOR may have ever had or  could have in the future against RELEASEES in any way arising out of or related to Claimant's Claims "*

'Confidentiality Settlement Agreement section 5.2' by J&J Lawyer Mr. Winter **also violates SEC Rule 21F-17(a)** which provides that "[n]o person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing or threatening to enforce a confidentiality agreement...with respect to such communications."

(2)

## 3. Claim Details Continued

      J&J Defense Lawyer Mr.John Winter **broke the American Bar Associations Model Rules of Professional Conduct Rule 8.4( d)** by engaging in conduct that is prejudicial to the administration of justice. Not being able to converse with other attorneys or there Claimants as laid out in Section 4.1 of the Confidentiality Agreement also restricts a lawyers right to practice which **violates the American Bar Associations Model Rules of Professional Conduct Rule 5.6(b)** A lawyer shall not participate in offering or making an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.

  "4.1....*RELEASOR agrees that he will not make any statement, either directly or indirectly, by implication or innuendo, to anyone, including but not limited to the press or media or to other attorneys or Claimants or potential Claimants concerning the Agreement Terms or describing or characterizing the Agreement Terms in any way other than to say that the matter has been resolved"*

      Furthermore J&J Lawyer John Winter **breaks 'American Bar Associations Model Rules of Professional Conduct Rule 8.4( c)** by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation;' when he advises further Confidentiality Agreement Terms such as:

  "6.4....*The RELEASOR further expressly agrees and covenants to release, discharge, forever indemnify, defend, and hold harmless RELEASEES and their attorneys from any liens and/or claims which may arise or may have heretofore arisen in favor of Medicare, Medicaid, any other government program or any other governmental entity, federal, state or local, by operation of law or equity, for medical expenses, disability benefits, or any other charge or expense, directly or indirectly relating to the alleged injuries caused by RELEASOR'S use of Risperdal® and/or Invega®. The indemnification set forth in this section specifically includes, but is not limited to, the payment of all reasonable costs and expenses of investigation, defense, settlement, attorney fees, judgments, court costs, and all other costs and expenses of defending such claims*."

      All 3 sections of Mr. John D. Winters 2022 Confidentiality Agreement: 4.1, 5.2 and, 6.4 **break American Bar Associations Model Rules of Professional Conduct Rule 3.4(f)** which states a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party

## 3. Personal Evidence of Injury and Obstruction

1. 2022 Confidentiality Settlement Agreement
2. 2022 Emails with John D. Winter ESQ.
3. 2019 Toledo Flower Hospital-State Hospital Inpatient Document
4. 2019 Harbor Behavioral Health in Toledo Ohio Invega Injection Records
5. 2019 Laparoscopic Cholecystectomy & Pathophysiological Findings
6. Early 2000's-2019 Company Prior Record Court Documents
   6a. 2003 risperdal FDA Patent states risperdal causes cholesestatis

4. <u>**Scientific Evidence For Claim**</u>

1) National Library of Medicine, PubMed study titled **New Pathophysiological Concepts Underlying Pathogenesis of Pigment Gallstones** [1], "Pigment gallstones, which are much less frequent than cholesterol stones, are classified descriptively as 'black' or 'brown'. They are composed mostly of calcium hydrogen bilirubinate,
Ca(HUCB)2."

2) National Library of Medicine, PubMed Study, **Pathogenesis of Gallstones**[2]. "Gallstones are composed principally of cholesterol monohydrate crystals (cholesterol stones) or the acid salt of calcium bilirubinate (pigment stones). Cholesterol stones and the black variety of pigment gallstones form in sterile gallbladder bile whereas brown pigment gallstones form in infected bile. **Biliary supersaturation is the principal pathophysiological defect and is hepatic in origin. Supersaturation results from excessive secretion of cholesterol or bilirubin conjugates**, the precursors of unconjugated bilirubin, and/or, deficient secretion of bile salt and lecithin, the solubilizers of these otherwise insoluble lipids" This Study further states, "Chemical compositions of brown and black pigment stones are different: In black stones, calcium bilirubinate is polymerized and oxidatively degraded **but in brown stones, calcium bilirubinate is present as the unpolymerised salt."**

3) The National Library of Medicine further states in a study Titled **LiverTox: Clinical and Research Information on Drug-Induced Liver Injury,**[3] "Risperidone is an atypical antipsychotic that is used widely in the treatment of mania and schizophrenia. Risperidone therapy is associated with serum aminotransferase elevations and in rare instances has been linked to clinically apparent acute liver injury." The Study further states, **"Liver test abnormalities may occur in up to 30% of patients on long term therapy with risperidone..The pattern of serum enzyme elevations is typically cholestatic**, but cases with hepatocellular and mixed patterns have also been described"

4) According to sciencedirect.com, Medical Faculty and Medical Scholars associated with European Psychiatry Volume 26, Supplement 1 conducted a study Titled **P01279 – Liver function tests and one year Risperidone treatment in children and adolescents** "Asymptomatic liver function test abnormalities mostly ALP elevation was found **in subjects treated with risperidone. The mean levels of liver enzymes and billuribin of the patients were significantly higher after one year of treatment than the baseline.** Also the mean levels of liver enzymes and billuribin of the patients were significantly higher after one year of treatment than the six months. **There was significant association between changes in weight, risperidone dose and liver enzymes and billuribin levels.**

(4)

5) According to Conversion guidance written on National Library of Medicine Government website in study, "**Maintenance dose conversion between oral risperidone and paliperidone palmitate 1 month: Practical guidance based on pharmacokinetic simulations**" from J&J  Dr. Russu," **Patients taking risperidone are therefore exposed as well to paliperidone f**ollowing in vivo conversion and **the clinical effects of oral risperidone result from the combined concentrations of risperidone and paliperidone (ie activemoiety)**.5  [According to 21 CFR § 314.3 an Active moiety is the molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt.]

6) In a study published on the government website The National Library of Medicine in a study by Kentaro Kawabe, MD. Department of Neuropsychiatry, Graduate School of Medicine, Ehime University titled "**A Case of Acute Pancreatitis Associated with Risperidone Treatmen**t" the team stated, "**Gallstones were present, which were due to an adverse effect of risperidone** because the two separate risperidone administrations elevated serum amylase and lipase independently."

7) C.. Michael Gibson M.S., M.D., Professor of Medicine, Harvard Medical School Founder and Chairman of the Board, WikiDoc Foundation (a 509 (a)(1) Charitable Organization); Chief Executive Officer, Baim Institute for Clinical Research says in his website wikidoc.org, "During its premarketing assessment, multiple doses of Risperdal® were administered to 2607 adult patients with schizophrenia and 1923 pediatric patients in Phase 2 and 3 studies...In the listings that follow, spontaneously reported adverse events were classified using World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 adult or 1923 pediatric patients exposed to multiple doses of Risperdal® who experienced an event of the type cited on at least one occasion while receiving Risperdal®.. (which then lists under) a.
**Gastrointestinal** (symptoms)  b.
**Cholelithiasis** (gallstones)

8) Dr.Aseel Al-Ibrahim stated in Psychiatry Research Case Reports Volume 3, Issue 1, June 2024 **A case of recurrent acute pancreatitis due to paliperidone palmitate long-acting injectables (LAI),** "Our patient experienced recurrent **acute pancreatitis five days after her paliperidone injection dates, pointing to a consistent latency**. All other possible causes were eliminated, rendering paliperidone a class IA drug based on the level of evidence (Badalov et al., 2007).)

(5)

9)  M-X Yan, Y-Q Li, Department of Gastroenterology, Shandong University Qilu Hospital, Shandong Province, China study on The Labeled, "**Gall stones and chronic pancreatitis: the black box in between**": "77% of gallstone patients, while 47% of non-gallstone patients were found to have chronic pancreatitis according to the Cambridge classification" "Secondly, a connection between gall stones and chronic inflammation of the pancreas might exist. **Numerous studies or investigations have shown that changes associated with chronic pancreatitis are common in gallstone patients."**

10) Matthew Silva, Pharm.D., R.Ph., B.C.P.S., a professor of pharmacy practice at MCPHS University in Worcester, Mass., and colleagues published:
'**Antipsychotics May Contribute to Cases of Acute Pancreatitis'** stating, "they reviewed case reports of antipsychotic pancreatitis published from 1990 to 2015 and classified these cases into groups according to the weight of published evidence for each agent"  "**Risperidone, which was previously categorized as a Class IV, was moved to Class II.**" "Class II drugs are those with at least four reports in the literature and consistent latency (time between drug initiation and illness)"

**Sources Cited Page**:

*1: Vítek L, Carey MC. New pathophysiological concepts underlying pathogenesis of pigment gallstones. Clin Res Hepatol Gastroenterol. 2012 Apr;36(2):122-9. Doi: 10.1016/j.clinre.2011.08.010. Epub 2011 Oct 5. PMID: 21978438; PMCID: PMC3311771

https://pmc.ncbi.nlm.nih.gov/articles/PMC3311771/

*2: Carey MC. Pathogenesis of gallstones. Recenti Prog Med. 1992 JulAug;83(78):379-91. PMID: 1529152. https://pubmed.ncbi.nlm.nih.gov/1529152/

*3: Clinical and Research Information on Drug-Induced Liver Injury [Internet]. Bethesda (MD): National Institute of Diabetes and Digestive and Kidney Diseases; 2012-. Risperidone. [Updated 2023 Jun 5]. Available from: https://www.ncbi.nlm.nih.gov/books/NBK548906/

*4:  A. Erdogan, N. Yurteri, A.E. Tufan, H. Ankarali, E. Demirci,P01-279 – Liver function tests and one year risperidone treatment in children and adolescents,European Psychiatry,Volume 26, Supplement 1,2011, Page 280, ISSN 0924-9338,

(https://www.sciencedirect.com/science/article/pii/S0924933811719903)

*5: Alberto Russu, PhD, Global Clinical Pharmacology, Quantitative Sciences, Janssen Research & Development, a Division of Janssen Pharmaceutica NV, Beerse, Belgium.

**Sources Cited Page Cont.**

Maintenance dose conversion between oral risperidone and paliperidone palmitate 1 month: Practical guidance based on pharmacokinetic simulations 2018 Apr 30

https://pmc.ncbi.nlm.nih.gov/articles/PMC6175146/#:~:text=Oral%20risperidone%20doses%20of%201,from%20oral%20risperidone%20to%20PP1M

*6: Kentaro Kawabe, MD. Department of Neuropsychiatry, Graduate School of Medicine, Ehime University A Case of Acute Pancreatitis Associated with Risperidone Treatment

https://pmc.ncbi.nlm.nih.gov/articles/PMC4022769/#:~:text=Gallstones%20were%20present%2C%20which%20were,serum%20amylase%20and%20lipase%20independently.

*7: Michael Gibson M.S., M.D., Professor of Medicine, Harvard Medical School Founder and Chairman of the Board, WikiDoc Foundation (a 509 (a)(1) Charitable Organization.

https://www.wikidoc.org/index.php/Risperidone_side_effects#Premarketing_evaluation

*8) Dr.Aseel Al-Ibrahim from Kuwait Centre for Mental Health in Psychiatry Research Case Reports Volume 3, Issue 1, June 2024 Titled A case of recurrent acute pancreatitis due to paliperidone palmitate long-acting injectables (LAI)

https://www.sciencedirect.com/science/article/pii/S2773021223001013

*9) M-X Yan, Y-Q Li, Department of Gastroenterology, Shandong University Qilu Hospital, Shandong Province, China study on The Labeled, "Gall stones and chronic pancreatitis: the black box in between": Postgrad Med J. 2006 Apr;82(966):254–258.  https://pmc.ncbi.nlm.nih.gov/articles/PMC2579631/

*10) Matthew Silva, Pharm.D., R.Ph., B.C.P.S., a professor of pharmacy practice at MCPHS University in Worcester, Mass. Published Online: Antipsychotics May Contribute to Cases of Acute Pancreatitis on 18 March 2016

https://psychiatryonline.org/doi/full/10.1176/appi.pn.2016.PP3b1#:~:text=D.%2C%20and%20colleagues%20say%20long,and%20combination%20therapy%20is%20necessary. %E2%80%9D

(7)

Signature For Plaintiff:  _(signature)_ 12/22/2025  10:45am

Signature For Court Clerk:  _____

Signature For Defendant:  _____

**Brandon Ward**

**Product Liability Addendum**

**"Cholelithiasis via inhibition of monocytes from Risperdal: The Meta-analysis "**

1) According to Dr. Xingwu Liu in an article written in The National Library of Medicine article, "**Association between monocyte-to-high-density lipoprotein-cholesterol ratio and gallstones in U.S. adults: findings from the National Health and Nutrition Examination Survey 2017–2020"** Studies have indicated that monocyte-to-high-density lipoprotein cholesterol ratio (MHR) can be a reliable indicator of various diseases." "Gallstone prevalence positively associated with elevated MHR, indicating that MHR can be employed as a clinical indicator to assess gallstone prevalence." "Inflammatory cytokines can alter the absorptive and secretory functions of human gallbladder epithelial cells, leading to gallstone formation."

   https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/

   https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/#:~:text=High%2Ddensity%20lipoprotein%20cholesterol%20(HDL,between%20MHR%20levels%20and%20gallstones

2) According Dr. Ibrahim Hawwari at the European Research Council In 2024, with others, wrote an essay called, "**Platelet transcription factors license the pro-inflammatory cytokine response of human monocytes:** "Monocytes secrete highly inflammatory cytokines that are critical for a proper immune response but can also lead to excessive inflammation when dysregulated" "While aberrant monocyte activity triggers hyperinflammation and cytokine storms"

   https://www.embopress.org/doi/full/10.1038/s44321-024-00093-3

3) According to Rajiv P. Sharma, Professor from The Psychiatric Institute, University of Illinois in a study titled, "**Treatment with the antipsychotic risperidone is associated with increased M1-like JAK–STAT1 signature gene expression in PBMCs from participants with psychosis and in THP-1 monocytes and macrophages.**" Collectively these data indicate that risperidone may contribute to increases in expression of JAK-STAT1 signature genes in participants with a longer illness duration and may skew myeloid cells to a more proinflammatory phenotype. Risperidone consistently increased expression of the "M1" (JAK-STAT1) genes CXCL10, IRF1 and STAT1 across different cellular differentiation states, including both monocytes and monocyte-derived macrophages,  Alterations to immune parameters in psychosis are not static, rather they appear to fluctuate in relation illnessrelated variables. This is perhaps not surprising given the plasticity of the immune

   .                                (1)

system, And particularly cells of the myeloid lineage, to previous and current signals present in the tissue milieu,

including pharmacological agents such as antipsychotic drugs.

https://pmc.ncbi.nlm.nih.gov/articles/PMC8792805/#:~:text=*%20Risperidone%20treated%20subjects%20with%20chronic%20psychosis,Risperidone%20decreases%20%E2%80%20%9CM2%E2%80%9D%20gene%20expression%20in%20macrophages.

4) Dr. Edward A. Fisher wrote, **"Inflammation—a Critical Appreciation of the Role of Myeloid Cells"** in American Society for Microbiology on journals.asm.org In the widely used mouse zymosan peritonitis model, resident F4/80hi macrophages leave the serosal cavity to local lymph nodes within 60 min of inflammagen injection and neutrophil recruitment peaks at 4 h. PMN recruitment is followed by a wave of inflammatory Ly6Chi monocytes, which peaks in between 16 and 24 h. In this model, neutrophil and monocyte numbers in the cavity return to baseline within 96 h, but these timings and the absolute number of myeloid cells depend on the dose and nature of the inflammagen. A recent paper from the group of Derek Gilroy (35) extended analysis of the classic zymosan peritonitis model out past this 96-h window and showed that a true return to tissue homeostasis following clearance of zymosan particles took more than 3 weeks. After disappearance of PMNs from the peritoneum, Newson et al. (35) observed changes in monocyte-derived macrophage subsets and a significant increase in the number of B and T lymphocytes in the peritoneum. The recruitment and retention of this collection of lymphoid and myeloid cells long after the disappearance of the inciting sterile stimulus is intriguing. Myeloid cells (macrophages, monocytes, dendritic cells, and granulocytes) survey the body for signs of infection and tissue damage and regulate tissue homeostasis, organogenesis, and immunity. They express receptors that initiate the inflammatory response, send signals that alter the vascular and cytokine milieu, and oversee the recruitment, differentiation, and activation of other myeloid and adaptive immune cells. Their activation must therefore be tightly regulated, optimized for maximal innate immune protection with a minimum of collateral tissue damage or disorganization

https://pmc.ncbi.nlm.nih.gov/articles/PMC8648988/

(2)

Sources Cited:

1. Dr. Xingwu Liu National Library of Medicine article, **"Association between monocyteto-high-density lipoprotein-cholesterol ratio and gallstones in U.S. adults: findings from the National Health and Nutrition Examination Survey 2017–2020"** **https://pmc.ncbi.nlm.nih.gov/articles/PMC11157827/**

2. Dr. Ibrahim Hawwari wrote an essay," **Platelet transcription factors license the proinflammatory cytokine response of human monocytes:"** https://www.embopress.org/doi/full/10.1038/s44321-024-00093-3

3. Rajiv P. Sharma, Professor from The Psychiatric Institute, University of Illinois in a study titled, **"Treatment with the antipsychotic risperidone is associated with increased M1-like JAK-STAT1 signature gene expression in PBMCs from participants with psychosis and in THP-1 monocytes and macrophages."**

   https://pmc.ncbi.nlm.nih.gov/articles/PMC8792805/#:~:text=*%20Risperidone%20treated%20subjects%20with%20chronic%20psychosis,Risperidone%20decreases%20%20%E2%80%9CM2%E2%80%9D%20gene%20expression%20in%20macrophages

4. Dr. Edward A. Fisher wrote **Inflammation—a Critical Appreciation of the Role of Myeloid Cells** https://pmc.ncbi.nlm.nih.gov/articles/PMC8648988/

(3)

Plaintiff Signature _~~Bandon W~~_ 12/22/2025 10:45am _____

Defendant Signature _____

Court Clerk Signature _____



*CONFIDENTIAL*



***CONFIDENTIAL***



*CONFIDENTIAL*



*CONFIDENTIAL*



***CONFIDENTIAL***



*CONFIDENTIAL*



***CONFIDENTIAL***

STATE OF                                     )
                                             )
COUNTY OF _____        )


      On this _____ day of _____, 2022, before me, a duly commissioned and sworn Notary Public in and for the State and County, did appear _____ and before me signed the within instrument.  I know that said signer of the within instrument is the person whose name is subscribed.

      IN WITNESS THEREOF, I have hereunto signed my name and affixed my official seal in the above-named County on this date.


      Signed, sealed and delivered before me this ____ day of _____, 2022.


      _____

      NOTARY PUBLIC



Page numbers for Invega Shot
Medical Records

Re: Record Request form below

Brandon Ward <brandonward679@yahoo.com>

Thu 11/4/2021 1:32 PM

T
C

Yes sorry I meant the 2018 and 2019 invega records I got so much stores in my head I forgot. Please send me all my shot records please I meant

Printed on: 11/04/2021

## RESOURCES

- **SEC Order**

"Whether it's in your employment contracts, settlement agreements or elsewhere, you simply cannot include provisions that prevent individuals from contacting the SEC with evidence of wrongdoing," said Gurbir S. Grewal, Director of the SEC's Division of Enforcement. "But that's exactly what we allege J.P. Morgan did here. For several years, it forced certain clients into the untenable position of choosing between receiving settlements or credits from the firm and reporting potential securities law violations to the SEC. This either-or proposition not only undermined critical investor protections and placed investors at risk, but was also illegal."

"Investors, whether retail or otherwise, must be free to report complaints to the SEC without any interference," said Corey Schuster, Co-Chief of the Enforcement Division's Asset Management Unit. "Those drafting or using confidentiality agreements need to ensure that they do not include provisions that impede potential whistleblowers."

The SEC's order finds that JPMS violated Rule 21F-17(a) under the Securities Exchange Act of 1934, a whistleblower protection rule that prohibits taking any action to impede an individual from communicating directly with the SEC staff about possible securities law violations. Without admitting or denying the SEC's findings, JPMS agreed to be censured, to cease and desist from violating the whistleblower protection rule, and to pay the $18 million civil penalty.

The SEC's investigation was conducted by Marie DeBonis and Jessica Neiterman, with assistance from John Farinacci, and supervised by Virginia Rosado Desilets, Brianna Ripa, Mr. Schuster, and Andrew Dean, all of the SEC's Asset Management Unit. Rua Kelly of the Trial Unit also assisted in the investigation.

The SEC strongly encourages the public to submit any tips, complaints, and referrals via https://www.sec.gov/tcr (https://www.sec.gov/tcr).

###

Last Reviewed or Updated: Jan. 16, 2024



U.S. Securities and Exchange Commission

Home / Newsroom / Press Releases / J.P. Morgan to Pay $18 Million for Violating Whistleblower Protection Rule

PRESS RELEASE

# J.P. Morgan to Pay $18 Million for Violating Whistleblower Protection Rule

Firm's confidential agreements impeded clients from communicating with the SEC

**FOR IMMEDIATE RELEASE** | 2024-7

Washington D.C., Jan. 16, 2024 — The Securities and Exchange Commission today announced settled charges against J.P. Morgan Securities LLC (JPMS) for impeding hundreds of advisory clients and brokerage customers from reporting potential securities law violations to the SEC. JPMS agreed to pay an $18 million civil penalty to settle the charges.

According to the SEC's order, from March 2020 through July 2023, JPMS regularly asked retail clients to sign confidential release agreements if they had been issued a credit or settlement from the firm of more than $1,000. The agreements required the clients to keep confidential the settlement, all underlying facts relating to the settlement, and all information relating to the account at issue. In addition, even though the agreements permitted clients to respond to SEC inquiries, they did not permit clients to voluntarily contact the SEC.

Clinical Review
G. Mannheim, MD
NDA22-264, S015
INVEGA® SUSTENNA® (paliperidone palmitate) Extended-Release Injectable Suspension

# 1 Recommendations/Risk Benefit Assessment

## 1.1 Recommendation on Regulatory Action

The data examined and discussed at FDA's Regulatory Briefing suggests that the current data is inconclusive at present to recommend approval. Despite, paliperidone palmitate suggesting superiority to treatment with oral antipsychotics in delaying time to first treatment failure in subjects with schizophrenia who had been incarcerated (primary endpoint), the presence of 31.3 % of the patients discontinuing early and being lost to follow-up, make such an interpretation unproven. In addition, there was a larger percent of patients who discontinued in the paliperidone palmitate group, and they were not completed followed up. No trend in favor of the paliperidone palmitate arm was demonstrated in terms of PSP total score and in CGI-S at month 15.

Implicitly, one would assume that giving injectable antipsychotics to non-compliant patients would be of more benefit than if they were asked to take oral antipsychotics. However, the present study does not clearly demonstrate this.

An additional study is recommended.

## 1.2 Risk Benefit Assessment

No clear benefit could be established in delaying time to first treatment failure in subjects with schizophrenia who had been incarcerated (primary endpoint). Risks associated with paliperidone and other second-generation antipsychotics include weight gain, dyslipidemias, glycemic abnormalities, hyperprolactinemia, movement disorders and cardiovascular events. Extrapyramidal motor side effects, tardive dyskinesia, etc. are also present. At present, based upon the current study, benefits cannot be said to exceed risks _____ (b) (4).

## 1.3 Recommendations for Postmarketing Risk Evaluation and Mitigation Strategies

None are recommended at this time.

## 1.4 Recommendations for Postmarketing Requirements and Commitments

None are recommended at this time.

# 2 Introduction and Regulatory Background

4

# CLINICAL REVIEW

|  |  |
|---|---|
| Application Type | Supplement |
| Application Number(s) | NDA 22-264, S015 |
| Priority or Standard | Standard |
| Submit Date(s) | July 11, 2014 |
| Received Date(s) | July 11, 2014 |
| PDUFA Goal Date | May 11, 2015 |
| Division / Office | OND-I/DPP |
| Reviewer Name(s) | Glenn B. Mannheim, MD |
| Review Completion Date | April 03, 2015 |
| Established Name | INVEGA SUSTENNA (paliperidone palmitate) Extended-Release Injectable Suspension |
| Therapeutic Class | Anti-Psychotics |
| Applicant | Janssen Pharmaceuticals, Inc. |
| Formulation(s) | Intramuscular |
| Dosing Regimen | 39, 78, 117, 156, 234 mg |
| Indication(s) | Comparison with Oral Antipsychotics in Delaying Time to Treatment Failure in Adults with Schizophrenia Who Have Been Incarcerated |
| Intended Population(s) | Previously Incarcerated Schizophrenics |

NDA 22264/S-015
Page 2

Overall, 39.8% of subjects in the paliperidone palmitate group and 53.7% of subjects in the comparator group met the definition for treatment failure ($p<0.05$). In our view, however, these results are not interpretable.

A total of 139 patients (31.3%) discontinued the study early without meeting the definition of a treatment failure, and, importantly, there were more discontinuations in the paliperidone palmitate group (n=81, 35.8%) than in the oral antipsychotic group (n=58, 26.6%). Furthermore, in 60 patients (26.5%) in the paliperidone palmitate group and 42 patients (19.3%) in the oral antipsychotic group, the reasons for discontinuation reported in the case report forms were either "lost to follow-up" or "withdrawal by subject" in the case report forms. Thus, there is no way to know whether or not these patients experienced treatment failure, and the relatively large differences between treatment groups undermine the interpretability of the results. To place this problem into perspective, in the paliperidone palmitate group, 39.8% of subjects were categorized as treatment failures and, as such, had endpoint events, whereas the disposition of a relatively large proportion of subjects, 26.5%, was unknown.

To assess the potential impact of the discontinuations, we performed two exploratory analyses on the explanatory Intent-to-Treat (eITT) set: 1) categorizing all 139 dropouts without an event as treatment failures; and 2) categorizing the 102 dropouts assessed as "lost to follow-up" or "withdrawal by subject" as treatment failures. Neither analysis yielded a statistically significant difference in delaying time to treatment failure (the $p$-values were 0.28 and 0.19, respectively). These analyses underscore the considerable uncertainty of the study's conclusions, given the high numbers of discontinuations and the disparity between treatment groups. Thus, we reached the conclusion that study R092670-SCH-3006 failed to provide substantial evidence in support of the intended labeling revisions.

2. We recognize the potential importance of improved compliance with antipsychotic treatment, but substantial evidence of effectiveness would be needed to support this sNDA approval. We would reconsider the requested labeling revisions if you could provide another similar, but more clearly positive, study to address the dropout concern, and we strongly encourage you to seek our guidance during the planning stage.


**<u>SAFETY UPDATE</u>**

When you respond to the above deficiencies, include a safety update as described at 21 CFR 314.50(d)(5)(vi)(*b*). The safety update should include data from all nonclinical and clinical studies/trials of the drug under consideration regardless of indication, dosage form, or dose level.

1. Describe in detail any significant changes or findings in the safety profile.

2. When assembling the sections describing discontinuations due to adverse events, serious adverse events, and common adverse events, incorporate new safety data as follows:



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring MD 20993**

NDA 22264/S-015

**COMPLETE RESPONSE**

Janssen Pharmaceuticals, Inc.
Attention: Beth Geter-Douglass, Ph.D.
Associate Director, Regulatory Affairs
1125 Trenton-Harbourton Road
Titusville, NJ 08560

Dear Dr. Geter-Douglass:

Please refer to your Supplemental New Drug Application (sNDA) dated and received July 11, 2014, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Invega Sustenna (paliperidone palmitate) extended-release injectable suspension 39, 78, 117, 156, 234 mg.

We acknowledge receipt of your amendments dated August 21, 2014, September 24, 2014, December 19, 2014, and February 25, 2015.

This "Prior Approval" efficacy supplemental new drug application proposes revisions to the product label based on findings from study R092670-SCH-3006 titled "A Fifteen-Month, Prospective, Randomized, Active-Controlled, Open-Label, Flexible-Dose Study of Paliperidone Palmitate Compared with Oral Antipsychotic Treatment in Delaying Time to Treatment Failure in Adults with Schizophrenia Who Have Been Incarcerated."

We have completed the review of your application, as amended, and have determined that we cannot approve this application in its present form. We have described our reasons for this action below and, where possible, our recommendations to address these issues.

1.  In our view, study R092670-SCH-3006 does not provide substantial evidence that paliperidone palmitate delays time to treatment failure in adults with schizophrenia who have been incarcerated, even though the results, on face, seem to demonstrate superiority of paliperidone palmitate based on the pre-specified primary endpoint and analysis.

    Treatment failure was defined as: 1) arrest/incarceration; 2) psychiatric hospitalization; 3) suicide; 4) discontinuation of antipsychotic treatment due to inadequate efficacy or poor tolerability; 6) treatment supplementation with another antipsychotic due to inadequate efficacy; and/or 7) increase in psychiatric services to prevent imminent psychiatric hospitalization.

- Are the proposed studies RIS-USA-161 and RIS-USA-222 adequately designed to evaluate the safety and efficacy of risperidone in non-mentally retarded children with conduct spectrum disorder?
- Are the available data and data from the proposed trials adequate to support a new indication for risperidone for the treatment of conduct spectrum disorder in pediatric patients (ages 5-16) without mental retardation?

FDA questioned the validity of conduct disorder (CD) as a diagnosis and even the concept of CD as a disorder. They don't believe it is well accepted outside the child psychiatrist community. FDA acknowledged CD as a valid clinical entity as it is included in DSM-IV, however elevation of a disorder to permanent status in DSM does not make it a disorder warranting an indication in the label.

FDA believes CD is synonymous with aggression and thinks we are trying to get approval of aggression under the guise of CD. Although we strongly disagreed, FDA indicated that they feel the problem is in the nature of the diagnosis because it is just a "list of behaviors", mainly aggressive behaviors that annoy others. If CD is just a form of aggressive behavior, they recommended that we study this from a symptom approach and look at aggression straight on. If the symptom approach were taken, FDA would expect us to look at the effects of RISPERDAL in three models. The suggested populations to examine were dementia, mental retardation, and conduct disorder. However, the first step in looking at aggression would be to get agreement publicly (e.g., an advisory committee meeting) on how to define aggression and the best way to measure it. FDA acknowledged it would take time to get public agreement and that this approach may not be the easiest way to get approval.

FDA commented that they do not often question a diagnosis, but in the case of CD they are. They feel a public hearing is needed to define how to look at CD and if it is an indication that society is willing to treat. Their main concern is that RISPERDAL or any other product would be used as a chemical straight jacket. Although CD has been discussed publicly at several conferences, the conference audiences have been only child psychiatrists. FDA would require this type of issue to be discussed by a wider scope of psychiatrists, so that the entire psychiatric community can weigh in on the decision, similar to discussions regarding behavioral disturbances in dementia at the March 9, 2000 Psychopharmacological Drug Advisory Committee meeting.

In the absence of a public hearing, either on aggression or CD itself, FDA could not assure us that we would be able to get an indication in the label, even with two positive trials. They emphasized again that they are uncertain whether CD is a diagnosis that merits treatment.

In regards to the two trials proposed (RIS-USA-161, RIS-USA-222), the FDA commented that they have no experience with the scale selected (Nisonger Behavior Rating Form). Based on the information we provided, (Attachment 1), they did not feel the subscale of the Nisonger mapped well to CD, and it was more of a combination of Oppositional Defiant Disorder and CD. This is based on the questions "talks back to teacher, parents, or other adults," "stubborn, has to do things own way," and "disobedient". We commented that we have experience with the Nisonger scale and believe it has a better CD subscale than the Conners rating scale does.

FDA asked about the validity and reliability of the Nisonger scale. We provided an article by Aman, et al (Attachment 2) to demonstrate validation in a mental retardation (MR) population. FDA indicated that they would not extrapolate from the MR population to the non-MR, and that we would have to validate the use of the scale in the non-MR population as well. We informed them we are in the process of doing the validation in the non-MR population. To address reliability, we offered to send the available clinical data we have generated along with any literature references. FDA requested that the clinical data provided include an item analysis.

Until FDA reviews the validation and reliability data, they can not accept the use of the Nisonger scale as the primary endpoint. We asked if they preferred us to use another scale (i.e., Conners), but they

CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION                    RISP-REM-1702686



**JANSSEN** · PHARMACEUTICA ·
· RESEARCH FOUNDATION ·

# RECORD OF FDA CONTACT

PRODUCT IDENTIFICATION: RISPERDAL® (risperidone) tablets and oral solution

| ORIGINATOR/SIGNATURE: | | DATE: 03 March 2000 | |
|---|---|---|---|
| **NDA NUMBER:**<br>**IND NUMBER:** 31,931 | **INITIATED BY: JANSSEN** X<br>FDA | **BY TELEPHONE**<br>IN PERSON X | |
| **FDA PERSONNEL: See below** | **DIVISION: Neuropharmacological Drug Products**<br>**TELEPHONE: (301) 594-5533** | | |

**SUBJECT:** Minutes of March 3rd Meeting to Discuss RISPERDAL Pediatric Exclusivity and Development Program for Conduct Disorder

**Meeting Attendees:**

*FDA*                                                      *Janssen Research Foundation (JRF)*

**Summary:** The objectives of this meeting were to discuss the requirements to obtain an additional six months market exclusivity as permitted under the FDA Modernization Act of 1997 and to discuss the clinical development plan for an indication in conduct disorder. The key issues discussed were:

*Pediatric Exclusivity*
- Pediatric exclusivity is not possible based on safety and PK alone (as proposed). Exclusivity must be based on the approved indication.
- FDA will issue a written request that contains a controlled trial in schizophrenia. JRF will submit a proposal for this controlled trial in adolescents (>13 years old); younger children will not need to be studied.
- The proposed PK trial was acceptable and if needed, JRF could enroll a mixed diagnosis (conduct disorder, schizophrenia) population.

*Conduct Disorder (CD) as an indication*
- FDA questioned the validity of CD as a diagnosis and even the concept of CD as a disorder.
- They stated that even though CD is in DSM-IV that does not mean it is a disorder warranting an indication in the label.
- FDA feels a public hearing is needed to define how to look at CD. Their main concern is that RISPERDAL or any other product would be used as a chemical straight jacket. This is the reason the issue needs to be publicly debated.
- FDA believes aggression is synonymous with CD.
- We could proceed with the two trials proposed (RIS-USA-161, RIS-USA-222). However, even if these trials are positive, they would want a consensus advisory committee meeting to confirm the disorder exists. This advisory committee meeting would be triggered by the review of our supplemental application.
- The Division is willing to work with us to define scales for CD and would like to see our data to show their validity and reliability.

CONTAINS CONFIDENTIAL COMMERCIAL INFORMATION

NDA 20-272 (Cross-reference NDAs 20-588 and 21-444)
RISPERDAL® (risperidone) Tablets
Special Supplement – Changes Being Effected

Page 2

the labeling. This supplemental application provides for this single change to the cerebrovascular adverse event warning. We believe the proposed sentence contains all the essential elements of the current statement, i.e., specificity to RISPERDAL, the non-approval status, and a clear identification of the patient population. In addition, we believe this revision will allow us to better communicate the originally agreed upon educational intent of the sentence. A marked-up copy of the labeling is enclosed. The revision appears on page 7.

Since issuance of a "Dear Healthcare Professional Letter" in April and implementation of the revised labeling, we have consistently been faced with comments and/or actions by physicians, formulary committees and managed care organizations, which reflect a misinterpretation of the third sentence in this paragraph. The principle misinterpretation is that this is a statement by FDA of their conclusion following review of an application. The outcome of this misinterpretation is that the educational intent of the labeling is not being accurately communicated. Physicians may be making potentially harmful or inappropriate patient management decisions based upon an incorrect interpretation of the sentence.

Under separate cover this day we have ⊏                              ⊐ to this file.

Please contact me at (609) 730-3486 if you have any questions regarding this submission.

Sincerely,

Edward G. Brann
Director, Regulatory Affairs

Enclosure
cc: S. Hardeman

*Johnson & Johnson*

PHARMACEUTICAL RESEARCH
& DEVELOPMENT, L.L.C.

**1 4 AUG 2003**

ORIGINAL

NDA SUPPLEMENT

1125 Trenton-Harbourton Road
P.O. Box 200, Titusville, NJ 08560

NDA NO. 20-272 REF NO. SLR-033
NDA SUPPL FOR Labeling

Russell Katz, MD, Director
Division of Neuropharmacological Drug Products
Center for Drug Evaluation and Research, HFD-120
U.S. Food and Drug Administration
**Attn: Document Control Room 10B-40**
1451 Rockville Pike
Rockville, MD 20852

RECEIVED

AUG 1 5 2003

HFD-120/CDER

Subject:    **NDA 20-272**
            Cross-reference NDAs 20-588 and 21-444
            **RISPERDAL® (risperidone) Tablets**
            **Special Supplement – Changes Being Effected**

Dear Dr. Katz:

Please refer to your approval letter of April 2, 2003 for NDA 21-444, RISPERDAL®
(risperidone) [      ] Tablets and the agreed-upon labeling. The labeling
included a new subsection under WARNINGS regarding the occurrence of
cerebrovascular adverse events in elderly patients with dementia. The text of this
subsection is as follows:

> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with**
> **Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including
> fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of
> risperidone in elderly patients with dementia-related psychosis. In placebo-
> controlled trials there was a significantly higher incidence of cerebrovascular
> adverse events in patients treated with risperidone compared to patients treated with
> placebo. RISPERDAL has not been shown to be safe or effective in the treatment
> of patients with dementia-related psychosis.

In addition, please refer to the meeting of August 13, 2003 between representatives of the
Division and J&J PRD, in which the Division agreed to the following proposed text to
replace the third sentence of the above statement.

> RISPERDAL is not approved for the treatment of patients with dementia-related
> psychosis.

Therefore, in accordance with 21 CFR 314.70(c)(2), we are submitting a supplemental
application to provide revised product labeling to improve the clarity of this sentence in

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

## NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

## <u>ADMINISTRATIVE and CORRESPONDENCE DOCUMENTS</u>

## Storage and Handling

RISPERDAL® tablets should be stored at controlled room temperature 15°-25°C (59°-77°F). Protect from light and moisture.

Keep out of reach of children.

RISPERDAL® 1 mg/mL oral solution should be stored at controlled room temperature 15°-25°C (59°-77°F). Protect from light and freezing.

Keep out of reach of children.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets should be stored at controlled room temperature 15°-25°C (59°-77°F).

Keep out of reach of children.

~~7503223~~**7503224**
US Patent 4,804,663
Revised ~~April~~ **August** 2003
©Janssen 2002

RISPERDAL® tablets are manufactured by:
JOLLC, Gurabo, Puerto Rico or
Janssen-Cilag, SpA, Latina, Italy

RISPERDAL® oral solution is manufactured by:
Janssen Pharmaceutica N.V.
Beerse, Belgium

RISPERDAL® M-TAB™ Orally Disintegrating Tablets are manufactured by:
JOLLC, Gurabo, Puerto Rico

RISPERDAL® tablets, RISPERDAL® M-TAB™ Orally Disintegrating Tablets, and oral solution are distributed by:
**Janssen Pharmaceutica Products, L.P.**
Titusville, NJ 08560

Hearing and Vestibular Disorders
*Rare:* tinnitus, hyperacusis, decreased hearing.

Red Blood Cell Disorders
*Infrequent:* anemia, hypochromic anemia. *Rare:* normocytic anemia.

Reproductive Disorders, Male
*Frequent:* erectile dysfunction*. *Infrequent:* ejaculation failure.

White Cell and Resistance Disorders
*Rare:* leukocytosis, lymphadenopathy, leucopenia, Pelger-Huet anomaly.

Endocrine Disorders
*Rare:* gynecomastia, male breast pain, antidiuretic hormone disorder.

Special Senses
*Rare:* bitter taste.

* Incidence based on elicited reports.

Postintroduction Reports
Adverse events reported since market introduction which were temporally (but not necessarily causally) related to RISPERDAL® therapy, include the following: anaphylactic reaction, angioedema, apnea, atrial fibrillation, cerebrovascular disorder, including cerebrovascular accident, hyperglycemia, diabetes mellitus aggravated, including diabetic ketoacidosis, intestinal obstruction, jaundice, mania, pancreatitis, Parkinson's disease aggravated, pulmonary embolism. There have been rare reports of sudden death and/or cardiopulmonary arrest in patients receiving RISPERDAL®. A causal relationship with RISPERDAL® has not been established. It is important to note that sudden and unexpected death may occur in psychotic patients whether they remain untreated or whether they are treated with other antipsychotic drugs.

## DRUG ABUSE AND DEPENDENCE
### Controlled Substance Class
RISPERDAL® (risperidone) is not a controlled substance.

### Physical and Psychologic Dependence
RISPERDAL® has not been systematically studied in animals or humans for its potential for abuse, tolerance, or physical dependence. While the clinical trials did not reveal any tendency for any drug-seeking behavior, these observations were not systematic and it is not possible to predict on the basis of this limited experience the extent to which a CNS-active drug will be misused, diverted, and/or abused once marketed. Consequently, patients should be evaluated carefully for a history of drug abuse, and such patients should be observed closely for signs of RISPERDAL® misuse or abuse (e.g., development of tolerance, increases in dose, drug-seeking behavior).

*Infrequent:* hyperventilation, bronchospasm, pneumonia, stridor. *Rare:* asthma, increased sputum, aspiration.

### Skin and Appendage Disorders
*Frequent:* increased pigmentation\*, photosensitivity\*. *Infrequent:* increased sweating, acne, decreased sweating, alopecia, hyperkeratosis, pruritus, skin exfoliation. *Rare:* bullous eruption, skin ulceration, aggravated psoriasis, furunculosis, verruca, dermatitis lichenoid, hypertrichosis, genital pruritus, urticaria.

### Cardiovascular Disorders
*Infrequent:* palpitation, hypertension, hypotension, AV block, myocardial infarction. *Rare:* ventricular tachycardia, angina pectoris, premature atrial contractions, T wave inversions, ventricular extrasystoles, ST depression, myocarditis.

### Vision Disorders
*Infrequent:* abnormal accommodation, xerophthalmia. *Rare:* diplopia, eye pain, blepharitis, photopsia, photophobia, abnormal lacrimation.

### Metabolic and Nutritional Disorders
*Infrequent:* hyponatremia, weight increase, creatine phosphokinase increase, thirst, weight decrease, diabetes mellitus. *Rare:* decreased serum iron, cachexia, dehydration, hypokalemia, hypoproteinemia, hyperphosphatemia, hypertriglyceridemia, hyperuricemia, hypoglycemia.

### Urinary System Disorders
*Frequent:* polyuria/polydipsia\*. *Infrequent:* urinary incontinence, hematuria, dysuria. *Rare:* urinary retention, cystitis, renal insufficiency.

### Musculo-Skeletal System Disorders
*Infrequent:* myalgia. *Rare:* arthrosis, synostosis, bursitis, arthritis, skeletal pain.

### Reproductive Disorders, Female
*Frequent:* menorrhagia\*, orgastic dysfunction\*, dry vagina\*. *Infrequent:* nonpuerperal lactation, amenorrhea, female breast pain, leukorrhea, mastitis, dysmenorrhea, female perineal pain, intermenstrual bleeding, vaginal hemorrhage.

### Liver and Biliary System Disorders
*Infrequent:* increased SGOT, increased SGPT. *Rare:* hepatic failure, cholestatic hepatitis, cholecystitis, cholelithiasis, hepatitis, hepatocellular damage.

### Platelet, Bleeding, and Clotting Disorders
*Infrequent:* epistaxis, purpura. *Rare:* hemorrhage, superficial phlebitis, thrombophlebitis, thrombocytopenia.

effect rating scale, and these events were not further categorized using standard terminology. (Note: These events are marked with an asterisk in the listings that follow.)

In the listings that follow, spontaneously reported adverse events were classified using World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 patients exposed to multiple doses of RISPERDAL® who experienced an event of the type cited on at least one occasion while receiving RISPERDAL®. All reported events are included, except those already listed in Table 1, those events for which a drug cause was remote, and those event terms which were so general as to be uninformative. It is important to emphasize that, although the events reported occurred during treatment with RISPERDAL®, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions: frequent adverse events are those occurring in at least 1/100 patients (only those not already listed in the tabulated results from placebo-controlled trials appear in this listing); infrequent adverse events are those occurring in 1/100 to 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients.

### Psychiatric Disorders
*Frequent:* increased dream activity*, diminished sexual desire*, nervousness. *Infrequent:* impaired concentration, depression, apathy, catatonic reaction, euphoria, increased libido, amnesia. *Rare:* emotional lability, nightmares, delirium, withdrawal syndrome, yawning.

### Central and Peripheral Nervous System Disorders
*Frequent:* increased sleep duration*. *Infrequent:* dysarthria, vertigo, stupor, paraesthesia, confusion. *Rare:* aphasia, cholinergic syndrome, hypoesthesia, tongue paralysis, leg cramps, torticollis, hypotonia, coma, migraine, hyperreflexia, choreoathetosis.

### Gastrointestinal Disorders
*Frequent:* anorexia, reduced salivation*. *Infrequent:* flatulence, diarrhea, increased appetite, stomatitis, melena, dysphagia, hemorrhoids, gastritis. *Rare:* fecal incontinence, eructation, gastroesophageal reflux, gastroenteritis, esophagitis, tongue discoloration, cholelithiasis, tongue edema, diverticulitis, gingivitis, discolored feces, GI hemorrhage, hematemesis.

### Body as a Whole/General Disorders
*Frequent:* fatigue. *Infrequent:* edema, rigors, malaise, influenza-like symptoms. *Rare:* pallor, enlarged abdomen, allergic reaction, ascites, sarcoidosis, flushing.

### Respiratory System Disorders

sleep, accommodation disturbances, orthostatic dizziness, palpitations, weight gain, erectile dysfunction, ejaculatory dysfunction, orgastic dysfunction, asthenia/lassitude/increased fatigability, and increased pigmentation.

### Vital Sign Changes

RISPERDAL® is associated with orthostatic hypotension and tachycardia (see PRECAUTIONS).

### Weight Changes

The proportions of RISPERDAL® and placebo-treated patients meeting a weight gain criterion of ≥7% of body weight were compared in a pool of 6 to 8-week, placebo-controlled trials, revealing a statistically significantly greater incidence of weight gain for RISPERDAL® (18%) compared to placebo (9%).

### Laboratory Changes

A between-group comparison for 6 to 8-week placebo-controlled trials revealed no statistically significant RISPERDAL®/placebo differences in the proportions of patients experiencing potentially important changes in routine serum chemistry, hematology, or urinalysis parameters. Similarly, there were no RISPERDAL®/placebo differences in the incidence of discontinuations for changes in serum chemistry, hematology, or urinalysis. However, RISPERDAL® administration was associated with increases in serum prolactin (see PRECAUTIONS).

### ECG Changes

The electrocardiograms of approximately 380 patients who received RISPERDAL® and 120 patients who received placebo in two double-blind, placebo-controlled trials were evaluated and revealed one finding of potential concern; i.e., 8 patients taking RISPERDAL® whose baseline QTc interval was less than 450 msec were observed to have QTc intervals greater than 450 msec during treatment (see WARNINGS). Changes of this type were not seen among about 120 placebo patients, but were seen in patients receiving haloperidol (3/126).

## Other Events Observed During the Premarketing Evaluation of RISPERDAL®

During its premarketing assessment, multiple doses of RISPERDAL® (risperidone) were administered to 2607 patients in Phase 2 and 3 studies. The conditions and duration of exposure to RISPERDAL® varied greatly, and included (in overlapping categories) open-label and double-blind studies, uncontrolled and controlled studies, inpatient and outpatient studies, fixed-dose and titration studies, and short-term or longer-term exposure. In most studies, untoward events associated with this exposure were obtained by spontaneous report and recorded by clinical investigators using terminology of their own choosing. Consequently, it is not possible to provide a meaningful estimate of the proportion of individuals experiencing adverse events without first grouping similar types of untoward events into a smaller number of standardized event categories. In two large studies, adverse events were also elicited utilizing the UKU (direct questioning) side

19

## Tardive Dyskinesia

A syndrome of potentially irreversible, involuntary, dyskinetic movements may develop in patients treated with antipsychotic drugs. Although the prevalence of the syndrome appears to be highest among the elderly, especially elderly women, it is impossible to rely upon prevalence estimates to predict, at the inception of antipsychotic treatment, which patients are likely to develop the syndrome. Whether antipsychotic drug products differ in their potential to cause tardive dyskinesia is unknown.

The risk of developing tardive dyskinesia and the likelihood that it will become irreversible are believed to increase as the duration of treatment and the total cumulative dose of antipsychotic drugs administered to the patient increase. However, the syndrome can develop, although much less commonly, after relatively brief treatment periods at low doses.

There is no known treatment for established cases of tardive dyskinesia, although the syndrome may remit, partially or completely, if antipsychotic treatment is withdrawn. Antipsychotic treatment, itself, however, may suppress (or partially suppress) the signs and symptoms of the syndrome and thereby may possibly mask the underlying process. The effect that symptomatic suppression has upon the long-term course of the syndrome is unknown.

Given these considerations, RISPERDAL® (risperidone) should be prescribed in a manner that is most likely to minimize the occurrence of tardive dyskinesia. Chronic antipsychotic treatment should generally be reserved for patients who suffer from a chronic illness that (1) is known to respond to antipsychotic drugs, and (2) for whom alternative, equally effective, but potentially less harmful treatments are not available or appropriate. In patients who do require chronic treatment, the smallest dose and the shortest duration of treatment producing a satisfactory clinical response should be sought. The need for continued treatment should be reassessed periodically.

If signs and symptoms of tardive dyskinesia appear in a patient treated on RISPERDAL®, drug discontinuation should be considered. However, some patients may require treatment with RISPERDAL® despite the presence of the syndrome.

## Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients With Dementia

Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. ~~RISPERDAL® has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis.~~ RISPERDAL® is not approved for the treatment of patients with dementia-related psychosis.

7

**JANSSEN**
**PHARMACEUTICA**
**PRODUCTS, L.P.**

**RISPERDAL®**
**(RISPERIDONE)**
**TABLETS/ORAL SOLUTION**

**RISPERDAL® M-TAB™**
**(RISPERIDONE)**
**ORALLY DISINTEGRATING TABLETS**

## DESCRIPTION

RISPERDAL® (risperidone) is a psychotropic agent belonging to the chemical class of benzisoxazole derivatives. The chemical designation is 3-[2-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl]-6,7,8,9-tetrahydro-2-methyl-4H-pyrido[1,2-a]pyrimidin-4-one. Its molecular formula is $C_{23}H_{27}FN_4O_2$ and its molecular weight is 410.49. The structural formula is:

**(insert structure)**

Risperidone is a white to slightly beige powder. It is practically insoluble in water, freely soluble in methylene chloride, and soluble in methanol and 0.1 $\underline{N}$ HCl.

RISPERDAL® tablets are available in 0.25 mg (dark yellow), 0.5 mg (red-brown), 1 mg (white), 2 mg (orange), 3 mg (yellow), and 4 mg (green) strengths. Inactive ingredients are colloidal silicon dioxide, hydroxypropyl methylcellulose, lactose, magnesium stearate, microcrystalline cellulose, propylene glycol, sodium lauryl sulfate, and starch (corn). Tablets of 0.25, 0.5, 2, 3, and 4 mg also contain talc and titanium dioxide. The 0.25 mg tablets contain yellow iron oxide; the 0.5 mg tablets contain red iron oxide; the 2 mg tablets contain FD&C Yellow No. 6 Aluminum Lake; the 3 mg and 4 mg tablets contain D&C Yellow No. 10; the 4 mg tablets contain FD&C Blue No. 2 Aluminum Lake.

RISPERDAL® is also available as a 1 mg/mL oral solution. The inactive ingredients for this solution are tartaric acid, benzoic acid, sodium hydroxide, and purified water.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets are available in 0.5 mg, 1.0 mg, and 2.0 mg strengths and are light coral in color.

RISPERDAL® M-TAB™ Orally Disintegrating Tablets contain the following inactive ingredients: Amberlite® resin, gelatin, mannitol, glycine, simethicone, carbomer, sodium hydroxide, aspartame, red ferric oxide, and peppermint oil.

1

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

# <u>LABELING</u>

---------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
---------------------------------------------------------------------------

```
 /s/
---------------------
Russell Katz
9/10/03 08:42:08 AM
```

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004
Page 2

of the copies on heavy-weight paper or similar material. For administrative purposes, these submissions should be designated "FPL for approved supplement NDA 20-272 / S-033, NDA 20-588 / S-021, and NDA 21-444 / S-004." Approval of these submissions by FDA is not required before the labeling is used.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Steve Hardeman, R.Ph., Senior Regulatory Project Manager, at (301) 594-5525.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
Rockville, MD  20857

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004

Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
Attention:  Edward G. Brann
1125 Trenton-Harbourton Road
Titusville, NJ  08560-0200

Dear Mr. Brann:

Please refer to your supplemental new drug applications dated August 14, 2003, received August 15, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Risperdal (risperidone) tablets and oral solution, and Risperdal M-TAB (risperidone) orally disintegrating tablets.

These "Changes Being Effected" supplemental new drug applications provide for revised product labeling under **WARNINGS, Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia**.

We have completed our review of these applications and they are approved, effective on the date of this letter.

As agreed in the meeting of August 13, 2003, the last sentence of the following section is amended as follows:

> **WARNINGS**
> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. RISPERDAL® has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis. RISPERDAL is not approved for the treatment of patients with dementia-related psychosis.

The final printed labeling (FPL) must be identical to the above labeling (package insert submitted August 14, 2003).

Please submit the FPL electronically according to the guidance for industry titled Providing Regulatory Submissions in Electronic Format – NDA.  Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed.  Please individually mount 15

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

# <u>APPROVAL LETTER</u>

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*
# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

## CONTENTS

| Reviews / Information Included in this NDA Review. | |
|---|---|

| | |
|---|---|
| **Approval Letter** | **X** |
| **Approvable Letter** | |
| **Labeling** | **X** |
| **Medical Review(s)** | |
| **Chemistry Review(s)** | |
| **Pharmacology Review(s)** | |
| **Statistical Review(s)** | |
| **Microbiology Review(s)** | |
| **Clinical Pharmacology/ Biopharmaceutics Review(s)** | |
| **Administrative and Correspondence Document(s)** | **X** |

# CENTER FOR DRUG EVALUATION AND RESEARCH

## **Approval Package for:**

*APPLICATION NUMBER:*

# NDA 20-272/S-033, 20-588/S-021 & 21-444/S-004

*Trade Name:*     Risperdal Tablets, Risperdal Oral Solution & Risperdal M-Tab Orally Distintegrating Tablets

*Generic Name:*     risperidone

*Sponsor:*     Janssen Pharmaceutica

*Approval Date:*     09/10/03

# <u>Exhibit 2</u>

4 pages motion to produce
Defendant testimony

## IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN
## AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA25-1784

Plaintiff: Mr. Brandon Tyler Ward

Defendant: Mr. John D. Winter Esq. (For Johnson & Johnson)


## "Motion To Produce Defendant Testimony"


Q.1:  Mr. John D. Winter Esq. how much did company Johnson & Johnson retain Your services for?


A.1:


Q.2: Is Attorney John D. Winter and Johnson & Johnson aware of SEC Rule 21F-17A?


A.2:


Q.3: Attorney John D. Winter if you would recall the number of clients listed beside your email visible during conversations with Me, Mr. Brandon Ward, in regards to $750?


A.3:


Q.4:  Are You Mr. John D. Winter Esq. & company Johnson & Johnson aware of the mass amount of one thousand dollar payments lawyer's for JP Morgan were sued by The Securities and Exchange Commission for making to employees for their silence conditioned on not telling Government Agencies, like The SEC?

(1)

A.4:

Q.5: Mr. John D. Winter Esq. do you recall denying liability for company Johnson & Johnson?

A.5:

Q.6:   Do You, Attorney John D. Winter, recall saying to some generalized regard the benefits of Paliperidone outweighed the risks according to my, Mr. Brandon T. Ward's, Doctor's and can You elaborate for The Honorable Court Your recollection of events surrounding soliciting a confidentiality agreement, from beginning to end, if you would?

A.6:

Q.7: Attorney John D. Winter did you actually speak to my, Mr. Brandon Tyler Ward's, Doctors or just read the medical records?

A.7:

Q.8: Attorney John D. Winter how long did you spend actually examining the medical records in my, Mr. Brandon Tyler Ward's, case?

A.8:

Q.9:  Mr. John D. Winter Esq. do You recall me, Mr. Brandon Tyler Ward, saying I could not find legal assistance understanding Your Confidentiality Agreement?

A.9:

(2)

Q.10: Attorney John D. Winter have you ever lived in California?


A.10:


Q.11: Attorney John D. Winter what state did You reside in when writing and coaching for my, Mr. Brandon Tyler Ward's, signature, in regards to The Confidentiality Agreement?


A.11:


Q.12: Mr. John D. Winter Esq. what member of company Johnson & Johnson contacted You in regards to me, Mr. Brandon Tyler Ward?


A.12:


Q.13: Do You Attorney John D. Winter or company Johnson & Johnson recall the 2003 Risperdal Patent from The FDA by Russell Katz M.D?


A.13:


Q.14: Do You Mr. John D. Winter Esq. or company Johnson & Johnson recall discussing that packaging for Paliperidone for years 2004-2020?


A.14:


Q.15: Are You, Attorney John D. Winter or Johnson & Johnson, aware that the Doctors for the 2003 FDA Risperdal Patent listed Cholelithiasis or Gallstones as symptoms of Paliperidone on page 20 and 21?

(3)

A.15:


Q.16: Do You, Johnson & Johnson or Attorney John D. Winter, recall including that data on the modern product packaging?


A.16:


(4)

# <u>Exhibit 3</u>

17 pages:

6 of Defendant Case background

11 of critical Case highlights

# In The New York Supreme Court Appellate Division
# First Judicial Department

### Docket No. 2025.3429

### Mr. Brandon Tyler Ward in The Matter of.
### Mr. John D. Winter Esq.  Duval County.
### Florida Courthouse & Florida Supreme Court

## This Presentation Contains The Following Cases , Statues and, Authorities:

1.    SEC Rule 21F-17A ................................................... Page 2,3,4

2.    S.623 - Sunshine in Litigation Act of 2011 ................................... Page  6

3.    American Bar Associations Model Rules of
Professional Conduct 3.4(f), 5.6(b) and, 8.4(c-e) .............................. Page 4,5

4.    Jones v. Goodyear Tire & Rubber Co. ("Jones I"), 871 So. 2d 899 (Fla. 3d
DCA 2003) ........................................................................ Page 6

5.    Goodyear Tire & Rubber Co. v. Jones ("Jones II"), 929 So. 2d 1081 (Fla.
3d DCA 2005) ..................................................................... Page 6

6.    Goodyear Tire & Rubber Co. v. Schalmo, 987 So. 2d 142 (Fla. 2d DCA
2008) ............................................................................ Page 6

(1)

**7.**   **TransUnion V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100975 / September 9, 2024** ............................................................................................... **Page 4**

**8.**   **Acadia Healthcare Company, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100970 / September 9, 2024 ADMINISTRATIVE PROCEEDING File No. 3-22079** ............................................................................................... **Page 4**

**9.**   **AppFolio, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100971 / September 9, 2024 ADMINISTRATIVE PROCEEDING File No. 3-22080** ............................................................................................... **Page 4**

**10.**   **a.k.a. Brands Holding Corp. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100969 / September 9, 2024** ............................................................................................... **Page 4**

**11.**   **Pledger v. Janssen Pharms., Inc., 198 A.3d 1126** .................. **Page 3**

**12.**   **Yount v. Janssen October 2016 Judge Paula A. Patrick Pennsylvania Court of Common Pleas for Philadelphia County** ............................. **Page 3**

Many companies are being forced to pay millions or hundreds of thousands of dollars to settle with The Securities and Exchange Commission for violation of S.E.C Rule 21F-17A. The S.E.C Rule 21F-17A comes from The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), enacted on July 21, 2010, amended The Exchange Act by adding Section 21F, "Whistleblower Incentives and Protection." The congressional purpose underlying these provisions was,

"to encourage whistleblowers to report possible violations of the securities laws by providing financial incentives, prohibiting employment-related retaliation, and providing various confidentiality guarantees." See Implementation of the Whistleblower Provisions of Section 21F of the

Securities Exchange Act of 1934, Release No. 34-64545, at p. 197 (Aug. 12, 2011)."

Congress explicitly noted the importance of providing financial incentives to promote whistleblowing to the Commission as it determined that,

"a critical component of the Whistleblower Program is the minimum payout that any individual could look towards in determining whether to take the enormous risk of blowing the whistle in calling attention to fraud." See The Restoring American Financial Stability Act of 2010, Committee on Banking, Housing, and Urban Affairs (Apr. 30, 2010)."

To fulfill the Congressional purpose, The Securities and Exchange Commission adopted Rule 21F-17, which provides in relevant part,

"(a) No person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement . . . with respect to such communications."

Rule 21F-17 became effective on August 12, 2011

Mr. John D. Winter Esq. and his Defendants Johnson and Johnson © broke this Government Rule and should be forced to pay out hundreds of thousands of dollars. The Company's product Paliperdone© is known for causing cholelithiasis and hyper-prolactin gynecomastia but Johnson and Johnson© has failed to properly alert the public via updating patent information, concealing/destroying Paliperdone© documents during Court or, in my case lawyer coercion of a non-client into a confidentiality agreement meant to invalidate future trials within The Courts or United States Government otherwise. I will show some of the communications today I had with Johnson and Johnson© lawyer John D. Winter Esq. (Yount v. Janssen October 2016 Judge Paula A. Patrick  Pennsylvania Court of Common Pleas for Philadelphia County, Pledger v. Janssen Pharms., Inc., 198 A.3d 1126)    (3)

Mr. John D. Winter Esq. in preparing, advising for and, paying for my 2022 Confidentiality Settlement Agreement broke American Bar Associations Model Rule of Professional Conduct Rule 8.4(e) and SEC Rule 21F-17(a) by implying an ability to influence, improperly, a government agency when he coerced,

"5.2 RELEASOR understands that upon execution of this Agreement, RELEASOR is forever barred from filing or causing to be filed any claim or litigation or proceeding in and before any agency, tribunal or court relating to any claim RELEASOR may have ever had or could have in the future against RELEASEES in any way arising out of or related to Claimant's Claims"

-Confidentiality Settlement Agreement Section 5.2 by Mr. John D Winter Esq.

Please see: (TransUnion V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100975 / September 9, 2024), (Acadia Healthcare Company, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100970 / September 9,  2024 ADMINISTRATIVE PROCEEDING File No. 3-22079), (AppFolio, Inc. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100971 / September 9, 2024 ADMINISTRATIVE PROCEEDING File No. 3-22080) and, (A.k.a. Brands Holding Corp. V. Securities and Exchange Commission SECURITIES EXCHANGE ACT OF 1934 Release No. 100969 / September 9, 2024).

Mr. John D. Winter broke the American Bar Associations Model Rules of Professional Conduct Rule 8.4( d) by "engaging in conduct that is prejudicial to the administration of justice."  By explicitly prohibiting being able to converse with other attorneys or there claimants as mentioned in Section 4.1 of the Confidentiality Agreement, Section 4.1 dually, "restricts a lawyers right to practice" which also violates the American Bar Associations Model Rule                (4)

of Professional Conduct Rule 5.6(b), "A lawyer shall not participate in offering or making an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy."

"4.1....RELEASOR agrees that he will not make any statement, either directly or indirectly, by implication or innuendo, to anyone, including but not limited to the press or media or to other attorneys or claimants or potential claimants concerning the agreement terms or describing or characterizing the agreement terms in any way other than to say that the matter has been resolved"

Moreover, Mr. John D. Winter Esq. breaks American Bar Associations Model Rules of Professional Conduct Rule 8.4(c) for, "conduct involving dishonesty, fraud, deceit or misrepresentation" when he advises further confidentiality agreement terms such as Section 6.4 which reads,

"6.4....The RELEASOR further expressly agrees and covenants to release, discharge, forever indemnify, defend, and hold harmless RELEASEES and their attorneys from any liens and/or claims which may arise or may have heretofore arisen in favor of Medicare, Medicaid, any other government program or any other governmental entity, federal, state or local, by operation of law or equity, for medical expenses, disability benefits, or any other charge or expense, directly or indirectly relating to the alleged injuries caused by RELEASOR'S use of Risperdal® and/or Invega®. The indemnification set forth in this section specifically includes, but is not limited to, the payment of all reasonable costs and expenses of investigation, defense, settlement, attorney fees, judgments, court costs, and all other costs and expenses of defending such claims."

Furthermore, Mr. John D. Winter's 2022 Confidentiality Agreement Sections: 4.1, 5.2 and, 6.4 break A.B.A Model Rules of Professional Conduct Rule 3.4(f) Which state, "a lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party."                    (5)

Finally, perhaps most importantly Mr. John D. Winter Esq. broke the bill congress passed known as S.623 - Sunshine in Litigation Act of 2011, which was adapted to Florida State Law Statue 69.081 The Sunshine in Litigation Act that prevents concealment of Public Hazards by non-disclosure, confidentiality or, settlement agreements. (Jones v. Goodyear Tire & Rubber Co. ("Jones I"), 871 So. 2d 899, (Fla. 3d DCA 2003, Goodyear Tire & Rubber Co. v. Jones ("Jones II"), 929 So. 2d 1081 (Fla. 3d DCA 2005) and, Goodyear Tire & Rubber Co. v. Schalmo, 987 So. 2d 142 (Fla. 2d DCA 2008) in all cases Florida District Court of Appeals upheld that confidentiality agreements concealing public hazards will not be respected in Court.  As they have not been respected in Duval County Florida Courthouse Case 16-2025-DR-003127 Ward V.  Trump Filing # 226206628 and Filing # 226244544 cross-examined with Case 16-2025-DR-002334 Ward V. Crawford Filing #226244538 then redirect examined with Case: Brandon Tyler Ward V. Eric Chase Roberson 16-2025-DR-002652's Filing # 226244553. All cases on Appeal To The Supreme Court in Washington D.C with no outstanding filing numbers to be submitted on my end. Clerk John A. Tomasino notes he will keep a file of my Appeal of Florida Supreme Court number SC2025-0986 and SC2025-0961 to Washington D.C Supreme Court.

(6)

Mr. Brandon Tyler Ward_____

July 18, 2025

**Entrapped Social Media Personality,**

**6x Federal Agent/U.S Army Coercion Situation Survivor,**

**100% Permanent and Total Service-Connected Gulf War**

**Era Marksmanship Badge Award-Winning Disabled Vet,**

**2x Sexual Trauma Survivor and, Invega Whistleblower**

**5501 University Club Blvd N. , APT 155, Jacksonville**

**Florida 32277 • (904) 815 - 2601**

**95.051   When limitations tolled.—**

(1)   The running of the time under any statute of limitations except ss. 95.281, 95.35, and 95.36 is tolled by:

(a)   Absence from the state of the person to be sued.

(b)   Use by the person to be sued of a false name that is unknown to the person entitled to sue so that process cannot be served on the person to be sued.

(c)   Concealment in the state of the person to be sued so that process cannot be served on him or her.

(d)   The adjudicated incapacity, before the cause of action accrued, of the person entitled to sue. In any event, the action must be begun within 7 years after the act, event, or occurrence giving rise to the cause of action.

   

leg.state.fl.us/statute    43



**Online Sunshine**

Official Internet Site of the Florida Legislature

January 5, 2025    Search Statutes: 2024 ▾ [        ] [Search]    Advanced Legislative Search and Browse

| | Select Year: 2024 ▾ [Go] |

Home
Senate
House
Citator
**Statutes, Constitution, & Laws of Florida**
Florida Statutes
Search Statutes
Search Tips
Florida Constitution
Laws of Florida
**Legislative & Executive Branch Lobbyists**
**Information Center**
Joint Legislative Committees & Other Entities
Historical Committees
Florida Government Efficiency Task Force
Legislative Employment
Legistore
Links

Interpreter Services for the Deaf and Hard of Hearing

Finding Florida   Grades K-5

LIFE AS A LAWMAKER   Grades 6+

## The 2024 Florida Statutes

Title VI                    Chapter 69                    View Entire Chapter
CIVIL PRACTICE AND PROCEDURE   MISCELLANEOUS PROCEDURAL MATTERS

### 69.081    Sunshine in litigation; concealment of public hazards prohibited.—

(1)    This section may be cited as the "Sunshine in Litigation Act."

(2)    As used in this section, "public hazard" means an instrumentality, including but not limited to any device, instrument, person, procedure, product, or a condition of a device, instrument, person, procedure or product, that has caused and is likely to cause injury.

(3)    Except pursuant to this section, no court shall enter an order or judgment which has the purpose or effect of concealing a public hazard or any information concerning a public hazard, nor shall the court enter an order or judgment which has the purpose or effect of concealing any information which may be useful to members of the public in protecting themselves from injury which may result from the public hazard.

(4)    Any portion of an agreement or contract which has the purpose or effect of concealing a public hazard, any information concerning a public hazard, or any information which may be useful to members of the public in protecting themselves from injury which may result from the public hazard, is void, contrary to public policy, and may not be enforced.







DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
Rockville, MD 20857

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004

Johnson & Johnson Pharmaceutical Research & Development, L.L.C.
Attention: Edward G. Brann
1125 Trenton-Harbourton Road
Titusville, NJ 08560-0200

Dear Mr. Brann:

Please refer to your supplemental new drug applications dated August 14, 2003, received August 15, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Risperdal (risperidone) tablets and oral solution, and Risperdal M-TAB (risperidone) orally disintegrating tablets.

These "Changes Being Effected" supplemental new drug applications provide for revised product labeling under **WARNINGS, Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia.**

We have completed our review of these applications and they are approved, effective on the date of this letter.

As agreed in the meeting of August 13, 2003, the last sentence of the following section is amended as follows:

> **WARNINGS**
> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was a significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients treated with placebo. RISPERDAL® has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis. RISPERDAL is not approved for the treatment of patients with dementia-related psychosis.

The final printed labeling (FPL) must be identical to the above labeling (package insert submitted August 14, 2003).

Please submit the FPL electronically according to the guidance for industry titled Providing Regulatory Submissions in Electronic Format – NDA. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Please individually mount 15

NDA 20-272 / S-033
NDA 20-588 / S-021
NDA 21-444 / S-004
Page 2

of the copies on heavy-weight paper or similar material. For administrative purposes, these submissions should be designated "FPL for approved supplement NDA 20-272 / S-033, NDA 20-588 / S-021, and NDA 21-444 / S-004." Approval of these submissions by FDA is not required before the labeling is used.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Steve Hardeman, R.Ph., Senior Regulatory Project Manager, at (301) 594-5525.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

World Health Organization (WHO) preferred terms. The frequencies presented, therefore, represent the proportion of the 2607 patients exposed to multiple doses of RISPERDAL® who experienced an event of the type cited on at least one occasion while receiving RISPERDAL®. All reported events are included, except those already listed in Table 1, those events for which a drug cause was remote, and those event terms which were so general as to be uninformative. It is important to emphasize that, although the events reported occurred during treatment with RISPERDAL®, they were not necessarily caused by it.

Events are further categorized by body system and listed in order of decreasing frequency according to the following definitions: frequent adverse events are those occurring in at least 1/100 patients (only those not already listed in the tabulated results from placebo-controlled trials appear in this listing); infrequent adverse events are those occurring in 1/100 to 1/1000 patients; rare events are those occurring in fewer than 1/1000 patients.

## Psychiatric Disorders
*Frequent:* increased dream activity*, diminished sexual desire*, nervousness. *Infrequent:* impaired concentration, depression, apathy, catatonic reaction; euphoria, increased libido, amnesia. *Rare:* emotional lability, nightmares, delirium, withdrawal syndrome, yawning.

## Central and Peripheral Nervous System Disorders
*Frequent:* increased sleep duration*. *Infrequent:* dysarthria, vertigo, stupor, paraesthesia, confusion. *Rare:* aphasia, cholinergic syndrome, hypoesthesia, tongue paralysis, leg cramps, torticollis, hypotonia, coma, migraine, hyperreflexia, choreoathetosis.

## Gastrointestinal Disorders
*Frequent:* anorexia, reduced salivation*. *Infrequent:* flatulence, diarrhea, increased appetite, stomatitis, melena, dysphagia, hemorrhoids, gastritis. *Rare:* fecal incontinence, eructation, gastroesophageal reflux, gastroenteritis, esophagitis, tongue discoloration, cholelithiasis, tongue edema, diverticulitis, gingivitis, discolored feces, GI hemorrhage, hematemesis.

## Body as a Whole/General Disorders
*Frequent:* fatigue. *Infrequent:* edema, rigors, malaise, influenza-like symptoms. *Rare:* pallor, enlarged abdomen, allergic reaction, ascites, sarcoidosis, flushing.

## Respiratory System Disorders

20

*Infrequent:* hyperventilation, bronchospasm, pneumonia, stridor. *Rare:* asthma, increased sputum, aspiration.

## Skin and Appendage Disorders
*Frequent:* increased pigmentation*, photosensitivity*. *Infrequent:* increased sweating, acne, decreased sweating, alopecia, hyperkeratosis, pruritus, skin exfoliation. *Rare:* bullous eruption, skin ulceration, aggravated psoriasis, furunculosis, verruca, dermatitis lichenoid, hypertrichosis, genital pruritus, urticaria.

## Cardiovascular Disorders
*Infrequent:* palpitation, hypertension, hypotension, AV block, myocardial infarction. *Rare:* ventricular tachycardia, angina pectoris, premature atrial contractions, T wave inversions, ventricular extrasystoles, ST depression, myocarditis.

## Vision Disorders
*Infrequent:* abnormal accommodation, xerophthalmia. *Rare:* diplopia, eye pain, blepharitis, photopsia, photophobia, abnormal lacrimation.

## Metabolic and Nutritional Disorders
*Infrequent:* hyponatremia, weight increase, creatine phosphokinase increase, thirst, weight decrease, diabetes mellitus. *Rare:* decreased serum iron, cachexia, dehydration, hypokalemia, hypoproteinemia, hyperphosphatemia, hypertriglyceridemia, hyperuricemia, hypoglycemia.

## Urinary System Disorders
*Frequent:* polyuria/polydipsia*. *Infrequent:* urinary incontinence, hematuria, dysuria. *Rare:* urinary retention, cystitis, renal insufficiency.

## Musculo-Skeletal System Disorders
*Infrequent:* myalgia. *Rare:* arthrosis, synostosis, bursitis, arthritis, skeletal pain.

## Reproductive Disorders, Female
*Frequent:* menorrhagia*, orgastic dysfunction*, dry vagina*. *Infrequent:* nonpuerperal lactation, amenorrhea, female breast pain, leukorrhea, mastitis, dysmenorrhea, female perineal pain, intermenstrual bleeding, vaginal hemorrhage.

## Liver and Biliary System Disorders
*Infrequent:* increased SGOT, increased SGPT. *Rare:* hepatic failure, cholestatic hepatitis, cholecystitis, cholelithiasis, hepatitis, hepatocellular damage.

Johnson & Johnson

PHARMACEUTICAL RESEARCH
& DEVELOPMENT, L.L.C.

**1 4 AUG 2003**

ORIGINAL

1125 Trenton-Harbourton Road
P.O. Box 200, Titusville, NJ 08560

NDA SUPPLEMENT

NDA NO. 20-272 REF NO. SLR-033
NDA SUPPL FOR Labeling

Russell Katz, MD, Director
Division of Neuropharmacological Drug Products
Center for Drug Evaluation and Research, HFD-120
U.S. Food and Drug Administration
**Attn: Document Control Room 10B-40**
1451 Rockville Pike
Rockville, MD 20852

RECEIVED

AUG 1 5 2003

HFD-120/CDER

Subject:     **NDA 20-272**
          Cross-reference NDAs 20-588 and 21-444
          **RISPERDAL® (risperidone) Tablets**
          **Special Supplement – Changes Being Effected**

Dear Dr. Katz:

Please refer to your approval letter of April 2, 2003 for NDA 21-444, RISPERDAL®
(risperidone) [          ] Tablets and the agreed-upon labeling. The labeling
included a new subsection under WARNINGS regarding the occurrence of
cerebrovascular adverse events in elderly patients with dementia. The text of this
subsection is as follows:

> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with
> Dementia**
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including
> fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of
> risperidone in elderly patients with dementia-related psychosis. In placebo-
> controlled trials there was a significantly higher incidence of cerebrovascular
> adverse events in patients treated with risperidone compared to patients treated with
> placebo. RISPERDAL has not been shown to be safe or effective in the treatment
> of patients with dementia-related psychosis.

In addition, please refer to the meeting of August 13, 2003 between representatives of the
Division and J&J PRD, in which the Division agreed to the following proposed text to
replace the third sentence of the above statement.

> RISPERDAL is not approved for the treatment of patients with dementia-related
> psychosis.

Therefore, in accordance with 21 CFR 314.70(c)(2), we are submitting a supplemental
application to provide revised product labeling to improve the clarity of this sentence in

PRD-1C



# Exhibit 4

14 pages:

Mr. John D. Winter esq. communications, 1 motion regarding My, Mr. Brandon Tyler Ward's, Florida Supreme Court Cases and Mr. John D Winter's involvement –He, Mr. Winter, and CEO Joaquin Duato left queue for Duval County service of documents and, some more communications between Company/Company Lawyer and I.

noreply@myflcourtaccess.com    June 30 ☆
(No Recipient) ⌄

Dear Brandon Ward:

This email verifies the processing of your Filing # 226244538 with the Duval County, Florida Domestic Relations/Family Division.

| | |
|---|---|
| Status: | Accepted |
| Filing Date/Time: | 06/29/2025 07:29:24 AM |
| UCN: | 162025DR002334AXXXMA |
| Clerk Case #: | 16-2025-DR-002334-AXXX-MA |
| Case Style: | WARD, BRANDON TYLER - CRAWFORD, SETH DAVIS |
| Matter #: | |
| Memo: | |
| Filing Fee: | $0.00 |
| Common Civil Codes Motion: | $0.00 |
| Statutory Convenience Fee: | $0.00 |
| Total Paid: | $0.00 |
| Fee Status: | Processed |
| Paid By: | No payment required |
| Order #: | |
| Financial ID: | |

Documents

| # | Document Type | Status | Filing Date | Rejection Reason | Your Attachment |
|---|---|---|---|---|---|
| 1 | C3 | Accepted | 06/29/2025 | | downloadfile(23).PDF |

Fees



Delete    Reply    Forward    Move    More

Filing # 226244538 E-Filed 06/29/2025 07:29:24 AM

IN THE COUNTY COURT OF THE FOURTH JUDICIAL CIRCUIT
IN AND FOR DUVAL COUNTY, FLORIDA

**Brandon Tyler Ward**

_____

Plaintiff(s)

Case No.: **16-2025-DR-003127**
Division: **DV-A**

Vs.

**Donald John Trump**
**Seth Davis Crawford**

Defendant(s)

## MOTION FOR/TO Arrest Seth C. & Pay Me 10 Million Mr. Trump

The [X] Plaintiff [ ] Defendant (check one) moves for entry of an order by the Court
Granting the following relief (explain what you want the Court to do):
**Order Payment of Several Million to 100% Permanent &**
**Total Service-Connected Marksmanship Badge**
**Award-Winning Disabled Army Veteran Brandon Tyler Ward**
**Arrest Seth Davis Crawford for Sex Abuse Recidivism**

The grounds or reason for this motion are (explain):
**Donald Trump's Accessory After The Fact Whistleblower**
**Retaliation With Dr. Wissam Hotiet and Obstruction of Justice**
**After That Fact Caused Sex Abuse Recidivism and Product**
**Liability; John Winter is His NDA Lawyer whose email is**
**Jwinter@pbwt.com, Also Florida Statue 69.081, 59.091(d)**
**and, Florida Statue 777.201(1) Trumps Sex Abuse Lawyer is**
**Angela M. Hatley in Fayetteville NC her email is**
**Angelaahatley@aol.com**

Certificate of Service
I certify that a copy has been furnished to **Mr.Trump & Mr. Crawford** (name of other
party) at **stevesadow@gmail.c/samantha.r.autry@nccourts.org** (address or email)
by (email)/ mail / hand delivery (circle one) on **June 30th 2025** (date).

Signature
**Brandon Tyler Ward**
Name [Print]
**confidentiality clause due to sex abusers**
Address
**Sex Abuser Donald Trump & Seth Crawford**
City, State, Zip Code
**904-815-2601**
Telephone

← **Processing Completed for Filing …**

This email verifies the processing of your Filing # 226206628 with the Duval County, Florida Domestic Relations/Family Division.

| | |
|---|---|
| Status: | Accepted |
| Filing Date/Time: | 06/27/2025 03:06:03 PM |
| UCN: | 162025DR003127AXXXMA |
| Clerk Case #: | 16-2025-DR-003127-AXXX-MA |
| Case Style: | WARD, BRANDON TYLER - TRUMP, DONALD JOHN |
| Matter #: | |
| Memo: | |
| Filing Fee: | $0.00 |
| Common Civil Codes Complaint: | $0.00 |
| Common Civil Codes Motion to Set for Trial: | $0.00 |
| Statutory Convenience Fee: | $0.00 |
| Total Paid: | $0.00 |
| Fee Status: | Processed |
| Paid By: | No payment required |
| Order #: | |
| Financial ID: | |

Documents

| # | Document Type | Status | Filing Date | Rejection Reason | Your Attachment |
|---|---|---|---|---|---|
| 1 | Common Civil Codes Complaint | Accepted | 06/27/2025 | | CourtPaper(2) (1) (1).PDF |
| | | Accepted | 06/2... | | CivilTrumpCase (1) |

 Delete    Reply    Forward    Move    More

← **Removal from Service List  – Cas…**

noreply@myflcourtaccess.com          2:16 PM  ☆
(No Recipient) ⌄

This is an automatic e-mail message generated by the
ePortal system. Please DO NOT RESPOND to this e-mail
as the mail box is unattended.

Removal From Service List

The following transaction was entered on 06/25/2025
02:16:27 PM ET.

Court:
Judicial Circuit in and for Duval County, Florida
Case #:
162025DR002334AXXXMA
Case Style:
WARD, BRANDON TYLER - CRAWFORD, SETH DAVIS
Filer:
Other Attorney/Interested Party 'Joaquin Duato' added
by 'Brandon Ward' 904-815-2601 has selected not to
receive electronic service on this case

---

This information has been electronically mailed to:

| Name | Primary Email | Alternate Email 1 | Alternate Email 2 |
|------|---------------|-------------------|-------------------|
| Brandon Ward | Mrward3740@aol.com | | |
| Sandra Williams | Williamsa@flcourts.org | | |

← Processing Completed for Filing …

226244553 with the Duval County, Florida Domestic Relations/Family Division.

| | |
|---|---|
| Status: | Accepted |
| Filing Date/Time: | 06/29/2025 07:44:58 AM |
| UCN: | 162025DR002652AXX XMA |
| Clerk Case #: | 16-2025-DR-002652-AXXX-MA |
| Case Style: | WARD, BRANDON TYLER - ROBERSON, ERIC CHASE |
| Matter #: | |
| Memo: | |
| Filing Fee: | $0.00 |
| Common Civil Codes Motion: | $0.00 |
| Appellate Pleadings Notice of Appeal to Supreme Court (Fee Outstanding): | $0.00 |
| Statutory Convenience Fee: | $0.00 |
| Total Paid: | $0.00 |
| Fee Status: | Processed |
| Paid By: | No payment required |
| Order #: | |
| Financial ID: | |

Documents

| # | Document Type | Status | Filing Date | Rejection Reason | Your Attachment |
|---|---|---|---|---|---|
| 1 | C3 | Accepted | 06/29/2025 | | downloadfile(23).PDF |
| 2 | C7091P | Accepted | 06/29/2025 | | JudgeEricChaseR.PDF |
| | | | 06/29/ | | Case- |





## AFFIDAVIT OF SERVICE

| Case: | Court: | County: | Job: |
|---|---|---|---|
| CA25-1784 | 7th Judicial Circuit | St. Johns County , Florida | 14906523 |
| **Plaintiff / Petitioner:** Brandon T Ward | | **Defendant / Respondent:** John D Winter | |
| **Received by:** RUSHREADY SERVE | | **For:** Brandon Ward | |
| **To be served upon:** John D Winter, Esq. of Belknap Webb & Tyler LLP | | | |

I, Tamara Jones, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| | |
|---|---|
| **Recipient Name / Address:** | Rafael S., 1133 Avenue of the Americas, New York , New York 10036 |
| **Manner of Service:** | Authorized, Jan 7, 2026, 4:32 pm EST |
| **Documents:** | Complaint, Request For Defendant Testimony, FinalDocket No. 2025.3429. Appeal Of John Winter - Final |

**Additional Comments:**
1) Successful Attempt: Jan 7, 2026, 4:32 pm EST at 1133 Avenue of the Americas, New York , New York 10036 received by Rafael S.. Age: 40-45 ; Ethnicity: Hispanic; Gender: Male; Weight: 165; Height: 5'9"; Hair: Black; Eyes: Brown; Relationship: Messenger Center Clerk ;
I arrived at the location and went inside to the security desk where I informed the security guard there that I had legal documents for John D. Winter, Esq. He told me this is a high security building and that I would need to have an appointment to be let upstairs. He gave me the number of John's direct office 212.336.2836 and I called. Moments later John answered, I told him I had a legal service for him and he said he will not be coming down or letting me up to execute service. I asked if I should leave in the messenger center and he told me I can do "what I want" before hanging up. With that and the full permission of the front desk, I took the documents to the messenger center. There, I informed the messenger center clerk that I had legal documents to drop off to John D. Winter Esq and showed him the documents. He told me the company is Patterson Belknap and that he will accept service. I had to place the documents in an envelope and properly label it before handing him service. After collecting his information, I left the premises.

01/08/2026

**Tamara Jones**
2117584-DCWP

**Date**

RUSHREADY SERVE
67 West Street Suite #401
Brooklyn, NY 11222
914-620-2266

Subscribed and sworn to before me by the affiant who is personally known to me.

**Notary Public**

8  26

12 / 19 / 27

**Date**

**Commission Expires**

JOSHUA LEE
Notary Public - State of New York
No. 01LE6252924
Qualified in Kings County
My Commission Expires 12/19/

## AFFIDAVIT OF SERVICE

| State of Florida | County of Saint Johns | Circuit Court |
|---|---|---|



STS2026004368

Case Number: CA25-1784

Plaintiff:
**BRANDON WARD**

vs.

Defendant:
**JOHNSON AND JOHNSON**

For:
BRANDON WARD, PRO SE

Received by STATUS, L.L.C. to be served on **Joaquin Duato, CEO, Johnson And Johnson Headquarters, 1 Johnson And Johnson Plaza, New Brunswick, NJ 08933**.

I, Christopher Obie, being duly sworn, depose and say that on the **14th day of January, 2026 at 2:11 pm, I:**

served a **CORPORATION** by delivering a true copy of the **Exhibit 1-4** with the date and hour of service endorsed thereon by me, to: **Megan Collova** as **Authorized Agent/Legal Department** for **Joaquin Duato, CEO**, at the address of: **Johnson And Johnson Headquarters, 1 Johnson And Johnson Plaza, New Brunswick, NJ 08933**, and informed said person of the contents therein, in compliance with state statutes.

**Additional Information pertaining to this Service:**
I further certify that I placed the time, date, my initials and my server I.D. number (if applies) on the first pages of the Summons and Complaint and/or Subpoena.

**Description** of Person Served: Age: 30, Sex: F, Race/Skin Color: White, Height: 5'6", Weight: 140, Hair: Dark Brown, Glasses: Y

I certify that I am over the age of 18, and a competent adult not having a direct interest in the litigation.

To Be Used Where Electronic Signature Not
Available Served Data; Subscribed and Sworn to
before me on |\ |\4| 2026 by the affiant who
is personally known to me.

_____
NOTARY PUBLIC

_____
Christopher Obie
Process Server

Date  1 | 14 | 26

CARLA P. GOMES
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES FEBRUARY 12, 2030

STATUS, L.L.C.
PO Box 370
Bayville, NJ 08721
(908) 688-1414

Our Job Serial Number: STS-2026004368
Service Fee: _____

Copyright © 1992-2026 DreamBuilt Software, LLC. - Process Server's Toolbox V9.0c

Court of Common Pleas of Philadelphia County
Trial Division - Civil

**TRIAL WORK SHEET**

| Judge's Name: | Judge's I.D.: | Signature: |
|---|---|---|
| **PAULA PATRICK** | J519 | |

| Caption: | Case Type: | Program: |
|---|---|---|
| **A.Y. ETAL VS JANSSEN PHARMACEUTICALS, INC. ETAL** | MASS TORT - RISPERDAL | MASS TORT |

| Court Term and Number: | If Consolidated, Court Term and Number: |
|---|---|
| #1304-02094 | |

| Trial Date: | | Total Amount: | Number of Days: | Disposition Date: | Date Sheet Prepared: |
|---|---|---|---|---|---|
| 16-JUN-2016 | X Jury / Non-Jury | $70,000,000.00 | 11 | 01-JUL-2016 | 05-JUL-2016 |

Full Description of Disposition (to be entered Verbatim on the Docket)

Jury verdict in favor of Plaintiff in the amount of $70 million

| | | |
|---|---|---|
| ☐ Default Judgment/Court Ordered | ☒ Jury Verdict for Plaintiff | Other (explain) |
| ☐ Directed Verdict | ☐ Jury Verdict for Defendant | |
| ☐ Discontinuance Ordered | ☐ Mistrial | A.Y. Etal Vs Janssen Ph-WSJVP |
| ☐ Transferred to binding arbitration | ☐ Hung Jury | |
| ☐ Finding for Defendant (Non-Jury) | ☐ Non-Pros entered | 13040209400173 |
| ☐ Finding for Plaintiff (Non-Jury) | ☐ Non-Suit entered | |
| ☐ Damages Assessed | ☐ Settled prior to assignment for trial (Team Leaders, only) | |
| ☐ Judgment entered by agreement | ☐ Settled after assignment for trial | **DOCKETED COMPLEX LIT CENTER** |
| ☐ Judgment entered | ☐ prior to jury selection | JUL 5 2016 |
| ☐ Judgment satisfied | ☐ after jury sworn | **J. STEWART** |

*TRIALWS REV 2/24/2015*

**IN RE: RISPERDAL® LITIGATION**

:  PHILADELPHIA COUNTY
:  COURT OF COMMON PLEAS
:  TRIAL DIVISION

A.Y., et al.,

      Plaintiffs,

        v.

JANSSEN PHARMACEUTICALS, INC., et. al.

      Defendants.

:  APRIL TERM, 2013

:  No. 2094

1.    Was Janssen negligent by failing to provide an adequate warning to Andrew's healthcare providers about the risk of gynecomastia from taking Risperdal?

Yes ____✓____          No_____

*If you answered "Yes" to Question 1, please proceed to Question 2.*

*If you answered "No" to Question 1, Plaintiff cannot recover. Do not answer any further questions and return to the courtroom.*

2.    Was Janssen's negligence a substantial factor in bringing about Andrew Yount's gynecomastia?

Yes ____✓____          No_____

*If you answered "Yes" to Question 2, please respond to Question 3.*

*If you answered "No" to Question 2, Plaintiff cannot recover. Do not answer any further questions and return to the courtroom.*

3.    If you answered "Yes" to Questions 1 and 2, state the amount of damages you award to Plaintiff as a result of the liability of Defendant, Janssen:

$ _____70 Million_____

4.    Did Janssen intentionally falsify, destroy or conceal records containing material evidence in this case?

Yes ____✓____          No_____

PLEASE SIGN AND DATE THE VERDICT SHEET AND RETURN TO THE
COURTROOM

DATE: _7-1-16_          FOREPERSON: _George Evas #9_



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

## J&J Loses Pa. High Court Appeal Bid In $70M Risperdal Case

By **Matt Fair**

Law360 (September 1, 2020, 3:50 PM EDT) -- The Pennsylvania Supreme Court said Tuesday it would not hear an appeal from a Johnson & Johnson unit aimed at striking down a $70 million verdict won four years ago by a man who grew breasts after taking the antipsychotic drug Risperdal as a child.

J&J subsidiary Janssen Pharmaceuticals Inc. had asked the justices to review the case following a Pennsylvania Superior Court ruling **rejecting arguments** that the seven-figure verdict, which was aimed at compensating 20-year-old Andrew Yount for psychological and emotional damage he claims he suffered as a result of his condition, was excessive.

But in a one-page order Tuesday, the Supreme Court rejected Janssen's call.

Yount and his family filed suit against Janssen in Philadelphia County in April 2013, alleging that the company failed to provide adequate warnings about the risk of gynecomastia, or the abnormal growth of breasts by men, that Risperdal carried for adolescent boys.

According to court records, Yount started taking Risperdal when he was 4 years old to combat psychiatric problems that included violent and erratic behavior.

When Yount first started taking the drug in 2003, it was only approved for use in treating schizophrenia in adults, and warning labels indicated that gynecomastia was a "rare" side effect that occurred in fewer than one in 1,000 patients.

The drug later won approval from the U.S. Food and Drug Administration for use in treating symptoms of autism in adolescent patients, and the label was updated to show that gynecomastia occurred in 2.3% of children who used it.

The case was the fifth case over alleged Risperdal-related side effects in children to go to trial in Philadelphia as part of a mass tort program that has grown to include claims from over 7,000 people.

A jury ultimately awarded Yount and his family $70 million in noneconomic damages following a trial in the summer of 2016.

Janssen argued on appeal to the Superior Court that the FDA was solely responsible for requiring warnings related to off-label use of medications, and that, as a result, claims Yount and his family brought over the label under applicable law in their home state of Tennessee were preempted.

But the Superior Court rejected this argument as it noted that pharmaceutical companies always had the authority to provide additional warnings when additional risks about their drugs were discovered.

The panel also rejected claims that a $70 million award solely for psychological and emotional damage was excessive.

"[Yount] was just 4½ years old when first prescribed Risperdal, and he has never since known life without gynecomastia," the opinion said. "At sixteen years of age when the jury considered its

award, [Yount] was living with severe and permanent disfigurement. The undisputed record confirms he has been routinely bullied and teased by peers and is too humiliated to ever remove his shirt in recreational or social situations where it would be customary for boys to do so when enjoying ordinary pleasures of youth."

The case is now set to return to a Philadelphia County courtroom for a second trial on a potential punitive damages award.

In a joint statement Tuesday afternoon, the Yount family's attorneys — Thomas Kline of Kline & Specter PC and Jason Itkin of Arnold & Itkin LLP — praised the Supreme Court's decision.

"We are pleased that allocatur has been denied and we look forward to trying the punitive damages phase of the case when jury trials resume early next year," they said.

A spokesperson for Janssen did not immediately return a message seeking comment.

Janssen is represented by Christopher Boisvert, Robert Heim, Judy Leone, Friedrich Wilhelm Sachse and Katherine Unger of Dechert LLP, and David Abernathy and Melissa Merk of Faegre Drinker Biddle & Reath LLP.

The Younts are represented by Charles "Chip" Becker, Christopher Gomez, Thomas Kline and Ruxandra Laidacker of Kline & Specter PC, Jason Itkin and Cory Itkin of Arnold & Itkin LLP and Stephen Sheller of Sheller PC.

The case is A.Y. et al. v. Janssen Pharmaceuticals Inc. et al., case number 95 EAL 2020, before the Pennsylvania Supreme Court.

--Additional reporting by Matthew Santoni. Editing by Abbie Sarfo.

All Content © 2003-2020, Portfolio Media, Inc.

Case 3:26-cv-00224-MMH-RDB    Document 1-2    Filed 02/03/26    Page 322 of 427 PageID 490

IN THE CIRCUIT COURT, SEVENTH JUDICIAL CIRCUIT,
IN AND FOR ST. JOHNS COUNTY, FLORIDA

BRANDON WARD

     Plaintiffs,                    Case No.: 25-CA-1784

Vs.

JOHNSON & JOHNSON,

     Defendants.

_____/

## NOTICE OF SPECIAL/LIMITED APPEARANCE
## WITHOUT WAIVING SERVICE

PLEASE TAKE NOTICE that Andrea Cox of LUKS, SANTANIELLO, PETRILLO, COHEN & PETERFRIEND, files this Notice of Special/Limited Appearance without waiving service of process and without voluntary submission to the jurisdiction of the Court as Counsel for Defendant JOHNSON & JOHNSON herein and requests service of all pleadings, notices and other papers in this matter, including but not limited to the signed return receipt for substituted service be sent to the below e-mail addresses.

Pursuant to Florida Rule of Judicial Administration 2.516, the undersigned counsel designated the following email address for service of all documents here:

**acox@LS-Law.com**

**jbarrero@LS-Law.com**

**LuksTALLY-Pleadings@InsuranceDefense.net**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has

been filed using the Court's E-Portal service and on this day have been used as

a means of service upon the parties to this case on the following service list on

this day of this 22nd day of January, 2026.

> LUKS, SANTANIELLO, PETRILLO, COHEN
>    & PETERFRIEND
> 6265 Old Water Oak Road, Suite 201
> Tallahassee, Florida
> Telephone:  (850) 385-9901
> Facsimile:    (850) 727-0233
>
> By: */s/ Andrea Cox*
>    Andrea Cox
>    Florida Bar No.:  173495
>    acox@LS-Law.com
>    jbarrero@LS-Law.com
>    LuksTALLY- Pleadings@InsuranceDefense.net

## IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA25-1784

Plaintiff: Mr. Brandon Tyler Ward

Defendant: Johnson and Johnson Represented by Andrea Cox esq Formerly John Winter esq

## "Motion To Forfeit Mediation Requirements and Request For Speedy Trial Guaranteed By The Sixth Amendment To The U.S. Constitution"

Its obvious that I, Mr. Brandon Tyler Ward, must be the only person with integrity about the facts herein - until a specific amount of discernment elapses and due diligence occurs which has obviously not happened still to this day. I have got a new Judge, a new disinterested Lawyer Mrs. Andrea Cox esq. who just like Felon Lawyer John Winter esq. from New York will not play nice. For the aforethought very concerning reasons I am filing motion of My, Mr. Brandon Tyler Ward's, Sixth Amendment Right To A Speedy Trial now this day January 26th 2026. I also consider this My, Mr. Ward's, motion to Forfeit Mediation Requirements as Johnson & Johnson will evidence, witness and, fact tamper unbridled by Donald John Trump's Bias and Florida Attorney General James Uthmeier's Accessory After The Fact both are being sued via Florida Supreme Court Clerk John A. Tomasino lawsuit in Saint John's County Florida Court Case CA26-0045 because Florida Supreme Court Case SC2025-0986 abuse of discretion. Thank you, Saint John's County Florida Judges et. al., for Your time. I, Mr. Brandon Tyler Ward, am not the narcissism in the courtroom. (Florida Statue 777.03(2)(a), 18 U.S.C. Chapter 73, Canakaris V. Canakaris, So. 2d 382, 1197, 1203 Florida 1980 and, motion of discovery.)

(1)

(CA25-1784)

# Certificate of Service

  I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to all concerned parties of Saint John's County Florida Court Case CA25-1784 by E-filing on My Florida Court Access Government Website on January 26th, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

01/26/2026

With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com

## Going to get 10's of thousands of views

1 message

**Brandon Ward** <mrbrandonward556@gmail.com>                                  Mon, Jan 26, 2026 at 5:49 PM
To: jbarrero@ls-law.com, ACox@insurancedefense.net, LuksTALLY-Pleadings@insurancedefense.net

https://youtu.be/kuoEqqaAUMg?feature=shared

https://youtu.be/XezELwydLMo?feature=shared

Both contain my epic last year with John D Winter esq

I'm just saying can you file a joint motion with me to skip mediation because its not possible; I, Mr. Brandon Tyler Ward, will only accept Jury Trial for many reasons.

# IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA25-1784

Plaintiff: Mr. Brandon Tyler Ward

Defendant: Johnson and Johnson

## More Rude Communications From New Johnson and Johnson Lawyer, A Running Tab "Probably"

Thank You, Honorable Court, Honorable Judicial Assistant and, Judges who have not been proven to have done abuse of discretion. In the coming weeks after a brief hiatus I, Mr. Brandon Tyler Ward, will return with concise rebuttal titled, "Request For Speedy Mediation" since we know, J&J, will at least not come see me out of Court before then, hopefully. They have not been reasonable; Attorneys John Winter and, Andrea Cox are seriously playing potential felonious hardball with a disabled person or at least being rude, Your Honor Judge Smith Sir, Honorable Judicial Assistant Traci Davis Ma'am and, Honorable Court otherwise. Thank You, All, for Your time.

(1)



## Saint John's County Florida Court Case CA25-1784

1 message

**Brandon Ward** <mrbrandonward556@gmail.com>                                    Tue, Jan 27, 2026 at 9:41 AM
To: jbarrero@ls-law.com, ACox@insurancedefense.net, LuksTALLY-Pleadings@insurancedefense.net
Cc: ███████████

    Q.1: Can You, Mrs. Cox esq., ask Your Client, J&J, if they will force Attorney John Winter to respond to Request For Defendant Testimony?

    A.1:

    Q.2: If You, Mrs. Andrea Cox esq., have any Requests For Production please let me know; Johnson and Johnson's active metabolite Paliperidone from the Risperdal patent from the FDA in 2003 with Your Client, J&J's, Doctor Edward Brann and The FDA's Russell Katz M.D. discusses Cholelithiasis as a side effect in two places on page 20 and on page 21, I was built up from 1mg Paliperidone at Toledo Flower Hospital November 2018 with Dr. Wissam Hotiet and moved to Ohio State Hospital. I was released conditioned on taking 234mg Invega Sustenna Injections monthly until I needed Surgery in April 2019 with Dr. Jason R. Canos III, in Toledo Ohio as well.

    A.2:

    Q.3: I need an email or another Affidavit that Your, Mrs. Andrea Cox esq.'s, Client, Johnson and Johnson, in immediate observation of Q.2 and the statements therein admit liability, okay?

    A.3:

    Q.4: What is Your, Mrs. Cox esq.'s, Client, Johnson and Johnson's, Product Liability Insurance Policy Limit; If They, J&J, have one?

    A.4:

With Humble Godspeed For Non-
Concealment of Public Hazards,
Mr. Brandon Tyler Ward
100% Permanent and Total Service-
Connected Gulf War Era Marksmanship.
Badge Award-Winning Disabled
American Army Veteran and 2x Sexual.
Trauma Survivor


**Saint John's County Florida Court Case CA25-1784**

1 message

**Andrea Cox** <ACox@insurancedefense.net>                                    Tue, Jan 27, 2026 at 10:08 AM
To: Brandon Ward <mrbrandonward556@gmail.com>

Good morning.


Mediation is required before trial, not before discovery is completed.  Also, since you have not complied with prerequisites to filing your discovery requests, we do not owe you a response.


Please stop emailing my client directly.  I am Johnson & Johnson's counsel for your case and you should direct your emails to me.  If you ignore this request, we will seek court intervention.



**Andrea Cox**

**Managing Partner, Tallahassee**

6265 Old Water Oak Road
Suite 201

Tallahassee, FL 32312

Phone: 850-385-9901

Direct: 850-701-8021

Fax: 850-727-0233



  

CONFIDENTIALITY NOTICE : The information contained in this e-mail is intended only for the confidential use of the recipient(s) named above. This message and its attachments are attorney-client privileged communications, work product and mental impressions of the above sender. If the reader of this message is not the intended recipient or if you have received this communication in error, you are hereby notified that you have received this in error, that you should destroy it, notify us at once and any review, dissemination or copying is strictly prohibited.

# Certificate of Service

I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to all concerned parties of Saint John's County Florida Court Case CA25-1784 by E-filing on My Florida Court Access Government Website on January 27th, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

01/27/2026

With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com

Saint John's County Florida Court Case CA25-1784

Brandon Tyler Ward

<u>Plaintiff</u>


Johnson and Johnson

<u>Defendant</u>

Represented by Attorney Andrea Cox


# **<u>Exhibit 6</u>**


Under 10 pictures: Megan Collova, John D Winter esq and, Abdominal Scars that cause Pain and Suffering. (Canakaris V. Canakaris, So. 2d. 382, 1197, 1203 (Fla 1980), Florida Statute 90.404 and, Federal Rules of Evidence 404



# Hello Attorney Andrea Cox Ma'am; Saint John's County Florida Court Case CA25 1784 (Ward V. Johnson & Johnson)

1 message

**Brandon Ward**  mrbrandonward556@gmail.com                                    Thu, Jan 22, 2026 at 8:38 PM
To: acox@ls law.com, LuksTALLY Pleadings@insurancedefense.net
Cc: jbarrero@ls law.com

P.1: Can You ask Your Client, J&J, if they will force Attorney John D Winter to respond to Request For Defendant Testimony?

P.2:  If you have any Requests For Production please let me know; I have several questions for You about Johnson and Johnson active metabolite Paliperidone from the Risperdal patent from the FDA in 2003 with Your Client, J&J's, Doctor Edward Brann and The FDA's Russell Katz M.D.

P.3: I need an email or another Affidavit that Your, Mrs. Andrea Cox Esq.'s, Client, Johnson and Johnson in immediate observation of P.3 and the statements therein admit liability, okay?

With Humble Godspeed For Non
Concealment of Public Hazards,
Mr. Brandon Tyler Ward
100% Permanent and Total Service
Connected Gulf War Era Marksmanship.
Badge Award Winning Disabled
American Army Veteran and 2x Sexual.
Trauma Survivor

*jbarrero@ls law.com wasn't included in our opening email a typo jbarrero@ls law.com was accidentally cc d just for Your, Mrs. Andrea Cox Esq s, knowledge. Thank You For Your Time!

---

📄 **Gmail**    **Please take care old friend Mr. Winter, I look forward to seeing You in Open Court. I will beg for it.PDF**
96 KB



**Megan Collova**
437 followers


✓ Following

Posts | **Comments** | Images | Reactions

 **Megan Collova** replied to **Melody Alberti's** comment on this    ⋮

 **Megan Collova** ✓ · 3rd+    ✓ Following
Litigation Paralegal at Johnson & …
2yr · 🌐

I'm happy to share that I'm starting a new position as Litigation Paralegal at **Johnson & Johnson**!



Starting a New Position

 35    4 comments


Like


Comment


Repost


Send

10:50

←  🔍 Megan Collova



# Megan Collova 
Litigation Paralegal at Johnson & Johnson

Johnson & Johnson • Montclair State University
Bridgewater, New Jersey, United States

**435** connections

 **Connect**     **Message**    ⋯

## Activity
436 followers

[ **Posts** ]  ( **Comments** )  ( **Images** )

 **Megan Collova** reposted this    ⋮

 **Leo Tropeano** ✓ · 3rd+     **+ Follow**
Founder & CEO of Mugsy
2mo · 🌐



# Certificate of Service

I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to LUKS, SANTANIELLO, PETRILLO, COHEN & PETERFRIEND by E-filing on My Florida Court Access Government Website on January 23nd, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

01/23/2026

With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com

For Saint John's County Florida
Court Case CA25-1784

Brandon Tyler
Ward
Plaintiff

Johnson & Johnson
Defendant

# **Exhibit 5**

Email Regarding Undersheriff Yang &
John D Winter Previous Lawyer For
Johnson & Johnson Adding To Their Rap
Sheet: NY Penal Law 195.05 - Obstructing
Governmental Administration In The
Second Degree And Accessory.

Request For Witness Testimony; Toledo
Ohio Probate Court responsible for
Paliperidone Injections.



# Saint John's County Florida Court Case CA25-1784 (Brandon Tyler Ward V. Johnson & Johnson)

1 message

**Brandon Ward** <mrbrandonward556@gmail.com>                                    Thu, Jan 22, 2026 at 5:29 AM

████████████████████████████████████████████████████████████████████████

   I, Mr. Brandon Tyler Ward, got out of The United States Army in 2016 then immediately got social security benefits for Military Sexual Trauma. I endured Whistleblower Retaliation & Involuntary Psych-Holds, even while on Government Benefits, for the 3 years after Military-Civilian transitioning in Tennessee then moving to North Ohio until 2019 when Americas Cover-up in the favor of Sex Abuse Recidivism combined with Johnson & Johnson's dangerous, hazardous medicine caused My, Mr. Ward's, Monocytes to rise and my Liver/Biliary system to develop Brown Gallstones known as Cholelithiasis. (Austin Pledger V. Janssen Pharmaceuticals February 2015, Nicholas Murray V. Janssen Pharmaceuticals February 20, 2018, Andrew Yount V. Janssen Pharmaceuticals July 1, 2016, FDA Doctor Glenn B. Mannheim New Drug Application 22-264, S015 from April 03, 2015 and, FDA Doctor Russell Katz/J&J Doctor Edward Brann 2003 Risperdal Patent)

   New York City Civil-Unit Sheriff's Officers at the discretion of Undersheriff Yang went to try to serve papers at: 1133 Avenue of the Americas in New York, New York for Saint Johns County Florida Court Case CA25-1784 on Evil Defendant Lawyer John D Winter of Patterson Belknap Webb & Tyler LLP.

   Then, Evil Mr. John D Winter esq. who also broke SEC Rule 21F-17A and Obstructed Justice in 2022, swayed Undersheriff Anthony Yang's naive female officers to defame my Court case, deny my Court case and, to even become Acessory After The Fact against my Court case even though I wrote Mr. Yang a check for more then $50. (Mr. Ward 2019 Laparoscopic Cholecystectomy records, The Senate Sunshine-in-Litigation Act, Florida Statue 69.081, New York Penal Law 195.05 - Obstructing Governmental Administration in the Second Degree and, New York Penal Law 205.50 - Rendering Criminal Assistance.)

   Moreover, Undersheriff Yang allowed the Defendant, Mr. Winter, to deny the acceptance of Official Court Case paperwork from Saint Johns County, Florida Court Case CA25-1784 that correlation with what's known as influence hindering the normal process of justice officials and Mr. Winter esq's, associated malice aforethought or in other words Mr. Yangs correlation with whats also known as "Obstruction of Justice" indicates legally that New York City Undersheriff Yang is now Acessory After The Fact. With hard work and determination I, Mr. Brandon Tyler Ward, turned the tides serving Both Lawyer John D Winter his Court Papers after all and also Johnson and Johnson Headquarters in New Brunswick, New Jersey before the Product Liability Statue of Limitations in April 2026. (18 U.S.C Chapter 73, Florida Supreme Court Case SC2025-0986, Federal Rules of Evidence 404, Florida Statue 90.404, Florida Statue 95.051(d), Underlying Sex Abuse and, Florida Statue 777.03(2)(a)

   Finally, Both Johnson & Johnson (J&J) and Previous Lawyer John D Winter respond to zero emails or phone calls in regards to the case or necessary mediation. I work tirelessly to make sure no pharmaceutical giant like J&J conceals public hazards Lobbying and hoping a Judge will order it so. I have had dozens of accepted filings in more then three Courts. I look forward to seeing You, Americas Great Population, in with the Online Rape Culture Resistance, Please Like follow and Subscribe.

---

**3 attachments**

**PDF** **239627681 Affidavit (1).pdf**
106 KB

**PDF** **JOHN D WINTER ESQ - affidavit (1).pdf**
1.1 MB

**PDF** **Gmail - Ward V. Winter St (1).PDF**
103 KB

## IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA25-1784

Plaintiff: Mr. Brandon Tyler Ward

Defendant: Johnson and Johnson

Witness: Judge Jack R. Puffenberger, Toledo Ohio Court Clerk In Place of or, Judicial Assistant In Place of

## "Request For Witness Testimony"

Q.1: Do You, Toledo Ohio Probate Court, under discretion of Honorable Judge Jack R. Puffenberger admit to having Me, Mr. Brandon Tyler Ward, at Toledo Flower Hospital for Involuntary Confinement or Baker Act with Dr. Wissam K. Hotiet around November 2018?

A.1:

Q.2: Do You, Honorable Toledo Ohio Court, have access to, know someone with access to or, have any problems sharing with Us, The Concerned People, the details regarding who and why the 2018 Baker Act/Involuntary Psych-Hold occurred at 2521 Lambert Drive, Toledo Ohio 43613

(1)

A.2:

Q.3: Can You, Honorable Judge Jack R. Puffenberger, confirm or deny Department of Justice or Federal Bureau of Investigation influence in, before, and/or, during the November 2018 medical records elaborated, "field sweep for the state mental health board" at 2521 Lambert Drive Toledo, Ohio 43613 with transfer to State Hospital in January 2019?

A.3:

Q.4: Honorable Toledo Ohio Probate Court, can You confirm or deny for The Honorable Circuit Court in Saint John's County Florida that Dr. Wissam K. Hotiet's allegations of, "responding to an internal stimulus response", "the sexual assault epidemic being a delusion" or that, "President Trump and Governor John Kasich were in a on plot against me" written in November 2018-2019 in fact do exist?

A.4:

Q.5: Can You, Honorable Judge Jack R. Puffenberger Sir or Honorable Toledo Ohio Probate Court, confirm or deny Department of Justice Special Agent Louis Dean's involvement at 2521 Lambert Drive Toledo, Ohio 43613 in January 2019?

(2)

A.5:

Q.6: Can You, Honorable Toledo Ohio Court or Judge Sir, confirm or deny records of Mr. Brandon Tyler Ward and St. Vincent's Hospital on Cherry Street in Toledo Ohio having a listed meeting with Me, Mr. Ward, and Dr. Jason R. Canos III, a Surgeon, who most importantly stated, "You won't have any visible scars", "If this fails you will have to be flown by helicopter to a specialist" and, "I have triple digits worth of experience."

A.6:

Q.7: Can You, Honorable Judge Jack R. Puffenberger or, Honorable Judicial Assistants or, Honorable Clerks, confirm or deny the Dr. Canos III from Q.6 said the qoutes from Q.6?

A.7:

Q.8: Can You, Honorable Judge Puffenberger or Honorable Court, confirm or deny the initial visit at Saint Anne's Emergency room with an ER doctor who did an ultrasound and said their was no other option due to swelling of the gallbladder and gallstones that had to be removed for relief at all?

(3)

A.8:

(4)

# Certificate of Service

     I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to LUKS, SANTANIELLO, PETRILLO, COHEN & PETERFRIEND by E-filing on My Florida Court Access Government Website on January 22nd, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

01/22/2026

  With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com

Saint John's County Florida Court Case CA25-1784

Brandon Tyler Ward

Plaintiff

V.

Johnson and Johnson

Defendant

Represented by Attorney Andrea Cox


## **<u>Final Non-Spoken Conclusionary Exhibit Other Then Future Attorney Dialogue and, Mediation Results; Exhibit 7.</u>**


9 pages of prose, "Discovery Status Qou", 1 previous Docket from a bunch of Johnson & Johnson whistleblowers and, two Certificates of Service.

## IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA25-1784

Mr. Brandon Tyler Ward

Plaintiff

Johnson and Johnson

Defendant

## "January 26th 2026 Status Qou and Request For Speedy Mediation"

## Section 1: Introduction;

The focus of this Status Qou and other titled relief, "Request For Speedy Mediation" is to highlight CA25-1784 Complaint's and all Six Exhibit's citied or referenced laws, cases and, authorities. This is to minimize room for disagreement and error for The Honorable People to be gathered here in Division 59, Honorable Judicial Assistant and, Honorable Judge Sir. I want to stress that although my jaded Court rhetoric may be bold and impressive at times, I am still innately conformed with the disability parameters as defined in Florida Statue 95.051(d) and if the titled relief for mediation doesn't go well Court Case CA25-1784 will be My, Mr. Brandon Tyler Ward's, first Jury Trial. With all that being said, after the aforethought brief moment of gratitude, respect and, humility for The Honorable Court and The Honorable People of The State of Florida I, Mr. Brandon Tyler Ward, 100% Permanent and Total Disabled Veteran would like to jump right into it.

(1)

(CA25-1784)

## Section 2.a: All listed cases, laws and, authorities cited in the 6 exhibits that make the current Saint John's County Florida Court Case CA25-1784 in its entirety;

(United States of America, ex rel. Victoria Starr v. Janssen Pharmaceutica Prod., L.P., No. 04-1529, United States of America, ex rel. Lynn Powell v. Janssen Pharmaceutica Prod., L.P., No. 04-5184, United States of America, ex rel. Camile McGowan and Judy Doetterl v. Janssen Pharmaceutica, Inc., et al., No. 05-4536, United States of America, ex rel. Kurtis J. Barry v. Ortho-McNeil-Janssen Pharms., Inc., et al., No. 10-98, E.D. Pa., Austin Pledger V. Janssen Pharmaceuticals February 2015, Nicholas Murray V. Janssen Pharmaceuticals February 2018, Andrew Yount V. Janssen Pharmaceuticals July 2016, SEC Rule 21F-17A, Florida Statue 69.081, Florida Statue 95.051(d), Florida Statute 90.404, Florida Rules of Appellate Procedure Rule 9.045, Florida Rules of Appellate Procedure Rule 9.420(d)(2), The Senate Sunshine in Litigation Act of 2014 (S.2364), New York Penal Law 195.05, New York Penal Law 205.50, 18 U.S.C Chapter 73, and, the following American Bar Associations Model Rules of Professional Conduct: 3.4(f), 5.6(b) and, 8.4(c-e)

## Section 2.b: Cited laws and how they apply to Saint John's County Florida Court Case CA25-1784;

1. Florida Statue 69.081; Sunshine in Litigation which states that confidentiality agreements, like the one written in 2022 by Attorney John Winter for Johnson & Johnson, that conceal public hazards cannot be entered into The Court record and are void for use in litigation thereafter.

(2)

(CA25-1784)

2. Florida Statue 90.404; which states the rules of evidence for introducing character evidence of wrongs, acts or, other crimes before the Honorable Court and Jury
3. Florida Statue 95.051(d); which states when limitations toll in civil cases specifically section d states, "mentally incapacitated persons get 7 years from the date of injury."
4. New York Penal Law 195.05; which states its a misdemeanor in the second to be proven guilty of Obstructing Governmental Administration from normal Court procedures, services or investigations. (Mr. John D Winter esq.)
5. New York Penal Law 205.50 Hindering prosecution or rendering criminal assistance when with intent to prevent, hinder or, avoid; discovery, apprehension or, prosecution a defendant renders assistance to another defendant who is in the commission of a crime. (Undersheriff Anthony Yang)
6. 18 U.S.C Chapter 73; which like section 2.b(4) deals with quid pro qou or transactional exchanges that interfere with normal Court procedures and Due Process. This is a more severe type of charge for Federal or Serial Offenders who act with malice aforethought. (Mr. John D Winter esq.)

## Section 2.c: Cited authorities and possible applications in Saint John's County Florida Court Case CA25-1784;

1. SEC Rule 21F-17A; Rule from The Securities Exchange Commission that makes it illegal for companies like JP Morgan, Johnson & Johnson and, others to prevent previous employees, personal injury plaintiffs or, the general population otherwise from disclosing serious wrongs or violations to The Commission.
2. Florida Rules of Appellate Procedure Rule 9.045;

(3)

(CA25-1784)

which gives My, Mr. Brandon Tyler Ward's, familiar rules regarding form of document, font, font size and, thereafter compliance with Florida Legislation. All of which have been accepted by this Court and many others.

## Section 2.c: Cited authorities and possible applications in Saint John's County Florida Court Case CA25-1784;

3. Florida Rules of Appellate Procedure Rule 9.420(d)(2); which concerns the formatting and delivery of certificates of service in a Florida Court.

4. American Bar Associations Model Rules of Professional Conduct 3.4(f), 5.6(b) and, 8.4(c-e); ethics violations which say Attorneys can't tell someone they don't represent to conceal information from other claimants, attorneys or, press. States no implying an ability to influence improperly an agency, engaging in conduct prejudicial to the administration of justice, engaging in dishonesty, fraud or, deceit and they say Lawyers shall not make an agreement in which a restriction on a lawyer's right to practice is part of the settlement of a client controversy.

5. The Sunshine in Litigation Act of 2014 (S.2364), Introduced to the Senate 05/20/2014; Amends the federal judicial code to prohibit a court, in any civil action in which the pleadings state facts relevant to protecting public health or safety, from entering an order restricting the disclosure of information obtained through discovery or approving a settlement agreement that would restrict such disclosure.

(4)

(CA25-1784)

## Section 2.d: Cited cases that will be completely, thoroughly discerned for The Honorable Court and Honorable Jury in Saint John's County Florida Court Case CA25-1784;

1. United States of America, ex rel. Victoria Starr v. Janssen Pharmaceutica Prod., L.P., No. 04-1529; Mrs. Starr was a former Elder Care Unit sales representative who had shocking evidence of fabricated sales pitch calls with no regard for life and special child formulation M-Tabs that teachers were supposed to just sit in an unruly child's mouth, in school, and let dissolve. (Mrs. Starr won slightly more then 20 Million Dollars for her story.)

2. United States of America, ex rel. Lynn Powell v. Janssen Pharmaceutica Prod., L.P., No. 04-5184; Health Care Law Monthly under Emerging Drug & Devices on 11-7-2013 titled "Johnson & Johnson, 2 Units Plead Guilty, Pay $2.2B In Criminal, Civil Penalties" Editors: Elissa Moore, Amanda Enyeart and, Drew McCormick December 2013, Volume 2013, Issue No. 12, "Relators Victoria Starr, Lynn Powell, Camile McGowan, Judy Doetterl and Kurtis J. Barry will share $112 million as their statutory share of the recovery."

3. United States of America, ex rel. Camile McGowan and Judy Doetterl v. Janssen Pharmaceutica, Inc., et al., No. 05-4536; "The Inside Story of J&J Whistle-Blowers Who Made Millions" posted on December 10th, 2013 by David Voreacos and Sophia Pearson on Bloomberg: "Doetterl, prosecutors and other lawyers offered an inside account of a decade-long probe that ended

(5)

(CA25-1784)

with eight J&J whistle-blowers making more than $20 million each…The U.S. said J&J marketed Risperdal and two other drugs for off-label uses and paid kickbacks to doctors and pharmacists to boost sales. J&J's Janssen unit pleaded guilty to misbranding Risperdal…Doetterl and four other former J&J employees filed such cases. They will each get about $29 million from the U.S. and state governments that claimed they overpaid through Medicare or Medicaid because of J&J's practices. A sixth whistle-blower, Allen Jones, got $20.3 million last year when J&J paid $158 million to settle with Texas over Risperdal."

## Section 2.d: Cited cases that will be completely, thoroughly discerned for The Honorable Court and The Honorable Jury in Saint John's County Florida Court Case CA25-1784;

4. United States of America, ex rel. Kurtis J. Barry v. Ortho-McNeil-Janssen Pharms., Inc., et al., No. 10-98, E.D. Pa., "The government's major break came in January 2010 when Kurtis J. Barry, a regional business director who oversaw 60 sales representatives and six managers, filed a whistleblower case...When the FDA said no, J&J had already invested "an enormous amount of money, time and energy" in its ElderCare sales force, and it was "not willing to walk away" from the "extremely profitable" elderly population, Barry claimed. Barry also presented prosecutors with evidence about off- label marketing of another

(6)

(CA25-1784)

antipsychotic, Invega..Beyond his Risperdal award, Barry got $2.2 million for Invega," according to the Justice Department. "The Inside Story of J&J Whistle-Blowers Who Made Millions" posted on December 10th, 2013 by David Voreacos and Sophia Pearson on Bloomberg

## Section 2.d: Cited cases that will be completely, thoroughly discerned for The Honorable Court and The Honorable Jury in Saint John's County Florida Court Case CA25-1784;

5. Austin Pledger V. Janssen Pharmaceuticals February 2015; Pledger V Janssen Pharm., Inc.,198 A. 3d 1126 (Pa. Super Ct. 2018) The jury found Johnson & Johnson was "negligent by failing to provide an adequate warning" to the prescribing doctor, and they found that defendants' "negligent failure to provide an adequate warning was a cause of Austin Pledger's gynecomastia." The jury awarded the family $2.5 million.

6. Nicholas Murray V. Janssen Pharmaceuticals February 2018; "Judge slashes $8 billion Risperdal award against Johnson & Johnson to $6.8 million" posted on Reuters January 17, 2020 5:49 PM by Jonathan Stempel says, "A Pennsylvania judge on Friday slashed to $6.8 million from $8 billion a punitive damages award against Johnson & Johnson to a man who said it failed to warn that boys using its antipsychotic drug Risperdal could grow breasts. Judge Kenneth Powell of the Philadelphia Court of

(7)

Common Pleas reduced the payout that a jury awarded Oct. 8 to the plaintiff Nicholas Murray, a Maryland resident."

**Section 2.d: Cited cases that will be completely, thoroughly discerned for The Honorable Court and The Honorable Jury in Saint John's County Florida Court Case CA25-1784;**

7. Andrew Yount V. Janssen Pharmaceuticals July 2016; "Risperdal Trial Ends in $70 Million Award for Boy Who Grew Breasts" By Clay Hodges on July 14, 2016; A jury in Philadelphia sent a very loud and angry message to Johnson & Johnson. After a lengthy trial, the jury awarded a young boy who grew breasts after taking the drug Risperdal a staggering $70,000,000.00. This verdict is far and away the largest money judgment awarded (yet) to a victim of the drug Risperdal. At trial, the lawyers for Andrew and the Yount family argued that Janssen Pharmaceuticals and its parent company Johnson & Johnson were aware of the risks of children growing female breasts but worked to downplay the risk involved. Despite the data showing a connection between use of Risperdal and the growth of female breasts in vulnerable boys, Janssen and Johnson & Johnson kept pushing the prescription to doctors, parents and, children."

(8)

(CA25-1784)

## Section 3: Summary and Request For Speedy Mediation;

This January 26th Status Qou contains all of the relevant cases, laws and, authorities that I, Mr. Brandon Tyler Ward, intend to present in Open Court to The Honorable People of The State of Florida (Jury) and The Honorable Court, during Saint John's County Florida Court Case CA25-1784, after the Court mandated mediation before Trial. I am hoping to hear back in regards to Johnson & Johnson's new Attorney Andrea Cox saying she will have a more substantive answer to My, Mr.Ward's, questions; "Does Your Client, J&J, admit liability when face to face with the evidence?" and "What, if any, is the modern product liability insurance limit in Your Client, Johnson & Johnson's, policy?" To which Mrs. Andrea Cox Esq. said the estimated response burden would be next week sometime. I, for the record, just want to note that I would like to reserve 5 minutes to verbally speak upon the significance of the new transition from Patterson Belknap Webb & Taylor LLP in New York, New York to the new legal team from LUKS, SANTANIELLO, PETRILLO, COHEN & PETERFRIEND in Jacksonville, Florida. This concludes Mr. Brandon Tyler Ward's January 26th Status Qou and Request For Speedy Mediation.

(9)

(CA25-1784)

# Certificate of Service

I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to LUKS, SANTANIELLO, PETRILLO, COHEN & PETERFRIEND by E-filing on My Florida Court Access Government Website on January 26th , 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

01/25/2026

 With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Victoria Starr, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : CIVIL ACTION NO. 04-cv-1529 |
| | : |
| JANSSEN PHARMACEUTICA PRODUCTS, L.P., | : |
| | : |
| Defendant. | : |

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Lynn Powell, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : CIVIL ACTION NO. 04-cv-5184 |
| | : |
| JANSSEN PHARMACEUTICA PRODUCTS, L.P., and JOHNSON & JOHNSON, | : |
| | : |
| Defendants. | : |

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Camille McGowan and Judy Doetterl, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : CIVIL ACTION NO. 05-cv-5436 |
| | : |
| JANSSEN PHARMACEUTICA, INC., JANSSEN PHARMACEUTICA PRODUCTS, L.P., and JOHNSON & JOHNSON, INC. | : |
| | : |
| Defendants. | : |

UNITED STATES OF AMERICA, *et al.*, *ex rel.* :
Kurtis J. Barry,                                :
                                                :
          Plaintiffs,                           :
                                                :
     v.                                         :        CIVIL ACTION NO. 10-cv-0098
                                                :
ORTHO-MCNEIL-JANSSEN                             :
PHARMACEUTICALS, INC. and                       :
JOHNSON & JOHNSON, INC.                          :
                                                :
          Defendants.                           :
                                                :

## UNITED STATES' COMPLAINT IN INTERVENTION

From at least 1999 through 2005, Johnson & Johnson (J&J) and its subsidiary Janssen

Pharmaceuticals, Inc. ("Janssen") (collectively, "defendants") promoted Risperdal, an atypical

antipsychotic drug, for uses that were not approved as safe and effective by the Food and Drug

Administration (FDA) ("off-label uses") and, in some cases, were not covered by Medicaid and

other federal healthcare programs. Defendants established a specialized ElderCare sales force to

promote Risperdal. This sales force promoted Risperdal in nursing homes to control agitation,

aggression, and other behavioral disturbances in elderly dementia patients. Janssen promoted

Risperdal to control behavioral disturbances and conduct disorders in children and to treat

attention deficit disorder and other off-label conditions. Janssen also promoted Risperdal for use

in the general population to control mood and anxiety symptoms unrelated to any psychotic

disorder. Clinical trials, including those sponsored by defendants, indicated that taking Risperdal

increased the risk of strokes in the elderly and diabetes in all patients. In 2005, FDA requested

that Janssen change the Risperdal label to include a "Boxed Warning," commonly known as a

"black-box warning" – the agency's strongest warning – about the increased risk of death in the

elderly. By knowingly and actively promoting Risperdal as safe and effective for off-label and

2

30 U.S.C. § 901 *et seq.*, which provides medical benefits to coal miners who are totally disabled
by pneumoconiosis arising out of coal mine employment.

## IV. THE RISPERDAL LABEL

30.     Risperdal is an atypical antipsychotic drug. On December 29, 1993, FDA
approved Risperdal for "management of the manifestations of psychotic disorders" in adults.
The approved label explained that "[t]he antipsychotic efficacy of RISPERDAL was established
in short-term (6 to 8-weeks) controlled trials of schizophrenic inpatients."

31.     The approved Risperdal label included a statement in the Precautions section that
"[c]linical studies of Risperdal did not include sufficient numbers of patients aged 65 and over to
determine whether they respond differently from younger patients." The label also provided
special dosing instructions for the elderly, stating that "[i]n general, a lower starting dose is
recommended for an elderly patient, reflecting a decreased pharmacokinetic clearance in the
elderly, as well as a greater frequency of decreased hepatic, renal or cardiac function, and
therapy greater tendency to postural hypotension." Janssen later sought FDA approval for 0.5
mg and 0.25 mg Risperdal tablets to address special dosing requirements of certain patient
populations, including the elderly. In 1999, FDA approved the lower-dose Risperdal tablets.

32.     On March 3, 2002, FDA approved revised labeling for Risperdal to state that
Risperdal is indicated for "the treatment of schizophrenia."

33.     On December 4, 2003, FDA approved Risperdal for the short-term treatment of
acute manic or mixed episodes associated with Bipolar I disorder in adults.

34.     Between 1999 and 2005, Risperdal was not approved by FDA for any other
conditions in adults or for use in children for any purpose.

10

35.    In 2006 and 2007, FDA approved Risperdal for the treatment of irritability associated with autistic disorder in children and adolescents, schizophrenia in adolescents, and Bipolar I disorder in children and adolescents.

## V. PROMOTION OF RISPERDAL

### A.    Janssen Promoted Risperdal for Elderly Nursing Home Residents

36.    From the time Risperdal was first approved in 1993, FDA repeatedly advised Janssen not to market the drug as safe and effective for the elderly.  In addition, clinical studies, including those sponsored by defendants, indicated health risks in elderly dementia patients taking Risperdal, including the risk of strokes.  In 2005, FDA requested that Janssen add a black-box warning to the Risperdal label about the risk of death in elderly patients taking the drug. Janssen promoted Risperdal to control behavioral disturbances in the elderly until at least 2005.

#### 1.    FDA Warned Janssen Against Promoting Risperdal as Safe and Effective in the Elderly.

37.    When Janssen asked FDA to review certain marketing materials in August 1994, FDA advised Janssen "it would be misleading to suggest that the safety and efficacy of Risperdal has been established in the elderly." (Exhibit 1).

38.    Janssen subsequently informed FDA that it was conducting a clinical trial (RIS-USA-63) aimed at determining the effectiveness of Risperdal in treating "behavioral disturbances in demented patients."  In a letter dated April 28, 1995, FDA responded that the proposed label expansion would improperly suggest that Risperdal was effective for "all the various signs and symptoms that fall under such an umbrella, e.g., anxiety, depression, phobic fears, panic attacks, diurnal rhythm disturbances, etc.  We would consider such a claim misleading in that sense. . . ."  FDA also cautioned that behavioral disturbances in dementia patients were not necessarily psychotic manifestations and "might even be construed by some as

11

appropriate responses to the deplorable conditions under which some demented patients are housed, thus raising an ethical question regarding the use of an antipsychotic medication for inappropriate behavioral control." (Exhibit 2).

39.    In a 1997 meeting with FDA, Janssen suggested that it might seek an indication for "aggression in dementia." FDA raised concerns about an indication for "aggression":

> [I]f a patient screams (one of the measured behaviors in the aggressive subscale of the BEHAVE-AD), is it because he/she is demented, or because he/she is trying to communicate displeasure or even pain? Many demented patients, particularly those included in our trials, have limited verbal skills. Therefore, an indication for 'aggression' could allow a patient's limited capacity for self-expression to be reduced.

(Exhibit 3).

40.    In January 1999, FDA reviewed selected Janssen sales aids for Risperdal and issued an Untitled Letter informing Janssen that "presentations that focus on this [elderly] population are misleading in that they imply that the drug has been found to be specifically effective in the elderly." In its letter, FDA stated that "Janssen is disseminating materials that imply, without adequate substantiation, that Risperdal is safe and effective in specifically treating hostility in the elderly." (Exhibit 4). When Janssen asked FDA to reconsider its position that the promotional materials in question made claims of specific efficacy in the elderly population, FDA explained that "the safety and efficacy in the elderly was not particularly examined in 'fragile' individuals" and that "the campaign 'Hostile Outside, Fragile Inside' implies without adequate substantiation, that Risperdal has been specifically shown to be effective in treating psychotic elderly patients with hostility." (Exhibit 5).

**2.    Defendants' Clinical Studies Showed That Risperdal Increased Health Risks in the Elderly.**

41.    In 1998, Janssen began pursuing an indication for dementia. In support of a potential indication, defendants funded a series of clinical studies involving the use of Risperdal

12

to treat behavioral disturbances in the elderly and psychosis in Alzheimer's patients. One study

(RIS-USA-63), published in 1999, failed to show a statistically significant improvement in

dementia patients taking Risperdal versus a placebo, but appeared to show some efficacy in

treating psychosis and aggression in elderly patients. A second study (RIS-INT-24), also

published in 1999, failed to show a statistically significant difference in effectiveness between

Risperdal and placebo on any scale.

42.    In March 2001, defendants received the top-line results of a third study

(RIS-AUS-5) that suggested efficacy in some symptoms, but also revealed more cerebrovascular

adverse events (CVAEs), including strokes, in elderly dementia patients taking Risperdal than in

the placebo group.

43.    After receiving the top-line results, one senior Janssen executive objected to

immediate submission of an abstract summarizing the study's results for a medical symposium.

In an internal e-mail dated March 22, 2001, the executive stated:

> I am very reluctant to have these data in the public domain that soon.
>
> You may have noticed in the topline results that there are substantially
> more CVD A.E.s [cerebrovascular disease adverse events] in the Risperdal
> group. They are of substantial concern to us and we are reviewing all the
> narratives of these cases as well as CVD A.E. in our other dementia
> studies. It is crucial we have a better understanding of these data before
> we make the data public. I propose to keep this discussion and concern in
> house, though, until we have better understanding.
>
> So, I cannot endorse a rapid submission of an abstract end March [sic].

(Exhibit 6).

44.    On May 11, 2001, a senior Janssen statistician and co-author of the RIS-AUS-5

study circulated an internal memorandum reporting that the CVAE disparity in the raw statistics

was similar in RIS-AUS-5 and RIS-INT-24 and that "this risk was statistically significant in

these two trials individually and when they were combined with USA-63." On May 15, 2001,

13

49. On April 3, 2003, at FDA's request, Janssen modified the Risperdal label to include a new warning regarding adverse events in elderly patients with dementia, which stated:

> **Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia:** Cerebrovascular adverse events (e.g. stroke, transient ischemic attack), including fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of risperidone in elderly patients with dementia-related psychosis. In placebo-controlled trials, there was significantly higher incidence of cerebrovascular adverse events in patients treated with risperidone compared to patients with placebo. RISPERDAL has not been shown to be safe or effective in the treatment of patients with dementia-related psychosis.

Janssen also sent out a letter to doctors on April 16, 2003, as FDA requested, warning them of the CVAE risk in elderly dementia patients.

50. After the label change and letter to doctors, Janssen instructed ElderCare sales personnel to affirmatively communicate the CVAE warning to doctors and to inform doctors that the risk of CVAEs increases with age and that patients who experienced CVAEs in Risperdal trials had a mean age of 85.

51. On March 21, 2003, Janssen received the top-line results of the fourth study involving the use of Risperdal in elderly dementia patients (RIS-USA-232). The study failed to demonstrate efficacy in treating dementia and confirmed the increased risk of CVAE in elderly patients treated with Risperdal. The RIS-USA-232 results showed that four patients treated with Risperdal experienced CVAEs compared to one patient in the placebo group. Internally, Janssen concluded that the results of RIS-USA-232 "confirmed the imbalance" of the risk of cerebrovascular events in patients taking Risperdal.

52. Janssen filed a non-public safety report with FDA under applicable regulations in June 2003 that included the CVAE data from RIS-USA-232.

15

53.     On September 1, 2003, one of the physicians who designed the protocol for the RIS-USA-232 trials sent an e-mail to a senior Janssen executive encouraging Janssen to publish the RIS-USA-232 results.  The physician stated:

> Janssen has been sitting on the [RIS-USA-232] trial results for a long time.  Yet it has a moral and ethical responsibility to publish results quickly and in a way that they can be understood and makes clinical sense.  It has an obligation to publish not just the clinical efficacy data which could very well be informative and supportive of the use of risperidone if considered properly, but also the safety data, including events that have been labeled in the past as "cerebrovascular adverse events" and deaths.

(Exhibit 8).

54.     Janssen finalized its internal analysis of the results of RIS-USA-232 and completed its internal Clinical Study Report for RIS-USA-232 on February 26, 2004.  The same month, at the meeting of the American Association of Geriatric Psychiatry, an FDA representative presented a paper regarding CVAE that included data from RIS-USA-232.  In March 2004, Janssen began including data from RIS-USA-232 in medical information packets the company provided in response to requests for information submitted by physicians.

55.     Through 2004, Janssen continued to disseminate the "pooled data" from the three earlier studies to doctors and sales representatives, not updating the "pooled data" to include the results of RIS-USA-232.  Janssen retained physicians identified as Key Opinion Leaders ("KOLs") to present the "pooled" data that omitted the results of RIS-USA-232.

56.     On March 25, 2004, another physician – a Janssen KOL – urged Janssen to include the RIS-USA-232 results in the pooled data with the three earlier dementia studies:

> At this point, so long after RIS 232 has been completed, I think it is wrong to continue to submit abstracts of the three pooled studies.  At this point, we must be concerned that this gives the strong appearance that Janssen is purposely withholding the findings from RIS 232.
>
> Adverse effect findings from 232 are available on the web through the British government's regulatory site.  It was also mentioned by someone

from FDA at the AAGP annual meeting. It is not a secret that a fourth study has been conducted. As an investigator who is loyal to this program, I really do have to speak out and urge that Janssen avoids embarrassment and accusations about suppressing information that is relevant to providers and consumers.

(Exhibit 9). In response, a Janssen executive agreed: "[A]t this point it is my opinion that all pooled analysis should include -232."

57.    Janssen presented some of the RIS-USA-232 data, including safety data, at a medical symposium in June 2004. Janssen submitted a poster documenting the results of RIS-USA-232, including safety data, at another medical symposium in October 2004. The full study results, including safety data, were submitted for publication on February 1, 2005 and published in March 2006.

58.    Separately, FDA conducted a meta-analysis of data from seventeen clinical trials involving four atypical antipsychotic drugs, including clinical trial data unavailable to Janssen. On April 11, 2005, FDA issued a safety alert referencing risk of death in elderly dementia patients taking Risperdal and other atypical antipsychotics. FDA's safety alert also announced the agency's intention to ask manufacturers of all atypical antipsychotics to add a black-box warning to their label. In subsequent correspondence with the company, FDA noted that "[a]lthough the signal for increased mortality is somewhat weaker and somewhat less consistent for risperidone than for several other drugs in this class, it is strong enough, in our view, for us to conclude this is likely a class effect." The Risperdal package label was subsequently modified to state:

**Increased Mortality in Elderly Patients with Dementia-Related Psychosis**

Elderly patients with dementia-related psychosis treated with atypical antipsychotic drugs are at an increased risk of death compared to placebo. Analyses of seventeen placebo controlled trials (modal duration of 10 weeks) in these patients revealed a risk of death in the drug-treated

17

patients of between 1.6 to 1.7 times that seen in placebo treated-patients. Over the course of a typical 10 week controlled trial, the rate of death in drug-treated patients was about 4.5%, compared to a rate of about 2.6% in the placebo group. Although the causes of death were varied, most of the deaths appeared to be either cardiovascular (e.g., heart failure, sudden death) or infectious (e.g., pneumonia) in nature. RISPERDAL (risperidone) is not approved for the treatment of patients with Dementia-Related Psychosis.

**3.    Janssen Promoted Risperdal as Safe and Effective for Elderly Patients**

59.    From 1999 through 2005, Janssen aggressively marketed Risperdal as having an "unparalleled safety profile" and being effective in controlling behavioral disturbances in the elderly. In its 1999 business plan for the ElderCare market, one of Janssen's express objectives was to "[e]xpand [the] geriatric market and enhance leadership position for the treatment of late life mental disorders." (Exhibit 10). That year, Janssen increased the size of its ElderCare sales force to 136 sales representatives. This specialized sales force focused on nursing homes, long term care facilities, and doctors who treated the elderly. It marketed Risperdal as effective to treat symptoms such as hostility, aggression, agitation, wandering, and depression, regardless of whether the patients exhibited any evidence of psychosis or schizophrenia. In 2000, one of Janssen's business plan objectives was to "[m]aximize and grow RISPERDAL's market leadership in geriatrics and long term care. Dementia share goal is 57% with sales of $302 MM." The core sales messages for 2000 included: "RISPERDAL has proven efficacy in treating geriatric patients" and "RISPERDAL has an excellent safety and tolerability profile in geriatric patients." (Exhibit 11).

60.    In a 2001 ElderCare Sales Force update, Janssen congratulated its ElderCare sales force for helping to increase Risperdal's market share in the elderly population, noting that:

> [A]s a result of your focused efforts and dedication, RISPERDAL continues to be the market leader in the LTC/geriatric market. . . . RISPERDAL continues to dominate the dementia market, with a share of 52.5% for the 12 months ending February 2001.

61.     In 2001, Janssen created a Business Plan titled "Risperdal LTC/Geriatrics

Business Plan" reflecting its continued focus on marketing Risperdal for behavioral disturbances

in the elderly. (Exhibit 12). That year, Janssen produced a series of 2,100 continuing medical

education ("CME") presentations called "Senior Care Seminars" attended by thousands of

healthcare providers nationwide. Sales representatives tracked prescriptions written by doctors

who attended the programs.

62.     In 2002, Janssen indicated in its Business Plan that it would continue to focus its

marketing message on the elderly. Its position statement was that "RISPERDAL is 1st choice for

psychotic & behavioral disorders," including behaviors associated with dementia. In one study

completed in early 2002, Janssen tracked physicians' recall of sales messages, including

"Effective for Geriatrics," "Effective for Dementia," and "Effective for Agitation," to confirm

that the sales representatives were delivering these sales messages and to identify opportunities

for better market penetration.

63.     In 2003, Janssen indicated in its Business Plan that dementia "remains an

important strategic area of focus for RISPERDAL and the company." At the 2003 ElderCare

National Meeting in Atlanta, Janssen encouraged sales representatives to deliver the following

core message:

> Risperdal is the #1 prescribed product in its class BECAUSE it offers
> *superior efficacy* in the treatment of behavioral, psychotic, mood and
> anxiety related symptoms of schizophrenia in patients 65+ with a low risk
> for diabetes/DKA, movement disorders and falls.

64.     In April 2003, FDA approved quick dissolving Risperdal tablets, commonly

referred to as "M-Tabs." In an April 2, 2003 memorandum to the J&J Global Pharmaceutical

Pricing Committee, Janssen stated that their marketing strategy was to promote M-Tabs in the

long-term care market, given the high prevalence of swallowing difficulties in the elderly.

19

65.    Janssen's 2004 Business Plan indicated that one of its main themes for the year would be to "Re-establish growth in the LTC market."

66.    Janssen did not disband the ElderCare sales force and exit the nursing home market until 2005.

67.    From at least 1998 through 2004, thousands of records of sales calls by Janssen sales representatives (known as "call notes") and individualized instruction provided by district managers following sales calls (known as "field conference reports") reflect promotion of Risperdal as safe and effective in controlling behavioral disturbances in the elderly.  For example:

### Examples from 1998 Call Notes

**New York**: "DISCUSSED HOW RIS[PERDAL] IS EFFECTIVE AND SAFE IN THE TX [TREATMENT]: OF BEHAVIORAL DISTURBANCES IN THE ELDERLY, ESPECIALLY THOSE WITH DEMENTIA."

**California**: "Left a note introducing myself and ElderCare with Ref[erence] to Risp[erdal] for Geriatric hostility/behavioral problems . . . ."

### Examples from 1999 Call Notes

**Ohio**: "detailed her on ris[perdal] - she said she would think about pts [patients] who display behavior symp[tom]s we talked about, ensured her ris[perdal] safe in elderly. . . ."

**Florida**: "risp[erdal] - core message - safe and effective in elderly pt [patient] with behavior problems. . ."

### Examples from 2000 Field Conference Reports

**Minnesota:** "We had the opportunity to meet with five of your targeted psychiatrists. . . .All five psychiatrists confirmed their support of Risperdal in the treatment of behavioral problems due to Dementia."

### Examples from 2001 Call Notes

**Washington**: "spoke to dr [doctor] about using RIS[perdal] for pts [patients] w/behavioral disturbances assoc [associated] w/dementia, described positive and negative symptoms, agitation"

20

**Maryland**: "She [the doctor] attended an inservice program today that was held at Menno Village addressing behavioral problems with or w/o dementia."

### Examples from 2002 Call Notes

**Michigan**: "Detailed on Risperdal efficacy, dosing and side-effect profile vs. competitors for dementia patients w/behavioral problems"

**New Jersey**: "Risp[erdal] works not only for agitation in the elderly but at low doses acts like an SSRI [antidepressant]. People live longer . . . ."

### Examples from 2003 Call Notes

**Connecticut**: "Risp[erdal]: Admits to not using as much as he could, not comfortable with APS [antipsychotic] meds. So, I went over dosing .25mg for his elderly patients, 1 mg maintenance dose. Stressed use for agitation and anxiety, esp when current SSRI [anti-depressant] therapy is not responding. . . ."

**Delaware**: "[F]ocused on mixed dementia w/ Dr this trip & Ris[perdal] as adjunct therapy for the mood & behavioral problems assoc. w/ dementia"

**Michigan**: "Dr . . . [s]aid he has very little experience with Risperdal and the elderly. Explained how it could help with sundowning syndrome. Told me that he would try it on Gloria's mother."

### Examples from 2004 Call Notes

**Tennessee**: "ris[perdal]: efficacy on behavioral problems in dementia patients"

**Texas**: "Risp[erdal]: . . . Said he writes in nursing home. Asked for nxt [next] pt [patient] w/ anxiety/depression. Said he will consider as adjunct w/ ssri [antidepressant]."

    **4.**        **Janssen Recruited Consultant Pharmacists to Assist In Off-Label Promotion.**

68.    A J&J subsidiary entered into agreements with long-term care pharmacy providers that provided financial incentives for increasing the use of Risperdal in the facilities they serviced. Defendants recognized that consultant pharmacists could influence doctors to write Risperdal prescriptions for off-label uses. As part of the off-label marketing campaign, Janssen recruited consultant pharmacists to attend advisory boards and worked with those pharmacists to identify patients to be placed on or switched to Risperdal.

21

69.     In addition to nursing homes, the long-term care pharmacy providers also serviced mental health facilities. In its 2002 business plan, Janssen identified mental retardation and developmental disability (MRDD) as a target market and encouraged sales representatives to market Risperdal as "the first choice for psychotic and behavioral disorder, including MRDD." Janssen trained speakers and consultant pharmacists and sponsored advisory boards or round table discussions to promote Risperdal for behavioral and conduct symptoms in MRDD patients.

**B.     Janssen Promoted Risperdal for Use in Children**

70.     Until late 2006, Risperdal was not approved for use in children for any purpose. The Risperdal label stated that "[t]he safety and effectiveness in children have not been established." Nonetheless, from at least 1999 through 2005, Janssen promoted Risperdal to treat children for a variety of unapproved uses, including conduct disorders, attention-deficit-hyperactivity disorder (ADHD), and bipolar disorder.

71.     On August 15, 1996, Janssen asked FDA to approve an addition of language to the Risperdal label regarding pediatric use. FDA rejected Janssen's request, stating:

> [Y]ou have not identified any pediatric indications for which you believe Risperdal could be approved and you have provided no data from adequate and well controlled trials to support any such approvals. . . To permit the inclusion of the proposed vague references to the safety and effectiveness of Risperdal in pediatric patients and the nonspecific cautionary advice about how to prescribe Risperdal for the unspecified target indication would only serve to promote the use of this drug in pediatric patients without any justification.

(Exhibit 13).

72.     On March 3, 2000, Janssen met with FDA to discuss a clinical development plan for an indication for "conduct disorder" in children. Although FDA recognized that "conduct disorder" is a diagnosis listed in the Diagnostic and Statistical Manual of Mental Disorders, the agency questioned whether it could approve Risperdal for "conduct disorder," explaining that its

22

"main concern is that RISPERDAL or any other product would be used as a chemical straight jacket." In addition, FDA expressed concern that conduct disorder was "synonymous with aggression" and that Janssen was "trying to get approval of aggression under the guise of CD [conduct disorder]." (Exhibit 14).

73.    Defendants knew that Risperdal could cause elevated levels of prolactin, a hormone released by the pituitary gland that stimulates breast development and milk production. Since launch, the FDA-approved label stated that Risperdal, like other antipsychotics, "elevates prolactin levels." The Risperdal label further stated that "the clinical significance of elevated serum prolactin levels is unknown for most patients."

74.    One of Janssen's Key Base Business Goals was to grow and protect share in the child/adolescent market, which Janssen defined to include patients 19 years and under. Janssen's 2001 Base Business Plan stated that the fastest-growing market for Risperdal was pediatrics, with the use of Risperdal "exploding" at a growth rate of 17 percent, for a total market share of $340 million per year. Janssen recognized that Risperdal was used in children primarily for non-psychotic diagnoses: bipolar disorder (21%), autism (18%), ADHD (15%). Janssen also noted that Risperdal was typically prescribed in children "to control aggressive/impulsive behavior."

75.    Janssen instructed its sales representatives to call on child psychiatrists as well as on mental health facilities that primarily treated children and to market Risperdal as effective to treat symptoms associated with various childhood disorders such as ADHD, OCD, and autism. The company sponsored numerous advisory boards with child psychiatrists and speakers programs concerning "Risperdal in Children and Adolescents with Severe and Disruptive Behaviors and Below-Average IQ."

76.    Janssen prepared two plans for addressing the child and adolescent market in 2002: a business plan ("Risperdal Child and Adolescent Market Segment: 2002 Business Plan

Summary") and a tactical plan ("2002 Tactical Plan RISPERDAL Child and Adolescent

Segment: Reach New Heights with Risperdal in 2002"). Janssen identified four key business

strategies:

- Understand the level of awareness of RISPERDAL in the child and adolescent market segment;

- Educate health care providers on therapeutic options for treating mental illness in children;

- Develop a child and adolescent public relations and media management plan; and

- Clarify FDA requirements and accelerate JRF program to obtain child and adolescent labeling.

77.    In 2002, Janssen created a "C&A Educational Initiative" to promote the use of

Risperdal in children and adolescents ("C&A"). As part of this Initiative, Janssen developed

advisory boards and CME programs and utilized national and regional opinion thought leaders in

child psychiatry. For example, in March 2002, Janssen sponsored a meeting attended by 1,000

physicians, which Janssen executives later described as "[a] great way to get the word out to a

big part of the child and adolescent prescribing community." Similarly, at an "Advisory

Summit" in February 2003, Janssen presented data promoting Risperdal to treat conduct

disorders in children with disruptive behavior disorders.

78.    When FDA approved M-Tabs in April 2003, Janssen district managers

encouraged contests and other incentives to promote this quick-dissolving Risperdal formulation

in children:

> In the San Antonio District, district managers encouraged "Risperdal
> 'Back to School' Bashing" and proposed ice-cream parties, snacks and
> lunches as an effective way to deliver an efficacy message of fast onset of
> M-Tabs and use in the pediatric population.

> Notes from a District Managers' Conference Call on August 11, 2003
> state: "'There is a very large market for the M-TABs* for
> children/adolescents!"

> Broad spectrum RISPERDAL is 1st choice for psychotic, behavioral, and
> mood disorders (bipolar disorder with/without psychosis, refractory
> depression and refractory anxiety disorders) because it is the only therapy
> to deliver rapid and sustained efficacy across the full range of symptoms
> (anxious, manic, depressed) and is uncompromised by safety
> concerns . . . .

82.    Janssen's 2002 Business Plan continued to emphasize marketing to behaviors and

mood and anxiety symptoms:

> Broad spectrum RISPERDAL is 1st choice for psychotic and behavioral
> disorders (Schizophrenia, Schizoaffective disorder, Psychotic depression,
> Dementia, Bipolar Mania, MRDD) because it is the only therapy to deliver
> rapid, sustained (within 30 min and for at least 1 year) efficacy across the
> full range of symptoms (PANSS, cognition, anxiety, mood and behavioral
> disturbances as well as improved patient function) . . . .

83.    In 2002, pursuant to FDA's request, Janssen modified the Risperdal label to state

that Risperdal was approved only for the treatment of "schizophrenia." Nonetheless, Janssen

instructed the sales managers that there was "No need to notify customers of the label change"

because "Our strategy remains the same - **SYMPTOM** focus!" One of Janssen's "core

message" for 2002 was:

> For patients with mood disorders (anxiety/depression), Risperdal is the #1
> prescribed product in its class because it offers superior efficacy in
> treating mood symptoms versus both Zyprexa and Haldol with less
> frequency to cause diabetes in your patients.
>
> Turn off-label use into symptom WAR!

84.    In 2002, defendants created a new sales force, "the 500 Gold," to market

Risperdal to primary care physicians (PCPs), who do not generally treat schizophrenia or

psychotic disorders.

85.    One sales representative summarized the direction she received in a 2002

memorandum she sent to other sales representatives and her district manager:

27

# Certificate of Service

I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to LUKS, SANTANIELLO, PETRILLO, COHEN & PETERFRIEND by E-filing on My Florida Court Access Government Website on January 23nd, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

01/25/2026

With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com

# New York Attorney John D Winter Breaks SEC Rule 21F-17A and New York Penal Law 195.05. (NY Supreme Court Appellate Div. 1st Judicial Dept. Docket No. 2025.3429 and Saint John's County Florida Court Case CA25-1784.)

1 message

████████████████████████████                                    Mon, Jan 26, 2026 at 12:33 PM

Good afternoon,

Thank you for reaching out.  All tips, complaints, or referrals can be submitted using our online form found here: https://www.sec.gov/tcr.  If you are a whistleblower and would like to submit information to the Commission, you may do so here: https://www.sec.gov/whistleblower.  If you have questions you'd like to discuss, you can contact the Office of Investor Education and Advocacy at 1-800-732-0330 or by email at help@sec.gov.

Office of Commissioner Hester M. Peirce

100 F Street, NE

Washington, DC 20549

---

**From:** Brandon Ward <mrbrandonward556@gmail.com>
**Sent:** Sunday, January 25, 2026 8:13 PM
████████████████████████████████
**Subject:** New York Attorney John D Winter Breaks SEC Rule 21F-17A and New York Penal Law 195.05. (NY Supreme Court Appellate Div. 1st Judicial Dept. Docket No. 2025.3429 and Saint John's County Florida Court Case CA25-1784.)

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

[Quoted text hidden]

Case 3:26-cv-00224-MMH-PDB    Document 1-2    Filed 02/03/26    Page 377 of 427 PageID 545

## AFFIDAVIT OF SERVICE

| Case: CA25-1784 | Court: IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR ST. JOHNS COUNTY, FLORIDA | County: ST. JOHNS COUNTY | Job: 14974258 |
|---|---|---|---|
| Plaintiff / Petitioner: Mr. Brandon Ward | | Defendant / Respondent: Johnson and Johnson | |
| Received by: Central Jersey Process Service | | For: Brandon Ward | |
| To be served upon: Johnson and Johnson | | | |

I, Fabrizio Mendoza, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein.

**Recipient Name / Address:** Dosiree Mims, CT Corporation System: 820 Bear Tavern Rd Suite 305, West Trenton, NJ 08628

**Manner of Service:** Registered Agent, Jan 23, 2026, 2:32 pm EST

**Documents:** EXHIBIT 1; COMPLAINT; PRODUCT LIABILITY ADDENDUM; CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE; MEDICAL RECORDS; EXHIBITS; UNIFORM CASE MANAGEMENT ORDER; PRACTICES AND PROCEDURES STANDING ORDER FOR CIVIL CASES IN DIVISION 59; CIVIL COVER SHEET (Received Jan 14, 2026 at 11:11am EST)

**Additional Comments:**
1) Successful Attempt: Jan 23, 2026, 2:32 pm EST at CT Corporation System: 820 Bear Tavern Rd Suite 305, West Trenton, NJ 08628 received by Dosiree Mims. Age: 52; Ethnicity: African American; Gender: Female; Weight: 145; Height: 5'8"; Hair: Black; Relationship: Intake Specialist; Other: Curly medium length hair with highlights;
I delivered the documents to Dosiree Mims, with identity confirmed by subject providing their name. Mims confirmed that she is authorized to accept legal documents on behalf of CT Corporation System, registered agent of Johnson and Johnson, in her official capacity as an Intake Specialist. Mims accepted the documents with direct delivery.

I declare under penalty of perjury that the record to which this declaration is attached is the same record on which Maximillian Hayden performed a notarial act and before whom I appeared by means of communication technology on this 25th day of January, 2026.

Signed by:

_8AAC4F26EDF3492..._

Fabrizio Mendoza                    01/25/2026

**Date**

Central Jersey Process Service
65 Morrell Street, Suite 103
New Brunswick, NJ 08901-1485
Authorized to serve pursuant to N.J. Ct. R. 4:4-3

*Subscribed and sworn to before me this 25th day of January, 2026, by Fabrizio Mendoza, who is personally known to me. Witness my hand and official seal. I, Maximillian Hayden, witnessed, by means of communication technology, Fabrizio Mendoza sign the attached record and declaration on this 25th day of January, 2026.*

DocuSigned by:

_AE880233B17F402..._

**Maximillian Hayden, Notary Public**
**State of New Jersey**
**County of Middlesex**

01/25/2026          09/26/2028

**Date**          **Commission Expires**

MAXIMILLIAN J HAYDEN IV
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 0050214468
MY COMMISSION EXPIRES 09/26/2028

# If Your Johnson and Johnson's lawyer get Court Intervention Your Rude, "Probably" and no case activity is unacceptable under The Constitutional Sixth Amendment

1 message

**Brandon Ward** <mrbrandonward556@gmail.com>                                       Wed, Jan 28, 2026 at 10:29 AM

I will not not email Joaquin Duato for taking my Gallbladder if your going to DO NOTHING

**2 attachments**

🖼 **Screenshot_20260127_104941_Gmail.jpg**
433 KB

🖼 **Screenshot_20260123_162946_Gmail.jpg**
433 KB

**IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA**

Case Number: CA25-1784

Plaintiff: Mr. Brandon Tyler Ward

Defendant: Johnson and Johnson

Date: 01/29/2026

## "Acknowledgement Noticing Attorney Andrea Cox's Post Thursday Response To Liability And Damages Questions And Request For Speedy Mediation"

This letter will serve as My, Mr. Brandon Tyler Ward's, notice of acknowledgement to Attorney Andrea Cox's nonchalant, rude and, self-dictated "probably" happening before one full business week elapses: mere answering of two or three questions as seen in Her, Mrs. Andrea Cox esq's., email dated January 23rd 2026 at 3:36 pm. As I write this here notice, Thursday January 29th 2026, She, Mrs. Cox esq., has still not complied with any accepted Court filings or even Her own rhetoric. Moreover, can You, Honorable People of The State of Florida, imagine My, Mr. Brandon Tyler Ward's, surprise when She, Mrs. Andrea Cox esq., thought that I, Mr. Ward, wouldn't want Her, Mrs. Cox esq., to, "seek Court Intervention."

Seeking Court intervention has been My, Mr. Brandon Tyler Ward's, plan all along and with My, Mr. Ward's, previous motion for Sixth Amendment, that got accepted by the Court, for a "Speedy Trial" not receiving any respect from Johnson & Johnson Lawyer Andrea Cox I, Mr. Ward, will now push for "Speedy Mediation" as a supplement or an auxiliary attempt at respecting case deadlines and statues of limitations.

(1)

(CA25-1784)

Since Mrs. Andrea Cox esq in accepted Court filing titled, "More Rude Communications From New Johnson and Johnson Lawyer, A Running Tab "Probably" showed us She, Mrs. Cox esq., insurance lawyer for Johnson & Johnson still wants a good payday saying in email on Tuesday, January 27th , 2026 at 10:08 AM, "Mediation is required before trial, not before discovery is completed. Also, since you have not complied with prerequisites to filing your discovery requests, we do not owe you a response." She, Attorney Andrea Cox, should atleast since not forfeiting mediation, respect this here, "Request For Speedy Mediation."

Because insurance lawyers and personal company Board Member lawyers will differ as they usually do, this discrepancy will be necessary in Brandon Ward V. Johnson & Johnson 2026 due to the extensive need for punitive damages, defamation recovery from both Mrs. Cox esq. and Mr. John Winter esq. and, the extensive need for fundamental confidentiality agreement disputes resolution. *(American Bar Associations Model Rules of Professional Conduct Rule 3.2 Expediting Litigation, Rule 3.4(a) Fairness to Opposing Party & Counsel, Rule 3.4(d) Frivolous discovery request or reasonably diligent effort, Rule 4.1 Truthfulness in Statements to Others and, American Bar Associations Model Rules of Professional Conduct Rule 4.3 Dealing with Unrepresented Person.)*

01/29/2026

With Humility,

Mr. Brandon Tyler Ward

Entrapped 6x Federal Agent/U.S Army Coercion Situation Survivor,

100% Permanent and Total Service-Connected Gulf War Era

 Marksmanship Badge Award-Winning Disabled American Army

Veteran, 2x Sexual Trauma Survivor and, Whistleblower

(2)                                              (CA25-1784)


# No worries can You tell me what Your Client's, J&J's, Product Liability Insurance Policy is Liable Up To In Dollars;

1 message

---

**Andrea Cox** <ACox@insurancedefense.net>                                          Fri, Jan 23, 2026 at 3:36 PM
To: Brandon Ward <mrbrandonward556@gmail.com>

Hello. I received your emails. I am just getting up to speed on your case and will respond more substantively to your emails, probably next week.

**Andrea Cox**
**Managing Partner, Tallahassee**

---

6265 Old Water Oak Road
Suite 201
Tallahassee, FL 32312
Phone: 850-385-9901
Direct: 850-701-8021
Fax: 850-727-0233



 

CONFIDENTIALITY NOTICE : The information contained in this e-mail is intended only for the confidential use of the recipient(s) named above. This message and its attachments are attorney-client privileged communications, work product and mental impressions of the above sender. If the reader of this message is not the intended recipient or if you have received this communication in error, you are hereby notified that you have received this in error, that you should destroy it, notify us at once and any review, dissemination or copying is strictly prohibited.

> On Jan 23, 2026, at 9:07 AM, Brandon Ward <mrbrandonward556@gmail.com> wrote:

> You don't often get email from mrbrandonward556@gmail.com. Learn why this is important
> [Quoted text hidden]
> <Screenshot_20260123_082355_Chrome.jpg>
> <Screenshot_20260123_082300_Chrome.jpg>


## Saint John's County Florida Court Case CA25-1784

1 message

**Brandon Ward** <mrbrandonward556@gmail.com>                                                  Tue, Jan 27, 2026 at 9:41 AM
To: jbarrero@ls-law.com, ACox@insurancedefense.net, LuksTALLY-Pleadings@insurancedefense.net
Cc: ███████████

    Q.1: Can You, Mrs. Cox esq., ask Your Client, J&J, if they will force Attorney John Winter to respond to Request For Defendant Testimony?

    A.1:

    Q.2: If You, Mrs. Andrea Cox esq., have any Requests For Production please let me know; Johnson and Johnson's active metabolite Paliperidone from the Risperdal patent from the FDA in 2003 with Your Client, J&J's, Doctor Edward Brann and The FDA's Russell Katz M.D. discusses Cholelithiasis as a side effect in two places on page 20 and on page 21, I was built up from 1mg Paliperidone at Toledo Flower Hospital November 2018 with Dr. Wissam Hotiet and moved to Ohio State Hospital. I was released conditioned on taking 234mg Invega Sustenna Injections monthly until I needed Surgery in April 2019 with Dr. Jason R. Canos III, in Toledo Ohio as well.

    A.2:

    Q.3: I need an email or another Affidavit that Your, Mrs. Andrea Cox esq.'s, Client, Johnson and Johnson, in immediate observation of Q.2 and the statements therein admit liability, okay?

    A.3:

    Q.4: What is Your, Mrs. Cox esq.'s, Client, Johnson and Johnson's, Product Liability Insurance Policy Limit; If They, J&J, have one?

    A.4:

With Humble Godspeed For Non-
Concealment of Public Hazards,
Mr. Brandon Tyler Ward
100% Permanent and Total Service-
Connected Gulf War Era Marksmanship.
Badge Award-Winning Disabled
American Army Veteran and 2x Sexual.
Trauma Survivor

**Saint John's County Florida Court Case CA25-1784**

1 message

---

**Andrea Cox** <ACox@insurancedefense.net>                                                    Tue, Jan 27, 2026 at 10:08 AM
To: Brandon Ward <mrbrandonward556@gmail.com>

Good morning.

Mediation is required before trial, not before discovery is completed.  Also, since you have not complied with prerequisites to filing your discovery requests, we do not owe you a response.

Please stop emailing my client directly.  I am Johnson & Johnson's counsel for your case and you should direct your emails to me.  If you ignore this request, we will seek court intervention.

**Andrea Cox**

**Managing Partner, Tallahassee**

---

6265 Old Water Oak Road
Suite 201

Tallahassee, FL 32312

Phone: 850-385-9901

Direct: 850-701-8021

Fax: 850-727-0233



  

CONFIDENTIALITY NOTICE : The information contained in this e-mail is intended only for the confidential use of the recipient(s) named above. This message and its attachments are attorney-client privileged communications, work product and mental impressions of the above sender. If the reader of this message is not the intended recipient or if you have received this communication in error, you are hereby notified that you have received this in error, that you should destroy it, notify us at once and any review, dissemination or copying is strictly prohibited.

# Certificate of Service

      I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to all concerned parties of Saint John's County Florida Court Case CA25-1784 by E-filing on My Florida Court Access Government Website on January 29th, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

01/29/2026

With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com

**[RCPT NO:RCT20260057402][FUP-2]Johnson and Johnson Follow Up Request RISPERDAL Referenc** ████████████████

1 message

**Johnson & Johnson Correspondence** ████████████████                    Fri, Jan 30, 2026 at 6:32 AM
To: mrbrandonward556@gmail.com <mrbrandonward556@gmail.com>

## Johnson&Johnson

30-JAN-2026

████████████████████

Johnson & Johnson monitors the safety of RISPERDAL, PALIPERIDONE. It is our policy to request additional information related to any experience reported with our products.

To better understand your experience with this product, we would appreciate you completing the enclosed questionnaire. The information we request is critical in understanding your experience and in maintaining a high standard of product safety. Our goal is to continue to ensure the safe and effective use of our products.

We understand that this is important and private information to you. Please know that the information you provide is used strictly for safety monitoring purposes and is treated with utmost confidentiality to ensure your privacy.

If you were seen by a healthcare professional, we also request your permission to contact your health care provider (e.g., doctor, nurse, midwife, pharmacist) to obtain additional medical information. Please complete the Authorization for Disclosure of Medical Information Form, included on the last page of this questionnaire.

If you have any future correspondence on this issue, please refer to the report number at the beginning of this letter.

Thank you very much for your cooperation.

Sincerely,
Johnson & Johnson
Drug Safety

Confidentiality Notice: This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please reply to the sender, so that Johnson & Johnson can arrange for proper delivery, and then please delete the message from your inbox. Thank you.This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender or system manager by email immediately if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited and against the law.

AER# / Receipt# : ████████████████████████

To decline providing the requested information, use this link: DECLINE

W  TV-FRM-09004_v13.20260123916 .docx
    69 KB

**CONSUMER QUESTIONNAIRE FOR ADVERSE EVENT EXPERIENCE**    <u>PLEASE PRINT CLEARLY OR TYPE</u>

Please return via postal to 850 Ridgeview Drive - Horsham PA 19044, or fax at 215-293-9955, or via reply email

| **Product:** RISPERDAL | **AER No** ▮▮▮▮ | **Other ID No.:** |
|---|---|---|

| **Person who had the adverse event ("the patient")** | | | |
|---|---|---|---|
| Initials | Brandon Ward | Date of Birth or Age | |
| Age Group *(if DOB or age unknown)* | ☐ Birth - 28 days<br>☐ 29 days – 24 months | ☐ 25 months – 13 years<br>☐ 14 years – 18 years | ☐ 19 years – 65 years<br>☐ Over 65 years |
| Gender | ☐ Male  ☐ Female | | |
| Was patient pregnant during treatment? | | ☐ No   ☐ Yes: weeks of gestation: | |

| Did the patient consult a healthcare professional (doctor, nurse, pharmacist) because of the adverse event? | |
|---|---|
| ☐ No | |
| ☐ Yes *(please check any that apply)* | ☐ Seen in Emergency Room |
| | ☐ Admitted to hospital |

| Product Name | |
|---|---|
| Formulation | ☐ Tablet   ☐ Capsule   ☐ Liquid ☐ Lotion   ☐ Cream   ☐ Powder<br>☐ Ointment  ☐ Emulsion  ☐ Spray ☐ Other - please specify: |
| Strength, Quantity & Frequency (e.g., two 5mg tablets, once a day) | |
| Route | ☐ By mouth     ☐ Applied to skin     ☐ Administered into vein (IV)<br>☐ Inhaled      ☐ Injection       ☐ Other - please specify: |
| Start date of therapy *(dd-MMM-yyyy)* | Product Lot Number |
| Stop date of therapy (if applicable) *(dd-MMM-yyyy)* | Expiration Date *(dd-MMM-yyyy)* |

| Does the patient have any other medical history or relevant pre-existing conditions? (e.g., food or drug allergies, chronic illness, past illnesses) | | | | |
|---|---|---|---|---|
| Was the patient on any other medication at the time the adverse event started?<br><br>(Include non-prescription drugs, herbal remedies and dietary supplements) | ☐ No | | | |
| | ☐ Yes | | | |
| | **Name** | **Reason for using** | **Start Date** | **Stop Date** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**CONSUMER QUESTIONNAIRE FOR ADVERSE EVENT EXPERIENCE**    PLEASE PRINT CLEARLY OR TYPE

Please return via postal to 850 Ridgeview Drive - Horsham PA 19044, or fax at 215-293-9955, or via reply email

| Product: RISPERDAL | AER No: ███████ | Other ID No.: |
|---|---|---|

Please describe the adverse event reported:
(e.g., symptoms, outcome, treatment)

Please describe any medical or laboratory tests performed because of the adverse event, including details of the test, date performed and result:

*In order to authorize The Company to contact your healthcare provider to gain further information on this adverse event, please complete the enclosed medical authorization form on page 4.*

*If suspected product is a Janssen Vaccine, please also complete page 3.*

**CONSUMER QUESTIONNAIRE FOR ADVERSE EVENT EXPERIENCE**     PLEASE PRINT CLEARLY OR TYPE

Please return via postal to 850 Ridgeview Drive - Horsham PA 19044, or fax at 215-293-9955, or via reply email

**Please provide any details about your experience with the Janssen Vaccine below.**

| Product: RISPERDAL | AER No: ██████ | Other ID No.: |
|---|---|---|

| | |
|---|---|
| **Patient** | Age at time of vaccination: <br> Number of previous doses for this vaccine: <br><br> Illness at the time of vaccination ☐ Yes  ☐ No  ☐ Unk   If yes, provide details: <br><br> Past history of similar event? ☐ Yes  ☐ No ☐ Unk   If yes, provide details: <br><br> Adverse event after any previous vaccination(s)? ☐ Yes  ☐ No  ☐ Unk If yes, provide details: <br><br> Pre-existing acute illness 30 days prior to vaccination? ☐ Yes  ☐ No  ☐ Unk   If yes, provide details: <br><br> History of hospitalization in last 30 days?  ☐ Yes  ☐ No  ☐ Unk   If yes, provide details: <br><br> Currently breastfeeding? ☐ Yes  ☐ No  ☐ N/A <br><br> If event is COVID-19 infection, was it confirmed by test? ☐ Yes  ☐ No <br><br> If yes, what specific test (PCR, molecular, antibody or at-home test) was performed?  Date: <br><br> Other Suspected causes including co-administered vaccine(s)/risk factors (Specify): |

| | | | |
|---|---|---|---|
| **SUSPECT** | Date  and time  of vaccination | Lot#: <br> Expiration Date: | Dose: <br> Booster Dose ☐ Yes   ☐ No |
| | Site of administration: ☐ Left ☐ Right | Route: | |

| **Vaccines Administered within 12 months prior** | **Vaccine (type and brand name)** | **Booster dose** | **Manufacturer** | **Lot Number** | **Dose** | **Number of previous doses** | **Administration** | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Route** | **Site** | **Date** |
| | | ☐ Yes <br> ☐ No | | | | | | | |
| | | ☐ Yes <br> ☐ No | | | | | | | |
| | | ☐ Yes <br> ☐ No | | | | | | | |
| | | ☐ Yes <br> ☐ No | | | | | | | |
| | | ☐ Yes <br> ☐ No | | | | | | | |

**CONSUMER QUESTIONNAIRE FOR ADVERSE EVENT EXPERIENCE**    <u>PLEASE PRINT CLEARLY OR TYPE</u>
Please return via postal to 850 Ridgeview Drive - Horsham PA 19044, or fax at 215-293-9955, or via reply email

Product:        RISPERDAL _____
AER No.:        ██████████ _____

**Authorization for Disclosure of Medical Information**
**(Please refer to the above AER # in all correspondence)**

I hereby authorize my health care provider (named below) to disclose my health information, specifically medical records and follow-up information to Global Medical Safety, Janssen Research & Development, LLC, for the purpose of adverse event reporting.

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"; 45 CFR, Part 164) permits the disclosure of patient health information for public health activities such as adverse event reporting. I understand this information provided may be disclosed to others consistent with those obligations and no longer protected by these regulations.

I understand this authorization is voluntary and I have the right to access, rectify and revoke this authorization at any time, in writing. My notice to revoke this authorization will not apply to actions taken prior to the date of my written request to revoke the authorization.

Name of the Patient (Please Print): _____

Signature of Patient, Patient's Guardian
or Authorized Representative: _____
                                                        Date: 
                                          *(dd-MMM-yyyy)* _____

Name and address of physician(s) or other health care professional(s) currently treating you:
Name: _____
Address: _____
Telephone Number: _____

Name: _____
Address: _____
Telephone Number: _____

Name: _____
Address: _____
Telephone Number: _____

If you wish to access, rectify, and revoke this authorization at any time, please send a formal written request with a photocopy of your ID to the company address.

1 message

**Brandon Ward** <mrbrandonward556@gmail.com>                    Fri, Jan 30, 2026 at 2:29 PM

TV-FRM-09004_v13(1)(2).PDF
449 KB

**CONSUMER QUESTIONNAIRE FOR ADVERSE EVENT EXPERIENCE**    <u>PLEASE PRINT CLEARLY OR TYPE</u>

Please return via postal to 850 Ridgeview Drive - Horsham PA 19044, or fax at 215-293-9955, or via reply email

| **Product:** RISPERDAL | **AER No:** ███████ | **Other ID No.:** |
|---|---|---|

| **Person who had the adverse event ("the patient")** | | |
|---|---|---|

| Initials | Brandon Ward | Date of Birth or Age | ███████ |
|---|---|---|---|

| Age Group *(if DOB or age unknown)* | ☐ Birth - 28 days<br>☐ 29 days – 24 months | ☐ 25 months – 13 years<br>☐ 14 years – 18 years | ☒ 19 years – 65 years<br>☐ Over 65 years |
|---|---|---|---|

| Gender | ☒ Male  ☐ Female |
|---|---|

| Was patient pregnant during treatment? | ☒ No   ☐ Yes: weeks of gestation: |
|---|---|

**Did the patient consult a healthcare professional (doctor, nurse, pharmacist) because of the adverse event?**

☐ No

☒ Yes *(please check any that apply)*    ██████████████

| Product Name | ████████ | |
|---|---|---|
| Formulation | ☐ Tablet  ☐ Capsule  ☒ Liquid ☐ Lotion  ☐ Cream  ☐ Powder<br>☐ Ointment  ☐ Emulsion ☐ Spray  ☐ Other - please specify: | |
| Strength, Quantity & Frequency<br>(e.g., two 5mg tablets, once a day) | ████████████████ | |
| Route | ████████████████████ | |
| Start date of therapy<br>*(dd-MMM-yyyy)* | ████████ | Product Lot Number | ██████████ |
| Stop date of therapy (if applicable)<br>*(dd-MMM-yyyy)* | ██████ | Expiration Date<br>*(dd-MMM-yyyy)* | |

| Does the patient have any other medical history or relevant pre-existing conditions? (e.g., food or drug allergies, chronic illness, past illnesses) | ██████████ | | | |
|---|---|---|---|---|
| Was the patient on any other medication at the time the adverse event started?<br><br>(Include non-prescription drugs, herbal remedies and dietary supplements) | ████ | | | |
| | **Name** | **Reason for using** | **Start Date** | **Stop Date** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**CONSUMER QUESTIONNAIRE FOR ADVERSE EVENT EXPERIENCE**    <u>PLEASE PRINT CLEARLY OR TYPE</u>

Please return via postal to 850 Ridgeview Drive - Horsham PA 19044, or fax at 215-293-9955, or via reply email

| **Product:** RISPERDAL | **AER No:** ███████ | **Other ID No.:** |
|---|---|---|

Please describe the adverse event reported:
(e.g., symptoms, outcome, treatment)

█████████████████████████████

Please describe any medical or laboratory tests performed because of the adverse event, including details of the test, date performed and result:

████████████

*In order to authorize The Company to contact your healthcare provider to gain further information on this adverse event, please complete the enclosed medical authorization form on page 4.*

*If suspected product is a Janssen Vaccine, please also complete page 3.*

**CONSUMER QUESTIONNAIRE FOR ADVERSE EVENT EXPERIENCE**    <u>PLEASE PRINT CLEARLY OR TYPE</u>

Please return via postal to 850 Ridgeview Drive - Horsham PA 19044, or fax at 215-293-9955, or via reply email

**Please provide any details about your experience with the Janssen Vaccine below.**

| Product: RISPERDAL | AER No: ████████ | Other ID No.: |
|---|---|---|

**Patient**

███████████████████████████████████████████

| SUSPECT | Date and time of vaccination This appears to Be for covid sorry | Lot#: Expiration Date: | Dose: Booster Dose ☐ Yes ☐ No |
|---|---|---|---|
| | Site of administration:    ☐ Left  ☐ Right | Route: | |

| Vaccines Administered within 12 months prior | Vaccine (type and brand name) | Booster dose | Manufacturer | Lot Number | Dose | Number of previous doses | Administration | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Route | Site | Date |
| | | ☐ Yes ☐ No | | | | | | | |
| | | ☐ Yes ☐ No | | | | | | | |
| | | ☐ Yes ☐ No | | | | | | | |
| | | ☐ Yes ☐ No | | | | | | | |
| | | ☐ Yes ☐ No | | | | | | | |

**CONSUMER QUESTIONNAIRE FOR ADVERSE EVENT EXPERIENCE**     <u>PLEASE PRINT CLEARLY OR TYPE</u>

Please return via postal to 850 Ridgeview Drive - Horsham PA 19044, or fax at 215-293-9955, or via reply email

Product:     RISPERDAL

AER No.:     - ███████████

**Authorization for Disclosure of Medical Information**
**(Please refer to the above AER # in all correspondence)**

I hereby authorize my health care provider (named below) to disclose my health information, specifically medical records and follow-up information to Global Medical Safety, Janssen Research & Development, LLC, for the purpose of adverse event reporting.

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"; 45 CFR, Part 164) permits the disclosure of patient health information for public health activities such as adverse event reporting. I understand this information provided may be disclosed to others consistent with those obligations and no longer protected by these regulations.

I understand this authorization is voluntary and I have the right to access, rectify and revoke this authorization at any time, in writing. My notice to revoke this authorization will not apply to actions taken prior to the date of my written request to revoke the authorization.

Name of the Patient (Please Print): _____

Signature of Patient, Patient's Guardian
or Authorized Representative:     _____

                                                            Date:     _____
                                                    *(dd-MMM-yyyy)*

Name and address of physician(s) or other health care professional(s) currently treating you:

Name:             _____ ███████████████████████ _____

Address:          _____ ███████████████████████ _____

Telephone Number: _____ ███████████████████████ _____

Name:             _____ ███████████████████████ _____

Address:          _____ ███████████████████████ _____

Telephone Number: _____ ███████████████████████ _____

Name:             _____

Address:          _____

Telephone Number: _____

If you wish to access, rectify, and revoke this authorization at any time, please send a formal written request with a photocopy of your ID to the company address.

## Planning on Filing a Lawsuit on Andrea Cox esq for Libel expect it monday "probably"

1 message

**Brandon Ward** <mrbrandonward556@gmail.com>                                      Fri, Jan 30, 2026 at 2:48 PM
To: ACox@insurancedefense.net, ███████████████████
Cc: jbarrero@ls-law.com

Saint John's County Florida Court Case CA25-1784 motion of discovery

---

🖼️ **Screenshot_20260130_144559_Chrome.jpg**
536 KB

## IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA25-1784

Plaintiff: Mr. Brandon Tyler Ward

Defendant: Johnson and Johnson

Date: 01/29/2026

## "Motion For Order Compelling Discovery Under Fla. R. Civ. P. 1.380 – Failure to Make Discovery; Sanctions"

Attorney Andrea Cox's emails confirming receipt of My, Mr. Brandon Tyler Ward's, request for discovery material productions on January 22nd, 2026, 11:08pm and on January 23rd, 2026, 3:36pm. Attorney Andrea Cox still gives no promised substantive answer to discovery material requests and February 2nd, 2026 marks the "10 days" necessary to submit "discovery material requests denial specifications" and You, Attorney Andrea Cox, must not appear disinterestedly to an unrepresented person and You, Attorney Andrea Cox, must ask for specifications to aforethought discovery material requests and not just frivolously deny them or make condescending statements. (Fla. R. Civ. P. 1.380 – Failure to Make Discovery; Sanctions, Seventh Judicial Circuit Administrative Order CV-22-004-SC, America Bar Associations Model Rules of Professional Conduct Rule 3.4(d) and, American Bar Associations Model Rules of Professional Conduct Rule 4.3 Dealing with Unrepresented Person.)

(1)

(CA25-1784)

Upon reasonable notice to other parties and all persons affected, a party may apply for an order compelling discovery. Fla. R. Civ. P. 1.380(a). If a party fails to timely respond to a discovery request, "the discovering party may move for an order compelling an answer, or a designation or an order compelling inspection, or an order compelling an examination in accordance with the request." Fla. R. Civ. P. 1.380(a)(2). "The motion must include a certification that the movant, in good faith, has conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action." Fla. R. Civ. P. 1.380(a)(2). This is My, Mr. Brandon Tyler Ward's, certification that I made several good faith attempts at gaining the requested discovery materials but, each and every time Attorney Andrea Cox responded condescendingly and disinterestedly. I, Mr. Ward, tried so many times to secure the requested discovery material that I do not think its possible with out a Court Order. (Florida Rule of Civil Procedure 1.280(a)(1)(D) and Federal Rules of Civil Procedure Rule 37(d)(ii)

## Section 2. The requested discovery materials are as follows:

1. Request For Production of Testimony from Johnson and Johnson's Original Lawyer Mr. John Winter esq. in Exhibit 2

2. The January 23rd, 2026, 9:07 AM emails from I, Mr. Brandon Tyler Ward, to Mrs. Andrea Cox esq. that said verbatim, "No worries can You tell me what Your Client's, J&J's, Product Liability Insurance Policy is Liable Up To In Dollars?"

3. The January 27th, 2026, 9:41 AM email with Judicial Assistant Traci Davis that said verbatim,

(2)

(CA25-1784)

"Q.1: Can You, Mrs. Cox esq., ask You Client, J&J, if they will force Attorney John Winter to respond to Request For Defendant Testimony?

 A.1:


Q.2: If You, Mrs. Andrea Cox esq., have any Requests For Production please let me know; Johnson and Johnson's active metabolite Paliperidone from the Risperdal patent from the FDA in 2003 with Your Client, J&J's, Doctor Edward Brann and The FDA's Russell Katz M.D. discusses Cholelithiasis as a side effect in two places on page 20 and on page 21, I was built up from 1mg Paliperidone at Toledo Flower Hospital November 2018 with Dr. Wissam Hotiet and moved to Ohio State Hospital. I was released conditioned on taking 234mg Invega Sustenna Injections monthly until I needed Surgery in April 2019 with Dr. Jason R. Canos III, in Toledo Ohio as well.

A.2:

Q.3: I need an email or another Affidavit that Your, Mrs. Andrea Cox esq.'s, Client, Johnson and Johnson, in immediate observation of Q.2 and the statements therein admit liability, okay?

 A.3:

Q.4: What is Your, Mrs. Cox esq.'s, Client, Johnson and Johnson's, Product Liability Insurance Policy Limit; If They, J&J, have one?

 A.4:

(3)

(CA25-1784)

# Certificate of Service

     I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to all concerned parties of Saint John's County Florida Court Case CA25-1784 by E-filing on My Florida Court Access Government Website on January 29th, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

     _(signature)_ 01/29/2026

 With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com





## Certificate of Service

I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to LUKS, SANTANIELLO, PETRILLO, COHEN & PETERFRIEND via My Florida Court Access Government Website February 2nd, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

02/02/2026

With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com

# Exhibit 9; In Respect of Filing 240746881 and, 240775449 in Case CA25-1784, Saint John's County Florida

1 message

**Brandon Ward** <mrbrandonward556@gmail.com>                                   Tue, Feb 3, 2026 at 6:18 AM
To: pam.bondi@usdoj.gov, jeremy.s.newman@usdoj.gov, james.uthmeier@eog.myflorida.com
Cc: john.guard@myfloridalegal.com, janna.barineau@myfloridalegal.com, jeffrey.desousa@myfloridalegal.com

    My Name is Brandon Tyler Ward, a 100% Permanent and Total Service-Connected Gulf War Era Marksmanship Badge Award-Winning, Almost Expert Infantry Badge Award-Winning Disabled American Army Veteran, 2x Sexual Trauma Survivor and, Whistleblower. I, Mr. Ward, have been trying for 6 weeks to make moves happen in Saint John's County Florida Court Cases.

    Since December 2025, I have been drafting and serving papers, studying law and, trying to garner tons of publicity because of negligence and or public corruption with Mr. Donald John Trump and his Florida Attorney General James Uthmeier. The lower tribunal Judges all seem to be nonchalant for due process but the law specifically states They, First Coast Judges Et. Al., must be prompt, unbiased and, diligent. (Fla. R. Civ. P. 1.380 – Failure to Make Discovery; Sanctions, Seventh Judicial Circuit Administrative Order CV-22-004-SC, America Bar Associations Model Rules of Professional Conduct Rule 3.4(d), American Bar Associations Model Rules of Professional Conduct Rule 4.3, Florida Rule of Civil Procedure 1.280(a)(1)(D), Federal Rules of Civil Procedure Rule 37(d)(ii), Florida Statute 44.102(4), Florida Rules of Civil Procedure Rule 1.431.(d) Peremptory Challenges, Florida Rules of Civil Procedure Rule 1.431.(h) Interview of a Juror, Florida Statute Title V., Chapter 40, Section 50 Jury duty and instructions in civil cases. (2018), Florida Statute 90.404, Florida Statute Title V., Chapter 40, Section 001 Chief judge; authority; duties (2018) and, Federal Rules of Evidence 404.)

    I, Mr. Brandon Tyler Ward, know that with hard work and determination We, The People, of Saint John's County Florida and The United States of America can score the win on injustice any time and any place it arises. I, Mr. Brandon Ward, look forward to working with You all, hearing from You all or, writing for all You. America was founded on helping the weak, the hungry, the tired and, the poor. I, Mr. Ward, sincerely hope You, The Honorable People of The United States of America, will write the Judges and the institutions of power for a change for the Sex Abuse Victims in: Ward V. Trump 2025 Florida Supreme Court. (Florida Statute 440.442(3), F.S.A. Code of Jud. Conduct, Canon 3, Florida Statute 43.26(e) and, Florida Statute 43.42)



**STATE OF FLORIDA
JUDICIAL QUALIFICATIONS
COMMISSION**

Post Office Box 14106
Tallahassee, Florida 32317
Tel: (850) 488-1581
www.floridajqc.com

FOR JQC USE ONLY

**COMPLAINT AGAINST A JUDGE**

---

**INSTRUCTIONS**: This form is designed to provide the Commission with the information required to make an initial evaluation of your complaint and to begin any necessary inquiry or investigation into your allegations.

Please print or type your information onto this form. Any materials or documents that you provide to the Commission will become part of the Commission's files, and will not be returned or copied to you. The Commission will contact you if additional information or materials are needed.

After you complete this form, please sign and date the certification page, and mail it, along with any attachments, to Post Office Box 14106, Tallahassee, Florida 32317. Please be aware that the Commission cannot accept complaints by fax, email, or telephone. You will receive an acknowledgement letter when the Commission has received your complaint. The Commission meets approximately every six weeks, and reviews complaints on a first-come-first-served basis. You will be notified in writing of the outcome of your complaint, subject to the limits of confidentiality.

**IMPORTANT**: **The Judicial Qualifications Commission has no authority to review, reverse, or modify a judge's decision or order, and cannot intervene in any way in a court case.** Similarly, the Commission does not have the authority to remove a judge from your case. Commission staff is not permitted to provide you with any legal advice or opinions.

The Commission has jurisdiction over Justices of the Florida Supreme Court, and Judges of the District Courts of Appeal, County Courts, and Circuit Courts. The Commission does not have jurisdiction over special masters, magistrates, hearing officers (including: traffic hearing officers, worker's compensation hearing officers), administrative law judges, or federal judges.

---

**YOUR CONTACT INFORMATION** (Please print legibly):

Name: Brandon Tyler Ward               Phone Number: _____

Mailing Address: Trump Whistleblower, 4th Amendment

City, State, Zip Code: Adress hidden for safety reasons.

**JUDGE'S INFORMATION:**

Judge's Name: Judge Kenneth Janesk      County: _____

Address: 7th Judicial Circuit In Saint John's County Florida

City, State, Zip Code: _____

1

## CASE INFORMATION

If your complaint involves a court case, please provide the following information.

Case Name: Ward V. J&J, R.Johnson &, J. Tomasir

Case Number (include all letters and numbers): CA25-1800, CA25-1784 and, CA26-0

County: Saint John's County Florida

*If you were represented by an attorney, please provide their contact information.*

Attorney's Name: _____

Address: _____

City, State, Zip Code: _____

Phone: _____

## WITNESS INFORMATION

In this section, provide the names and contact information for any other persons who may have witnessed the improper conduct. (Attach additional sheets if necessary).

1. Name: Megan Lapinski

   Relationship to case: Judicial Assistant

   Phone number: mlapinski@circuit7.org

2. Name: Traci Davis

   Relationship to case: Judicial Assistant

   Phone: tdavis@circuit7.org

## ADDITIONAL DOCUMENTS

Attach copies of any relevant documents which you believe support your claim that the judge has engaged in judicial misconduct or has a disability. Please do not staple or bind documents. **Retain the originals or copies of any documents submitted. All submitted materials become property of the Commission and will not be returned**.

2

**STATEMENT OF FACTS**

Please provide, in as much detail as possible, the information you believe constitutes judicial misconduct or disability. Include names, dates, places, addresses, and telephone numbers which may assist the Commission. <u>Attach additional pages as necessary</u>.

Please see attached PDF entitled, "FJQ.CA26-0045" about lower tribunal criminal negligence and abuse of discretion.

https://youtube.com/@mkbrandotheshow?si=oXX0PDbX2Os_vU8C

With Austere Humility,
Mr. Brandon Tyler Ward
100% Permanent and Total Service-Connected Gulf War Era Marksmanship Badge Award-Winning, Almost Expert Infantry Badge Award-Winning Disabled American Army Veteran, 2x Sexual Trauma Survivor and, Whistleblower

**IN FILING THIS COMPLAINT, I UNDERSTAND THAT FLORIDA LAW REQUIRES THAT COMPLAINTS FILED WITH THE COMMISSION MUST REMAIN CONFIDENTIAL, AND THAT ALL INQUIRIES BEFORE THE COMMISSION ARE CONFIDENTIAL, UNLESS AND UNTIL PROBABLE CAUSE IS DETERMINED AND FORMAL CHARGES ARE FILED.**

UNDER THE PENALTY OF PERJURY, I declare that I have read and understand this complaint form, and the above information is true, correct, complete, and submitted of my own free will.

02/02/2026

Date

Complainant's Signature

*Please note that the Commission only has authority to investigate allegations of judicial misconduct or permanent disability by persons holding state judicial positions. The Commission has no jurisdiction over, and does not consider complaints against, Federal Judges, magistrates, law enforcement, clerks, court personnel, attorneys, etc.*

**The Commission does not act as an appellate court and cannot review, reverse or modify a decision or ruling made by a judge in the course of a court proceeding.**

Please return the completed complaint form by regular US Mail, and direct all future communications, to:

Florida Judicial Qualifications Commission
Post Office Box 14106
Tallahassee, Florida 32317

4

## IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT IN AND FOR ST. JOHN'S COUNTY, FLORIDA

Case Number: CA26-0045

Mr. Brandon Tyler Ward

V.

John A. Tomasino Florida Supreme Court Clerk in Case SC2025-0986,

District Attorney Russell Johnson Represented by Attorney General Jonathan Skrmetti and,

Johnson & Johnson Represented by Attorney Andrea Cox Et. Al.

## "FJQ CA26-0045"

A lot has happened in the past six weeks since I, Mr. Brandon Tyler Ward, opened Saint John's County Court Case CA25-1784 V. Johnson & Johnson for Product Liability

12/19/2025 Civil Cover Sheet

12/22/2025 Case Filed 12/22/2025 Case Number CA25-1784

12/23/2025 Judge Janesk, Kenneth J II: Assigned

1/8/2026 Exhibit 1-FL Statue 69.081 Complaint...PDF 115 Pages Of Opening Arguments, Medical Records And, Patents/Patent-Related Communications

1/15/2026 Affidavit Of Service

Motion for Discovery Judicial Assistant Megan Lapinski and how long I, Mr. Ward, asked Her for a Certificate of Indigency in 2024-2025 and Her not one response back for a whole month!!!

(1)

(FJQ CA26-0045)

1/16/2026 Judge Smith, R. Lee: Assigned

1/22/2026 Notice of Special/Limited Appearance Without Waiving Service; Andrea Cox esq. J&J New Attorney

1/23/2026 Exhibit 5-Email Regarding Undersheriff Yang & John D. Winter Previous Lawyer For Johnson & Johnson Adding To Their Rap Sheet: NY Penal Law 195.05

1/27/2026 Rude Communications From Andrea Cox esq.

1/29/2026 "Acknowledgement Noticing Attorney Andrea Cox's Post Thursday Response To Liability and Damages Questions

1/29/2026 Motion For Order Compelling Discovery Under FLA. R. CIV. P. 1.380 – Failure To Make Discovery; Sanctions

1/30/2026 Email With Intent To Sue J&J Lawyer For Libel

2/2/2026 Tennova ER Medical Records

02/02/2026 Filing #:240769471 Brandon Tyler Ward V Andrea Cox

Will Saint John's County Florida Court Case CA25-1784 go another 4 weeks with zero communication or transparency under new Judicial Assistant Traci Davis, just like Judicial Assistant Megan Lapinski?

Humbly,

02/02/2026

(2)                                                    (FJQ CA26-0045)

# Certificate of Service

I, Mr. Brandon Tyler Ward, certify that a copy hereof has been furnished to LUKS, SANTANIELLO, PETRILLO, COHEN & PETERFRIEND via My Florida Court Access Government Website February 2nd, 2026 and that this Certificate compiles with Florida Rules of Appellate Procedure Rule 9.420(d)(2).

02/02/2026

With Humility,

Mr. Brandon Tyler Ward

100% P&T SC US Army Vet.

mrbrandonward556@gmail.com